## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 6:20-cv-00423-JFH |
| JEFFREY LOWE, | |
| LAUREN LOWE, | |
| GREATER WYNNEWOOD EXOTIC ANIMAL PARK, LLC, and | |
| TIGER KING, LLC, | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

PAGE

INTRODUCTION ................................................................................................................. 1

STATEMENT OF THE CASE............................................................................................... 3

   I. STATUTORY AND REGULATORY BACKGROUND ...................................................... 3

     A. ANIMAL WELFARE ACT............................................................................................ 3

     B. ENDANGERED SPECIES ACT.................................................................................... 4

   II. FACTUAL BACKGROUND............................................................................................ 5

     A. THE LOWES AND GWEAP'S MISTREATMENT AND SUBSTANDARD CARE OF
        ANIMALS AT THE GREATER WYNNEWOOD EXOTIC ANIMAL PARK............. 5

     B. USDA ENFORCEMENT OF THE AWA AT THE WYNNEWOOD FACILITY ...... 12

     C. DEFENDANTS ATTEMPT TO AVOID USDA OVERSIGHT WHILE CONTINUING
        TO EXHIBIT. ............................................................................................................. 13

ARGUMENT ........................................................................................................................ 14

   I. THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS. ........................... 14

     A. THE UNITED STATES IS LIKELY TO SUCCEED ON ITS CLAIM THAT
        DEFENDANTS ARE PLACING THE HEALTH OF THE ANIMALS IN SERIOUS
        DANGER IN VIOLATION OF THE AWA................................................................... 14

       1. DEFENDANTS ARE "EXHIBITORS"................................................................. 15

       2. DEFENDANTS FAIL TO COMPLY WITH AWA REQUIREMENTS ................. 15

     B. THE UNITED STATES IS LIKELY TO SUCCEED ON ITS CLAIMS THAT
        DEFENDANTS HAVE UNLAWFULLY TAKEN ESA-PROTECTED ANIMALS IN
        VIOLATION OF THE ESA............................................................................................ 18

   II. IRREPARABLE HARM IS LIKELY ABSENT AN INJUNCTION. .................................. 22

   III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF
      ENJOINING DEFENDANTS FROM CONTINUING TO PLACE THE HEALTH OF
      ANIMALS IN THEIR CARE, CUSTODY, POSSESSION, OR CONTROL IN SERIOUS
      DANGER. .................................................................................................................... 24

CONCLUSION...................................................................................................................... 25

i

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE

*Babbitt v. Sweet Home Chapter of Ctys. for a Great Or.*,
   515 U.S. 687 (1995).................................................................................. 4

*Big Cat Rescue Corp. v. Schreibvogel*,
   2020 WL 2842845 (W.D. Okla. June 1, 2020)...................................... 12

*First W. Cap. Mgmt. v. Malamed*,
   874 F.3d 1136 (10th Cir. 2017) ...........................................................22

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016) ............................................................ 14

*Forest Guardians v. Babbitt*,
   174 F.3d 1178 (10th Cir. 1999) ......................................................... 22

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
   916 F.3d 792 (10th Cir. 2019) ........................................................... 22

*Hill v. Congress*,
   867 F.3d 499 (4th Cir. 2017) ............................................................... 4

*Kuehl v. Sellner*,
   887 F.3d 845 (8th Cir. 2018) ...................................................... passim

*Kuehl v. Sellner*,
   2016 WL 9114915 (N.D. Iowa July 21, 2016) ................................... 23

*Kuehl v. Sellner*,
   161 F. Supp. 3d 678 (N.D. Iowa 2016)........................................... 2, 19

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
   23 F.3d 1508 (9th Cir. 1994) .................................................. 18, 19, 22

*People for the Ethical Treatment of Animals v. Lowe*, No. 20-cv-1076, Dkt. No. 17 (W.D. Ok.
   Nov. 12, 2020) ..........................................................................6

*People for the Ethical Treatment of Animals v. Tri-State Zoological Park of W. Md., Inc.*,
   424 F. Supp. 3d 404 (D. Md. 2019)............................................. passim

*People for the Ethical Treatment of Animals v. Wildlife in Need and Wildlife in Deed, Inc.*, No.
   4:17-cv-186-RLY-DML, Dkt. Nos. 416-17 ..............................7, 20, 21

*Prairie Band of Potawatomi Indians v. Pierce*,
   253 F.3d 1234 (10th Cir. 2001) ..................................................... 22, 23

*Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*,
   2014 WL 1922234 (E.D.N.C. May 13, 2014) ..................................... 23

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) ......................................................... 22

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978).......................................................................... 24

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981).............................................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................ 14

<u>STATUTES</u>

7 U.S.C. § 2131(1) ......................................................................................... 3, 15

7 U.S.C. § 2131(2) ............................................................................................. 24

7 U.S.C. § 2132(b) ............................................................................................... 3

7 U.S.C. § 2132(h) ...................................................................................... 1, 3, 15

7 U.S.C. § 2133 .................................................................................................... 3

7 U.S.C. § 2140 ............................................................................................. 3, 25

7 U.S.C. § 2143 ...................................................................................................3

7 U.S.C. § 2143(a)(1)-(a)(2)(A) .........................................................................3

7 U.S.C. § 2146(a) .............................................................................................. 3

7 U.S.C. § 2149(a) .......................................................................................... 3, 12

7 U.S.C. § 2149(b) ............................................................................................... 3

7 U.S.C. § 2151 ................................................................................................... 3

7 U.S.C. § 2159 .................................................................................................. 16

7 U.S.C. § 2159(a) .......................................................................................... 4, 14

7 U.S.C. § 2159(b) ..................................................................................... 4, 14, 22

16 U.S.C. § 1532(8) ............................................................................................. 4

16 U.S.C. § 1532(19) ...................................................................................... 4, 18

16 U.S.C. § 1538(a)(1)(G) ...................................................................................4

16 U.S.C. § 1538(a)(1)(B) ...................................................................................4

16 U.S.C. § 1538(b) .............................................................................................4

<u>REGULATIONS</u>

9 C.F.R. § 1.1 ............................................................................................. 1, 3, 16

9 C.F.R. § 2.8 ………………………………………………………….……3, 25

9 C.F.R. § 2.1-2.12................................................................................................3

9 C.F.R. § 2.40(a)(1) .............................................................................. 2, 12, 16, 17

9 C.F.R. § 2.40(a)(2) ..................................................................................... 12, 16

9 C.F.R. § 2.40(b)(4) .......................................................................................................... 18

9 C.F.R. § 2.75(b)(1)-(3) ................................................................................................... 3, 25

50 C.F.R. § 17.11(h) ............................................................................................................ 4

50 C.F.R. § 17.3 ....................................................................................................... 4, 18, 19

50 C.F.R. § 17.21(d) ............................................................................................................ 4

50 C.F.R. § 17.31(a) ............................................................................................................ 4

## FEDERAL  REGUALTIONS

63 Fed. Reg. 48,634 (Sept. 11, 1998) .................................................................................. 4

FEDERAL RULES OF CIVIL PROCEDURE
Fed. R. C. P. 65(d) ……………………………………………………………………………24

**EXHIBIT LIST**

| Exhibit A | Declaration of Brittany Peet ("Decl. Peet") |
|---|---|
| | Attachment 1: PETA's 2018 Request submitted to USDA |
| | Attachment 2: Dkt. No. 378 (Order granting PETA's cross-motion for partial SJ) |
| Exhibit B | New York Times Article, dated |
| Exhibit C | Declaration of Morris Smith ("Decl. Smith") |
| | Attachment: Cameo Exhibition Content |
| Exhibit D | Declaration of Theodore Melott ("Decl. Melott") |
| | Attachment: OnlyFans Exhibition Content |
| Exhibit E | Declaration of Kyle Hogan ("Decl. Hogan") |
| | Attachment 1: OnlyFans statements |
| | Attachment 2: Cameo statements |
| | Attachment 3: filming statements |
| | Attachment 4: future plans to exhibit statements |
| Exhibit F | Declaration of Dr. JoAnne Green ("Decl. Dr. Green") |
| Exhibit G | Declaration of Dr. Jennifer Devine Fritzler ("Decl. Dr. Divine") |
| | Attachment: Dr. Devine's Veterinary Records |
| Exhibit H | Declaration of IES Investigator McLaughlin regarding Dr. Gilmore, 07/01/20 ("Decl. IES Investigator McLaughlin regarding Dr. Gilmore, dated July 1, 2020") |
| Exhibit I | Declaration of Betty Goldentyer ("Decl. Goldentyer") |
| Exhibit J | June 2020 Inspection Report |
| Exhibit K | Declaration of Dr. Laurie Gage ("Decl. Dr. Gage") |
| | Attachment: Dr. Laurie Gage's Curriculum Vitae |
| Exhibit L | Declaration Dr. Joyce Thompson ("Decl. Dr. Thompson") |
| | Attachment 1: Colorado State University "CSU" veterinary records |
| | Attachment 2: September 30, 2020 Video of Nala |
| | Attachment 3: November 18, 2020 Video of Nala |

| Exhibit M | Jeffrey Lowe Affidavit, dated July 8, 2020 |
|---|---|
| Exhibit N | Declaration of Dr. Debbie Cunningham ("Decl. Dr. Cunningham") |
| Exhibit O | Declaration of Pat Craig ("Decl. Craig") |
| Exhibit P | July 2020 Inspection Report |
| Exhibit Q | Declaration of Natalie A. Popovic ("Decl. Popovic") |
| | Attachment:  Ayeesha Necropsy Report |
| Exhibit R | Declaration of Taylor Logan ("Decl. Logan") |
| Exhibit S | Declaration of Hannah Grace ("Decl. Grace") |
| Exhibit T | Declaration of IES Investigator McLaughlin regarding Dr. Gilmore, 09/21/20 ("Decl. IES Investigator McLaughlin regarding Dr. Gilmore, dated September 21, 2020") |
| | Attachment:  Dr. Gilmore's veterinary records |
| Exhibit U | Lauren Lowe's Statement to Garvin County Sheriff's Office |
| Exhibit V | August 21, 2020 Inventory (provided by Lowe) |
| Exhibit W | June 5, 2019 Inventory "page 13 of 22" (provided by Lowe) |
| Exhibit X | Suspension Letter |
| Exhibit Y | Amended USDA Administrative Complaint |

# INTRODUCTION

Defendants Jeffrey and Lauren Lowe, Greater Wynnewood Exotic Animal Park, LLC ("GWEAP"), and Tiger King, LLC recently constructed a zoo in the midst of a rural, residential neighborhood in Thackerville, Oklahoma.  The U.S. Department of Agriculture ("USDA") has never inspected this facility.  It houses approximately 100 to 200 Endangered Species Act ("ESA") protected tigers, lions, lemurs and other animals.  Defendants exhibit there to the public.  Yet, to evade federal inspection and sanction for well-documented animal abuse, cruelty, harm, and harassment, Jeffrey Lowe voluntarily terminated his Animal Welfare Act ("AWA") license 73-C-0230.

Mr. Lowe brags of having "learned a lot about distracting, diverting attention, & using smoke and mirrors in the last few years . . . . If we lose a lawsuit, we simply change the name and open another animal business someplace else, we all have multiple USDA licenses available."  Exhibit ("Exh.") A, Attachment ("Att.") 1, p. 204 (Decl. Peet).  Mr. Lowe is attempting such "smoke and mirrors" now.  The Lowes never stopped exhibiting their animals.  Defendants readily admit that they are displaying their animals to documentary filmmakers at their "Tiger King Park" zoo.[1]  7 U.S.C. § 2132(h); 9 C.F.R. § 1.1.  The Lowes also exhibit online through paid subscription services, including Cameo and OnlyFans.  Exh. C (Decl. Smith) & Att. 1 (Cameo Exhibition Content); Exh. D (Decl. Melott) & Att. 1 (OnlyFans Exhibition Content).  And the Lowes continuously market themselves as animal exhibitors to the public.  The Lowes advertise their animals will soon be available at a new "Tiger King Park."  Exh. E, Att. 4 (Future Plans to Exhibit Statements).  The Lowes sell merchandise, and seek donations, on the premise of this park.  *Id*. at Sub-Att. 4f.  And the Lowes have built a new park for this purpose—including a gift shop for the public.

---

[1]  *See* Exh. B, https://www.nytimes.com/2020/11/20/us/jeffrey-lowe-tiger-king.html (Lowes' attorney statement regarding allowing documentary film crew onto their property) (last visited November 25, 2020); *see also* Exh. E, Att. 3 (filming statements).



The United States is likely to succeed on the merits of its AWA and ESA claims. Defendants have placed the health of animals in their care in "serious danger." They fail to consistently provide adequate food and nutrition required by the AWA. *See Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. 2016), *aff'd* 887 F.3d 845, 852 (8th Cir. 2018). They do not consistently employ an "attending veterinarian" with species-specific training or experience under formal arrangements, nor consistently establish, maintain, and follow a "written program of veterinary care." 9 C.F.R. § 2.40(a)(1). This alone warrants a preliminary injunction. Defendants are also harassing and harming, and thereby taking, ESA-protected Big Cats in violation of the ESA. *See*, *e.g.*, *People for Ethical Treatment of Animals* ("PETA")*, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 424 F. Supp. 3d 404, 412 (D. Md. 2019) ("Tri-State Zoo"), *appeal docketed*, No. 20-1010 (4th Cir. Jan. 7, 2020).

This cruelty, neglect, harassment, and harm is irreparable. And it serves the public interest to stop. The physical and psychological trauma to many animals in the Lowes' possession can never be undone. And, for now, the United States merely seeks to inspect the facility, obtain veterinary and other records relating to the health and safety of the animals, and otherwise maintain the *status quo*. So the balance of harms tips strongly in favor of a preliminary injunction. The United States respectfully asks its motion be granted.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

#### A. Animal Welfare Act

Congress enacted the AWA to, *inter alia*, "insure that animals intended . . . for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131(1). The AWA is administered by the Secretary of Agriculture ("Secretary" or "USDA") through the Administrator of the Animal Plant Health and Inspection Service ("APHIS"). 7 U.S.C. § 2132(b). The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151. The Secretary promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by exhibitors. These include minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extreme weather and temperatures, and adequate veterinary care. *Id.* § 2143(a)(1)-(a)(2)(A).

The AWA defines an "exhibitor" as "any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation, as determined by the Secretary, and such term includes . . . zoos exhibiting such animals whether operated for profit or not." 7 U.S.C. § 2132(h); 9 C.F.R. § 1.1.[2] Exhibitors must obtain and maintain a valid "Class C" license from the USDA. 7 U.S.C. § 2133; 9 C.F.R. §§ 1.1, 2.1-2.12. Exhibitors must also, among others, maintain pertinent records and comply in all respects with the regulations and standards for the humane handling, care, treatment, housing, and transportation of animals. 7 U.S.C. §§ 2140, 2143; 9 C.F.R. §§ 2.8, 2.75(b)(1)-(3).

The AWA directs the Secretary to conduct investigations or inspections as necessary to determine whether any exhibitor has violated or is violating any provision of the AWA or its regulations or standards. "[T]he Secretary shall, at all reasonable times, have access to the places of business and the facilities, animals, and those records required to be kept . . . of any . . . exhibitor. 7 U.S.C. § 2146(a). If the Secretary has reason to believe that any person licensed as

---

[2] "Zoo" is defined by regulation as "any park, building, cage, enclosure, or other structure or premise in which a live animal or animals are kept for public exhibition or viewing, regardless of compensation." 9 C.F.R. § 1.1.

an exhibitor has violated or is violating the AWA or its regulations or standards, he may temporarily suspend the license for up to 21 days, and may seek to revoke the license along with civil penalties after notice and opportunity for hearing.  *Id.* §§ 2149(a)-(b).  If an exhibitor "is placing the health of any animal in serious danger" in violation of the AWA, the Secretary shall notify the Attorney General, who may seek a temporary restraining order or injunction to prevent any such person from operating in violation of the Act's requirements.  7 U.S.C. § 2159(a).  The district court "shall, upon a proper showing, issue a temporary restraining order or injunction under subsection (a) without bond."  *Id.* § 2159(b).

### B.  Endangered Species Act

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Babbitt v. Sweet Home Chapter of Cntys. for a Great Or.*, 515 U.S. 687, 698 (1995) (citation omitted).  Among its protections, it is unlawful for any person to "take" any endangered "species of fish or wildlife."  16 U.S.C. § 1538(a)(1)(B), 50 C.F.R. §§ 17.21(d), 17.31(a).  "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The ESA likewise prohibits the violation of any regulation issued under the ESA pertaining to any species of fish or wildlife listed as threatened.  *Id.* § 1538(a)(1)(G).  These prohibitions apply to fish and wildlife held in captivity or a controlled environment.  *Id.* § 1538(b) (identifying limited exceptions to the ESA Section 9 prohibitions for captive species, none applicable here).  Tigers, lions, and hybrids in zoos are therefore protected by these prohibitions.  50 C.F.R. § 17.11(h) (listing tigers as "endangered" and lions as either "endangered" or "threatened" based upon their subspecies); 16 U.S.C. § 1532(8) (including offspring).

Congress defined the term "take" in the "broadest possible manner."  *Sweet Home,* 515 U.S. at 704-05 (citation omitted).  The term "harm" is defined by regulation as "an act which actually kills or injures wildlife."  50 C.F.R. § 17.3(c)(3).  The term "harass" is "less demanding."  *Hill v. Coggins*, 867 F.3d 499, 511 (4th Cir. 2017).  It requires only an "act *or omission* which creates the likelihood of injury to the wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns *which include, but are not limited to, breeding, feeding, or sheltering*."  50 C.F.R. § 17.3(c) (emphasis added); *see also* 63 Fed. Reg. 48,634, 48,638 (Sept. 11, 1998) ("maintaining animals in inadequate, unsafe or unsanitary conditions, physical mistreatment, and the like constitute harassment because such conditions

4

might create the likelihood of injury or sickness [and] [t]he Act continues to afford protection to listed species that are not being treated in a humane manner"). This captive bred exemption is limited to the definition of "harass," but not other types of takes, such as "harm." *Kuehl*, 887 F.3d at 852. "Furthermore, if a facility fails to meet the standards outlined in the [AWA] regulations, the exemption does not apply." *Id.*

## II. Factual Background

### A. The Lowes and GWEAP's Mistreatment and Substandard Care of Animals at the Greater Wynnewood Exotic Animal Park.

From 2017 until about September 2020, Jeffrey Lowe, together with Lauren Lowe and GWEAP, exhibited numerous wild and exotic animals, including ESA-protected animals, at a roadside zoo known as the Greater Wynnewood Exotic Animal Park in Wynnewood, Oklahoma ("Wynnewood facility").[3] As of August 2020, the Lowes had over 200 animals in their possession, including around 115 ESA-protected animals, including ESA-protected Big Cats, a grizzly bear, and ring-tailed lemurs. Exh. V (Aug. 2020 Inventory Provided by Lowe).

The Lowes and GWEAP exhibited animals at the Wynnewood facility under an AWA exhibitor license individually held by Jeffrey Lowe. *See* Exh. J (June 2020 Inspection Report).[4] On June 22, 2020 and July 8, 2020, APHIS Animal Care Inspectors conducted inspections of the Wynnewood facility and documented numerous AWA violations, including disturbing instances of inhumane treatment and substandard care of animals. Exh. J; Exh. P (July 2020 Inspection Report). Further investigation only served to confirm APHIS's findings.

APHIS's inspections and investigation revealed that since June 2018, Defendants had not employed an attending veterinarian under formal arrangements as required by AWA regulations. Exh. F (Decl. Dr. Green); Exh G, ¶ 3 (Decl. Dr. Devine); Exh. H, ¶¶ 4-5 (Decl. of IES Investigator McLaughlin regarding Dr. Thomas Gilmore 07/01/20). Rather, if Defendants consulted with a veterinarian at all, it was on an "as needed" basis. *See* Exh. H, ¶ 8; Exh. G, ¶ 3. This was often only after the animal had suffered and, at times, resulted in euthanasia due to the delay in seeking care for their animals. Defendants' failure to have an attending veterinarian was devastating for the health of animals.

---

[3] The Wynnewood facility previously was operated by Joe Maldonado-Passage, also known as "Joe Exotic" featured in the Netflix® series "Tiger King: Murder, Mayhem and Madness."
[4] Lauren Lowe and GWEAP operated under Jeffrey Lowe's license.

Attending veterinarians are essential to ensuring appropriate nutrition for animals, especially exotic animals. Exh. I, ¶ 8 (Decl. Goldentyer). Without proper guidance and monitoring by a veterinarian, there is a serious risk of malnutrition. *Id.* Malnutrition and parasitism often co-exist and, without proper medical treatment, can lead to serious medical conditions or death. *Id.* This was the unfortunate result for animals at the Wynnewood facility. It is exemplified by the sickly condition of Big Cats Nala and Ayeesha.

These Big Cats' diets under Defendants' care were so deficient in nutrients that Nala and Ayeesha suffered from numerous fractures, lameness, neurological problems and, in the case of Ayeesha, death. Exh. K, ¶¶ 7-11 (Decl. Dr. Gage); Exh. G, Att. 1 (Dr. Devine's Veterinary Records), p. 238-71 (Nala), p. 336-56, 431-90 (Ayeesha); Exh. Q (Decl. Popovic) & Att. 1 (Ayeesha Necropsy Report).[5] Nala suffered from a Vitamin A and Thiamine deficiency. Exh. L, Att. 1 (CSU Veterinary Record); Exh. K, ¶ 10. Vitamin A deficiencies cause abnormalities in the cranial bones and progressive ataxia, a neurological sign consisting of lack of voluntary coordination of muscle movements and leads to abnormalities in an animal's gait. *See* Exh. K, ¶ 10-11; Exh. L, ¶ 4-14 (Decl. Dr. Thompson). Moreover, during the June 22, 2020 inspection, Nala's body condition was so poor, APHIS inspectors believed her to be a 4-5-month-old juvenile; in fact, she was 10 months old at the time. Exh. J, p. 4. She was "lethargic, depressed, and thin and would not get up out of the mud from the sitting position even after prompting." *Id.* "She had a string of purulent nasal discharge hanging from her right nostril and had an accumulation of green discharge in her eyes. Her respiration was shallow and rapid." *Id.* Due to the dire condition of Nala's health, APHIS stopped the inspection and directed the Lowes get immediate veterinary care for Nala. *Id.*

The Lowes later claimed they had an appointment scheduled with the veterinarian that morning for Nala. Exh. M, p. 3-4 (Affidavit – Jeffrey Lowe). But this was false. Exh. G, ¶ 6; Exh. N, ¶ 4 (Decl. Dr. Cunningham). When Dr. Devine finally saw Nala, she noted that Nala

---

[5] The Lowes filed an objection to PETA's Petition to Perpetuate Evidence, representing that the "21 animals [sent to Tiger Haven at the end of September] are alive and well; they are simply at a different location." *PETA v. Lowe*, No. 20-cv-1076, Dkt. No. 17 (W.D. Ok. Nov. 12, 2020). Defendants appear willing to state whatever it takes to avoid enforcement of federal law. In fact, the evidence shows, at a minimum, that one of those animals—Ayeesha—was in such terrible physical condition when she was transferred to Tiger Haven that she had to be euthanized shortly after her arrival. Exh. Q & Att. 1.

was underweight and the tips of her ears were ulcerated due to parasites and fleas.  Exh. G, Att., p. 250-51.  Dr. Devine diagnosed Nala with an upper respiratory infection, urinary tract infection, and dehydration, for which she administered intravenous fluids.  *Id.* at p. 238.

 

Pursuant to a court order in another case,[6] Nala, along with two other lion cubs, was transferred to a wildlife sanctuary in Colorado in September 2020.  Nala was evaluated by Colorado State University ("CSU").  Exh. L, ¶ 7 & Att. 1.  CSU found that Nala was underweight and undersized for her age.  Exh. L, ¶ 4 & Att. 1.  Nala had difficulty standing and was lame.  Exh. L, ¶ 5 & Att. 1 *see* https://youtu.be/zIy9--KkGIU (Video of Nala upon arrival in Colorado) (last visited Nov. 25, 2020); Exh. A.  Nala was tested for a vitamin A deficiency.  Her level was found to be 0.1 mcg with a low normal level being 90 mcg.  Exh. L, ¶ 10 & Att. 1.  CSU determined that she suffered from historical poor husbandry and her prognosis was fair to poor, pending response to husbandry improvement and healing from fractures.  Exh. L, Att. 1.  Nala also suffers from a chronic fracture of her right humerus.  *Id.*  CSU concluded that her poor body condition was likely due to poor nutrition.  *Id.*

Defendants' inhumane treatment of the lion-tiger hybrid cub Ayeesha was equally disturbing.  Ayeesha was born on October 31, 2019.  Exh. G, Att. 1, p. 336.  Yet, no one noticed the cub was weak, distressed, and unable to nurse until she was finally pulled from her mother on December 24, 2019, at which point she was already suffering from dehydration and malnutrition.

---

[6]  *See* Exh. A (Decl. Peet); *see also PETA v. Wildlife in Need And Wildlife in Deed, Inc.*, No. 4:17-cv-186-RLY-DML, Dkt. Nos. 416-417 (S.D. Ind. Aug. 3, 2020).  In *Wildlife in Need*, the court ordered Timothy Stark to maintain the status quo during an injunction by not disposing of any animals in his possession.  4:17-cv-186, Dkt. No. 239.  In violation of the order, Stark left four neonatal lions with the Lowes, including Nala.  After granting PETA's cross-motion for partial summary judgment, the court entered a permanent injunction terminating Stark's ownership rights, including to the four lions in Lowe's custody.  Exh. A, ¶¶ 3-6, Dkt. No. 379.

*Id.*, p. 338; *see also* Exh. K, ¶¶ 7-9.  Despite this condition, Ayeesha was not scheduled to see a veterinarian until six days later.  At that point, Ayeesha was in such bad condition that she required hospitalization and a feeding tube because she was not eating.  Exh. G, Att. 1, p. 338.

Because Ayeesha had not been provided adequate nutrition or care, all of which could have been timely addressed by an attending veterinarian, her bones did not develop normally and her growth was stunted.  Exh. G, Att., p. 336-56, 431-90; *see also* Exh. K, ¶¶ 7-9.  In June 2020, Ayeesha was 7 months old and weighed 60 pounds (normal weight for a 5-month-old cub).  Exh. G, Att. 1, p. 450.  At 8 months, Ayeesha lost weight to 58.6 pounds.  *Id.*, p. 452.  At that point, in July 2020, she was diagnosed with metabolic bone disease[7] and had bilateral distal femoral fractures, humeral fractures, and diffuse osteopenia; "[n]utritional intervention [was] considered essential."  *Id.*, p. 474.  She also had roundworms.  *Id.*, p. 459.  After failing to heed the advice of their consulting veterinarian to keep Ayeesha in a medical hold and instead placing her in an outdoor enclosure, Ayeesha suffered from an additional fracture.  Exh. G, ¶ 10; Exh. N, ¶ 5 (Decl. Dr. Cunningham).  By the end of September 2020, the situation had become grave.  Defendants took Ayeesha to see a consulting veterinarian because she was not eating and was immobile.  Dr. Devine found maggots on her rectal area.  Exh. G, Att. 1, p. 459, 461, 467. The Lowes transported Ayeesha to Tiger Haven in Tennessee.  Ayeesha was euthanized there shortly after her arrival.  Exh. Q & Att. 1.

At the June 22, 2020 inspection, APHIS inspectors also observed that Gizzy, a female grizzly bear was emaciated and exhibiting a heightened and aggressive activity level.  Exh. J, p. 4-5.  "The spinous processes of the vertebral bodies and hip bones [were] easily visible."  *Id.* The APHIS inspector noted that proper nutrition is key in maintaining bear health and that other factors, such as internal parasites, must be ruled out.  *Id.*, p. 5.  The APHIS inspector, when citing Lowe for failing to have an attending veterinarian provide adequate veterinary care, mandated that Lowe communicate Gizzy's "sub-optimal conditions" to the attending veterinarian and have him or her observe Gizzy.  *Id.*  The Lowes, however did not have an attending veterinarian to communicate these "sub-optimal conditions" to.  *Id.*  Indeed, there is no

---

[7] This condition, caused by Big Cats being fed calcium-deficient diets, causes the Big Cats' bones to become weak and susceptible to fractures, animals to become lame, and may result in serious neurological problems that, if caught late, cannot be reversed.  Exh. K, ¶ 8.

indication that between the initial June 22 inspection and October 4, 2020, Gizzy was evaluated in person by any veterinarian.  In early October, when Gizzy was transported to a sanctuary in Colorado, she was still underweight and exhibited ravenous eating behavior.  Exh. O, ¶ 6 (Decl. Craig); Exh. L, ¶ 16.  Since she arrived at the Colorado sanctuary, Gizzy has been fed an appropriate diet and has been allowed to eat until satiation.  Exh. L, ¶ 16; Exh. R (Decl. Logan) (updated photos of Gizzy).

 

Defendants' failure to employ an attending veterinarian also resulted in the death of at least two pregnant tigers:  Dot and Mama.  An attending veterinarian is essential to proactively monitoring and identifying medical problems in vulnerable animals, including pregnant animals, in order to avoid unnecessary complications or adverse health outcomes.  Exh. I, ¶ 9.  Between the ages of two and five, Defendants bred Dot five times.  Exh. G, Att., p. 169.  The final three litters resulted in stillbirths.  *Id.*  Although it is uncommon for tigers to have a litter of stillborn cubs, Defendants continued to breed Dot.  Exh. K, ¶ 6.  "When more than one set of stillborn cubs was born to this female, this would have been alarming to any conscientious animal manager because it strongly suggests the tiger likely could not produce normal litters and that measures should be taken to protect the health of the tiger by ensuring that the tiger never becomes pregnant again."  *Id.*  The Lowes only sought treatment for Dot when she required an emergency ovariohysterectomy after the last litter of stillborns.  Exh. G, Att. p. 170.  Dot died two days later on June 21, 2020, as a result of complications from the surgery.  *Id.*, p. 170-74; Exh. K, ¶ 6.

A similar fate befell a tiger named Mama when she was struggling to give birth. Although tigers typically give birth to their entire litter in 1-2 hours, Defendants allowed Mama

to continue with labor for 48 hours before calling a consulting veterinarian to examine and treat her.  Exh. G, Att. p. 94-96; Exh. K, ¶ 5.  Forty-eight hours is an unreasonable length of time to fail to delay veterinary care for a tiger in labor.  Exh. K, ¶ 5.  Instead of seeking appropriate care, Defendants took her veterinary care into their own hands and gave Mama three doses of oxytocin that they obtained from an equine breeding facility.  Exh. G, ¶ 8 & Att. p. 94.  When oxytocin is given to an animal that has not produced a fetus after a certain amount of time, the hormone may increase the risk of uterine rupture.  Exh. K, ¶ 5.  As a result of their delay and decision to act without qualified veterinary oversight, Mama's uterus ruptured, causing sepsis.  Exh. K, ¶ 5; Exh. G, Att. p. 94-95.  Unfortunately, the tiger had to be euthanized.  *Id.*  An attending veterinarian would proactively monitor the situation and timely conduct a C-section to save Mama's life and the lives of her offspring   Instead, by the time Defendants contacted a consulting veterinarian, it was too late.  *Id.*

Defendants' use of consulting veterinarians on an *ad hoc* basis—particularly with the animals' health so poor—often means that nothing can be done except to euthanize.  In another example, Lizzie, an 11-year-old tiger, suffered from a subluxated disc, which caused her to have significant mobility issues.  Exh. G, Att. p. 103-11.  Over the course of about a month, Lizzie went from being lame in one limb to being immobile with wounds on her rear limbs going down to the bone.  Exh. K, ¶ 14; Exh. G, Att. p. 103-04, 110-11.  By the time Defendants had a veterinarian treat her, Lizzie was unable to use her back legs.  *Id.* at 110-11.  Concerned about sepsis due to the wounds, the consulting veterinarian euthanized her.  *Id.*  "If the problem had been diagnosed early, surgery is often a viable choice, or euthanasia may have been the other alternative, which, had it been done early in this disease, would have prevented this tiger from more than a month of unnecessary suffering."  Exh. K, ¶ 14.

Promise, a 12 year old tiger, had been declining for about a month before the Lowes sought treatment for him.  Exh. G, Att. p. 43-55; Exh. T, ¶ 5(b)(viii) (Decl. IES Investigator McLaughlin regarding Dr. Gilmore, September 21, 2020) & Att. p. 15, 38-39 (veterinary records).  Defendants attempted to treat him with cannabidiol ("CBD") oil, which was not recommended by the veterinarians occasionally consulted.  Exh. G, ¶ 7 & Att. p. 49; Exh. H, ¶ 5.  Promise was unable to walk for two weeks and had large pressure sores on both hips and left stifle before Defendants finally sought veterinary treatment for him.  Exh. G, Att. p. 43-55; Exh. T, Att. p. 38-39.  By that time, the steroids he was given were insufficient.  Promise had to be

10

euthanized a few days later.  Exh. T, Att. p. 39.  Instead of delaying veterinary care until the prognosis was poor, an attending veterinarian should have examined Promise when the problem first occurred.  Exh. K, ¶ 15.

Lack of an attending veterinarian with experience or training in Big Cats similarly resulted in the untimely death of at least two Big Cats apparently suffering from renal failure: Petunia and Young Yi.  Renal failure is typically a treatable condition and does not often lead to death in younger Big Cats.  Exh. K, ¶ 12 (Decl. Dr. Gage).  In March 2019, Petunia, a 5-6-year-old female tiger, was euthanized, apparently for renal failure.  Exh. G, Att. p. 81-82; Exh. T, Att. p. 31.  Defendants treated her with CBD oil, which was not recommended by the veterinarians who occasionally treated the Defendants' Big Cats.  Exh. G, ¶11; Exh. H, ¶ 5.  Defendants eventually contacted the veterinarian.  Petunia was "pretty lethargic" and was not eating.  Exh. G, Att. p. 82.  That veterinarian was out of town at the time, so the veterinary hospital recommended consultation with Oklahoma State University.  *Id.*  Instead, Defendants relied on a food animal vet, who cares for other animals raised for food production.  Exh. T, Att. p. 31.  Petunia died a few days later.  Exh. T, Att. p. 31.

Similarly, Young Yi, a lion-tiger hybrid, also did not receive timely veterinary care.  Young Yi died on or around June 13, 2020, at the age of 12, purportedly from renal failure.  Exh. J, p.2.  The Lowes provided to APHIS three falsified veterinary records, dated July 14, 2019, September 14, 2019, and May 18, 2020.  Exh. G, ¶ 11.  No other records reflect Young Yi was examined or treated by any veterinarian before his death, despite exhibiting signs of illness.  *See* Exh. J, p.2 (neither consulting veterinarian that occasionally treated Defendants' animals treated Young Yi).  Defendants told APHIS inspectors during the June 22, 2020 inspection that Young Yi was 17 years old.  *Id.*  However, the Lowes provided documentation to USDA a year earlier indicating that Young Yi was born in August 2007, making him only 12 years old, which is still young for a tiger to die from renal failure.  Exh. W (June 5, 2019 Inventory "page 12 of 22").

Guidance from a qualified attending veterinarian also is vital to ensuring that the animals are properly handled and sedated.  Errors can result in the death of the animal, as it did with a female lion-tiger hybrid as recently as October 3, 2020.  Exh. I, ¶ 9; Exh. O, ¶ 6.  On or around October 3, 2020, Defendants hired a veterinarian with no experience handling or treating Big Cats to assist with moving animals from the Wynnewood facility to the Thackerville facility.  Defendants tranquilized a number of Big Cats and failed to monitor their condition.  Exh. O, ¶ 6.

In the case of one female lion-tiger hybrid, Defendants' failure to closely monitor the hybrid after darting her three times with tranquilizers and to timely administer a reversing agent, resulted in her overdosing on tranquilizers and dying.  *Id.*  Jeffrey Lowe and the consulting veterinarian neither stayed to monitor her condition nor had a reversal agent nearby for timely administration.  *Id.*  By the time the consulting veterinarian returned from the parking lot with the necessary reversal drug, it was too late:  the hybrid was not breathing and her eyes were fixed and dilated.  *Id.*  At least one female lion-tiger hybrid died.

Notwithstanding their abysmal record, Defendants do not have a written program of veterinary care that they established and maintain with an attending veterinarian.  The requirements that the exhibitor, together with the attending veterinarian, develop and follow a program of veterinary care and that the attending veterinarian conduct regularly scheduled visits ensures the adequacy of all aspects of the care provided to the animals.  *See* 9 C.F.R. § 2.40(a)(1)-(2).  The APHIS inspectors found that Jeffrey Lowe was not following any program of veterinary care.  Exh. P, p. 1.

### B.   USDA Enforcement of the AWA at the Wynnewood Facility

In view of the above documented violations, by letter dated August 14, 2020, the APHIS Administrator suspended Jeffrey Lowe's license (73-C-0230) for 21 days, effective immediately after service of the suspension letter, pursuant to 7 U.S.C. § 2149(a).  Exh. X.  The suspension letter advised Jeffrey Lowe that it was then a violation of the AWA regulations to buy, sell, transport, exhibit, or deliver for transportation, any "animal," as the term is defined in the AWA and regulations, during the period of suspension and that in addition to Jeffrey Lowe.  *Id.*  This applied to any employee, agent or other person acting on his behalf.  *Id.*  On August 17, 2020, USDA filed an administrative complaint seeking permanent revocation of Jeffrey Lowe's AWA license and imposition of civil penalties.  Exh. Y (Amended Administrative Complaint).  Lauren Lowe does not have a USDA Class C exhibitor license. https://www.aphis.usda.gov/animal_welfare/downloads/List-of-Active-Licensees-and-Registrants.pdf (List of Active Licensees under the AWA) (last visited Nov. 24, 2020).  In response to the suspension and administrative action, Jeffrey Lowe voluntarily terminated his USDA Class C exhibitor license on August 21, 2020. USDA filed an amended administrative complaint on October 26, 2020.  Exh. Y.  The USDA administrative action is still ongoing.

### C.      Defendants Attempt to Avoid USDA Oversight While Continuing to Exhibit.

At the end of September 2020, Defendants were required to vacate the premises in Wynnewood, Oklahoma per a court order from the Western District of Oklahoma.  *Big Cat Rescue Corp. v. Schreibvogel*, No. 16-cv-155-SLP, 2020 WL 2842845 (W.D. Okla. June 1, 2020).  Defendants moved anywhere from 100 to 200 animals to a new unlicensed facility located on a 33-acre parcel of land in Thackerville, Oklahoma, which they have dubbed "Tiger King Park" ("Thackerville facility").[8]  Previously, Mr. Lowe declared to representatives of PETA that he would utilize evasive tactics, if necessary, to avoid legal liability for his conduct.  In an email, Lowe wrote:

> I've learned a lot about distracting, diverting attention, & using smoke and mirrors in the last few years. … I promise you that guys like, me, Joe or Tim Stark will never roll over and give up. If we lose a lawsuit, we simply change the name and open another animal business someplace else, we all have multiple USDA licenses available. Or better yet, we all negotiate with Indians to put zoo's inside their reservations and live displays in their casinos like I've been doing. That takes the USDA out of the equation entirely.

Exh. A, Att. 1, p. 204 (Decl. Peet).

Although Mr. Lowe surrendered his USDA license and since claimed he is no longer an exhibitor, in public statements, including on the Internet, the Lowes have declared that the facility will operate for the foreseeable future as a film set.  Exh. E, Att. 3.  This will exhibit Tiger King-related content and that Tiger King programming has been and will be available to the public through the paid subscription service Netflix®.  *Id.*  The Lowes also exhibit animals, including lions and tigers, through paid online platforms such as "shout out" videos on the video-sharing platform, Cameo, and the paid subscription online platform "OnlyFans."  Exh. C, Att. 1; Exh. D, Att. 1.  Other webpages advertise Tiger King Park apparel and other merchandise for sale and exhort the public to purchase the merchandise to "Support the New Tiger King Park opening 2021!"  Exh. E, Att. 4.  This new facility with hundreds of animals is located in the midst of a rural, residential area.  Neighboring homes surround the facility on all sides.

---

[8]  On May 15, 2020, Tiger King, LLC was registered with the trade name "Tiger King Park" as an Oklahoma limited liability company with its principal place of business identified as the address of the facility in Thackerville.



**ARGUMENT**

The United States is entitled to a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), *accord Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). Because the United States demonstrates all four requirements, the Court should grant the preliminary injunction.

**I.     The United States Is Likely To Succeed On The Merits.**

The United States will succeed in proving that Defendants are violating the law. First, the Lowes place animals in serious danger by failing to consistently maintain an attending veterinarian, and otherwise failing to provide appropriate food and care required by the AWA. *Kuehl*, 887 F.3d at 852. Second, the Lowes "take"—by both "harm" and "harassment"—ESA-protected animal species in violation of the ESA. *Tri-State Zoo*, 424 F. Supp. 3d at 412.

**A.  The United States Is Likely to Succeed on its Claim that Defendants Are Placing the Health of the Animals in Serious Danger in Violation of the AWA.**

The AWA provides that district courts shall issue an injunction upon a showing that an exhibitor is placing an animal's health in serious danger in violation of the AWA, its regulations, or standards. 7 U.S.C. § 2159(a), (b). As detailed above, Defendants are exhibitors that have amassed a long list of AWA violations. These have not just placed the health of animals under their care in serious danger. Many times, it resulted in actual death. While the Lowes have shut

out USDA and moved their operations to a new "Tiger King Park" to evade federal oversight, *see, e.g.,* Exh. A, Att. 1 at 197, the Lowes' consistent, abysmal track record of animal mistreatment and AWA violations—as recently as October—leaves no doubt these violations of law continue.

### 1.   Defendants Are "Exhibitors."

Defendants have been and continue to be exhibitors within the meaning of the AWA. Until August 2020, Jeffrey Lowe indisputably held an AWA exhibitor license. And, while Jeffrey Lowe has since relinquished that license in the mistaken belief that doing so would put him beyond AWA jurisdiction, *id.*, the only thing that changed as a factual matter is that Mr. Lowe went from being a licensed exhibitor to an unlicensed exhibitor.

Defendants continue to exhibit animals to the public for profit through various means. These include to a film crew, *see* Exh. E, Att. 3, and through online paid subscription services, including Cameo and OnlyFans. Exh. C, Att. 1 (Cameo exhibition); Exh. D, Att. 1 (OnlyFans exhibition). The Lowes represent themselves as exhibitors to the public on the Internet. They solicit public compensation for the new Thackerville facility. Exh. E. And the Lowes advertise that they will resume in-person exhibition for compensation when construction is completed. The Lowes simply temporarily paused much of the in-person exhibition due to the need to move to a new facility (and to evade the USDA). While Defendants may have relinquished their formal license, they still must meet the statutory requirements for the business of exhibition under the AWA. *See* 7 U.S.C. § 2131(1) (AWA purposes is to "insure that animals *intended* . . . for exhibition purposes . . . are provided humane  care and treatment") (emphasis added). The statute contains no distinctions or caveats based on whether the public exhibition is via in-person visiting to zoos on through some other exhibition method. *See* 7 U.S.C. § 2132(h).

### 2.   Defendants Fail To Comply With AWA Requirements.

Defendants have repeatedly failed to comply with the AWA, including the requirements governing the humane handling, care, treatment, and transportation by exhibitors. This not only put the health of animals in "serious danger," it repeatedly resulted in actual death.

A program of adequate veterinary care is a cornerstone of the AWA regulatory program to assure humane care and treatment for animals. Exh. I, ¶ 5. Each exhibitor shall have an "attending veterinarian," who must have "appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use." 9 C.F.R. § 2.40(a)(2). The attending veterinarian must also have training and/or experience in the care and management of the specific species being attended and have direct or delegated authority for activities involving animals at the facility. *Id.* § 1.1. It is essential to protect the health and welfare of animals that exhibitors have an established relationship with an attending veterinarian, who has the knowledge and authority to protect the animals' health and well-being. Exh. I, ¶ 5.

As chronicled above, Defendants failed to consistently employ an "attending veterinarian" under formal arrangements that includes "a written program of veterinary care and regularly scheduled visits" to the zoo. 9 C.F.R. § 2.40(a)(1). In response to the United States' complaint, Defendants might claim to have one available now. This would be nothing more than Lowe's "smoke and mirrors." Exh. A, Att. p. 197. The cumulative evidence of Mr. Lowe's past habit and abysmal business practices proves that whatever care Defendants might claim to provide, their activities are (and will be) insufficient under the AWA.

Since June 2018, Defendants have not consistently employed an attending veterinarian under formal arrangements. 9 C.F.R. § 2.40(a)(1) (requiring "formal arrangements"); Exh. F; Exh G, ¶ 3; Exh. H, ¶¶ 4-5. And even when Defendants consulted with veterinarians, delay in seeking veterinary care often caused the animal to suffer and at times necessitated euthanasia. *See* Exh. H, ¶¶ 8-9; Exh G, ¶ 3 (Decl. Dr. Devine).[9] *See Tri-State Zoo*, 424 F. Supp. 3d at 412 (finding inadequate veterinary care when the veterinarian did not have species-specific training or experience); *see* 9 C.F.R. §§ 1.1, 2.40(a). Defendants' failure to have an attending veterinarian places the health of the animals in their care, custody, possession or control in "serious danger." Exh. I, ¶ ¶ 10-12. This warrants the requested injunction under 7 U.S.C. § 2159.

---

[9] Further, it is unlikely that either of the consulting veterinarians would meet the regulatory requirements for an attending veterinarian. *See Tri-State Zoo*, 424 F. Supp. 3d at 412 (finding inadequate veterinary care when the veterinarian did not have species-specific training or experience); *see* 9 C.F.R. §§ 1.1, 2.40(a).

Defendants' animals have suffered from easily preventable or treatable conditions, which frequently have caused their untimely death. Exh. K, ¶¶ 4, 8, 10; *see generally* Exh. L. This includes the animals being malnourished. Attending veterinarians are essential to ensuring appropriate nutrition for animals, especially exotic animals. Exh. I, ¶ 8. Without proper guidance and monitoring by a veterinarian, there is a serious risk of malnutrition. *Id.* Malnutrition and parasitism often co-exist and, without proper medical treatment, can lead to serious medical conditions or death. *Id.* As set out above, Defendants' failure in this regard caused serious adverse and deadly health conditions for animals in their case which would have been preventable under the AWA's standards.

Similarly sad, yet predictable, outcomes, arose from Defendants' failure to employ an attending veterinarian to proactively monitor and identify medical problems in vulnerable animals, including pregnant animals. Exh. I, ¶ 9; *see supra* at (describing suffering and death of animals arising from failing to properly care for pregnant and other vulnerable animals). Defendants' failure to comply with AWA requirements for properly handling and sedating animals for transport also resulted in the death of a female lion-tiger hybrid as recently as October 3, 2020. In short, as the USDA's experts attest hereto and the additional evidence shows, Defendants are placing the health of animals in their care in serious danger in violation of the AWA.

AWA regulations also require that each exhibitor establish and maintain with the attending veterinarian written programs of adequate veterinary care. 9 C.F.R. § 2.40(a)(1) Adequate veterinary medical care for animals requires a program of preventive care, a plan for emergency care, and guidance to personnel who care for the animals. Exh. I, ¶ 5. Without a proper program of veterinary care compiled by an attending veterinarian, who provides preventive care, emergency care, and guidance, animals are at risk of preventable diseases and injury, untreated medical conditions, and inappropriate and inadequate care and husbandry. *Id.* Yet, Defendants do not have a written program of veterinary care that they established and maintain with an attending veterinarian. Exh. J, p. 1 (finding that Jeffrey Lowe was not following any program of veterinary care). This, too, has placed and continues to place the health of the animals in their care, custody, possession, or control in serious danger. Exh. I, ¶ 5; *see Tri-State Zoo*, 424 F. Supp. 3d at 412 (finding inadequate veterinarian care when the exhibitor and veterinarian "utterly failed to implement a satisfactory program of veterinary care

17

for the lions, tigers, and lemurs").

As detailed above, had a program of veterinary care been in place and followed, someone would have noticed and reported to the attending veterinarian that Nala was underweight, lethargic, and having respiratory problems.  Or, seen that Ayeesha was weak, distressed, and unable to nurse.  Mama was abnormally laboring.  And, Lizzie was dragging her back legs before it caused wounds down to her bone.  Petunia could not walk.  Similarly, an adequate program should have guided personnel involved with the care and use of animals regarding handling, and tranquilization.  9 C.F.R. § 2.40(b)(4).  Had this guidance been in place and followed, the improper tranquilization of the female lion-tiger hybrid—as recently as October 3, 2020—which resulted in her death, could have been prevented.  And the sad stories of Gizzy, and Dot, and Promise, and Young Yi are equally bad.

In sum, had Defendants maintained required programs of veterinary care, many of the harms their animals suffered, including death, could have been avoided.  And there is no reason to believe that any protestation to the contrary by the Lowes now is anything but their smoke and mirrors.  *See Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 (9th Cir. 1994) ("Past takings are indeed instructive, especially if there is evidence that future similar takings are likely").  The United States will succeed in showing that Defendants' longstanding failure to establish and maintain a program of veterinary care, among many other regulations, has placed and continues to place the health of animals in serious danger and violates the AWA.  Exh. I, ¶ 5; *see Tri-State Zoo*, 424 F. Supp. 3d at 412 (finding inadequate veterinarian care when the exhibitor and veterinarian "utterly failed to implement a satisfactory program of veterinary care for the lions, tigers, and lemurs"); *Kuehl*, 887 F.3d at 852.

### B. The United States Is Likely to Succeed on its Claims that Defendants Have Unlawfully Taken ESA-Protected Animals In Violation of the ESA.

The United States also is likely to succeed on its claims that Defendants have taken ESA-protected species, in particular ESA-protected lions, tigers, and hybrids (collectively "ESA-protected Big Cats"), in violation of the ESA.  ESA "take" includes "harm" and "harass."  16 U.S.C. § 1532(19).  Harm is further defined by regulation as an act which "kills or injures" an endangered or threatened animal.  50 C.F.R. § 17.3.  "Harass" is defined by regulation to include an "intentional or negligent act or omission which creates a likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which

include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3;[10] *see also Kuehl*, 161 F. Supp. 3d at 716 ("Any act which injures a protected animal constitutes 'harm' within the definition of 'take' in the [ESA]") (citation omitted). Here, the evidence overwhelmingly demonstrates that Defendants actually injured or killed ESA-protected Big Cats, and thereby have taken these animals through both harm and harassment in numerous ways.

As detailed above, Defendants' inadequate care harmed the lion cubs, including Nala. She was malnourished, underweight, and developmentally stunted. Exh. L ¶¶ 4-11 & Att. 1; Exh. J, p. 3-4; Exh. G, Att. 1, p. 238-71; Exh. K, ¶¶ 10-11. She and other animals were provided with nutrient-deficient diets, which caused them extraordinary suffering. *See Tri-State Zoo*, 424 F. Supp. 3d at 419-20 (finding that "the Big Cats were not provided 'basic nutritional needs', the absence of which results in skeletal, structural damage, neurological problems, or other potentially irreversible health problems including death") (citations omitted). Indeed, Nala was ataxic, which is a neurological sign consisting of lack of voluntary coordination of muscle movements that leads to abnormalities in an animal's gait. Exh. K, ¶¶ 10-11; Exh. L, Att. 1. This aspect of Nala's condition is apparent in the following video taken shortly after the animal's arrival at Wild Animal Sanctuary in Colorado, entitled, Lion Rescued From Jeff Lowe Can Barely Walk: https://youtu.be/zIy9--KkGIU (last visited Nov. 24, 2020), where she struggles to even walk. *See* Exh. A, ¶¶ 7-9 (Decl. Peet). She also suffered from several painful fractures and immediately was prescribed pain medication after being taken out of Defendants' care. Exh. L, Att. 1.

Defendants' failure to provide adequate nutrition and care, resulting in metabolic bone disease, neurological abnormalities, fractures, lameness, and even death harms ESA-protected Big Cat. These harms, even to ESA-protected species in captivity, constitute an unlawful take under the ESA. *See Nat'l Wildlife Fed'n*, 23 F.3d at 1512. And there can be no doubt this misconduct has occurred and will continue.

Defendants also harm and harass, and thereby take, ESA-protected Big Cats by failing to provide adequate and timely veterinarian care. *See*, *supra*, at 5-12. As detailed above, at least

---

[10] The regulatory definition provides that when applied to captive wildlife, "harass" does not include generally accepted animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act. 50 C.F.R. § 17.3. As shown above, Defendants practices do not meet AWA standards.

seven Big Cats—Lizzie, Promise, Petunia, Young Yi, Dot, and Mama, and a female hybrid—
died from Defendants' inadequate and insufficient veterinarian care.[11]  *See Kuehl v. Sellner*, 887
F.3d at 845 (holding that a roadside zoo harmed tigers by failing to provide them with adequate
veterinary care, which "delayed or prevented adequate treatment, thus resulting in 'injury' to the
tigers.").

       Defendants also subjected ESA-protected Big Cats to harm by unsanitary conditions.
These included improper or delayed disposal of decomposing carcasses, attracting large numbers
of flies, which then attack the Big Cats—leaving painful fly strike ulcerations on the animals.

 

At the June 2020 inspection, APHIS inspectors found a large pile of wood debris in the back.  It
contained the partially burned carcass of Young Yi, with a black tarp covering the deceased tiger
Dot.  Exh. J, p. 5.  There was "a foul odor of decomposing flesh and many flies present on the
Board and surrounding areas."  *Id.*  The flies thus caused fly strikes, which are "large patches of

---

[11] Around August 2020, a young lion named Kahari died at the Wynnewood facility under
suspicious circumstances.  *See* Exh. A, ¶ 6 (Decl. Peet).  The Lowes filed a notice with the
Indiana Court in which they described an incredible story in which someone broke into their
Wynnewood facility and killed only Kahari several weeks before the Court ordered the Lowes to
account for the whereabouts of the lion so that she could be transferred to a sanctuary along with
Nala and two other lions.  *See id.*  In that notice, the Lowes conveniently state that the break-in
occurred the night before Kahari was found dead and that "[i]t is suspected whoever kicked in
the door into the animal nursery also shot or otherwise caused a dart to inject poison into the
lion."  *PETA*, No. 17-cv-186, Dkt. 420 ¶ 4.  Just three days before the notice was filed, Lauren
Lowe made a statement to the Garvin County Sheriff's Office, stating that "[a] couple days *after*
Kahari's passing our zoo nursery was broken into with the door kicked in."  Exh. U, p. 1 (Lauren
Lowe Statement) (emphasis added).  Although we cannot definitively state the cause of Kahari's
death, we do know the Lowes are willing to concoct stories to explain away the deaths of
animals at their zoo.  *See* Exh. A, ¶ 6 (Decl. Peet) (referring to evidence presented in the Indiana
case, which undercuts the Lowes' story on the death of Kahari).

painful ulceration on the ears and legs," on many species, including Big Cats. *Id.* The ulcerated areas were red, scabbed, and some "exuded pus or fresher blood." *Id.*; *see also PETA v. Wildlife in Need and Wildlife in Deed, Inc.*, No. 4:17-cv-186-RLY-DML, Dkt. No. 408-12 (S.D. Ind. Aug. 3, 2020) (Decl. Grace with fly strike photos, June 21, 2020). Even assuming, *arguendo*, that this did not constitute harm, this certainly constitutes harassment. *Kuehl*, 887 F.3d at 853-54 (finding unsanitary conditions at roadside zoo constituted harassment); *Tri-State Zoo*, 424 F. Supp. 3d at 431 (same).

Defendants have also failed to maintain sanitary conditions with regard to their storage of meat fed to their animals. During the July 8, 2020 inspection, the APHIS inspectors noticed an odor of decaying flesh. Exh. P, p. 4. When questioned about the odor, the Wynnewood facility representative identified a broken down refrigerator truck. The temperature inside the truck was greater than 85 degrees Fahrenheit. *Id.* The truck contained open boxes of rotting meat. *Id.* at 11 & 13.

 

Yet the Wynnewood facility had no other on-site refrigeration or freezer in which to store meat for the animals. *Id.* at 4. Weeks later during another visit to the Wynnewood facility, the APHIS inspectors observed a large amount of packaged chicken sitting in the sun surrounded by flies. Exh. N, ¶ 7. There was no doubt Defendants intended this rotting food for the animals.

These unsanitary conditions similarly harassed, if not harmed, the ESA-protected Big Cats by attracting flies, which then attack the animals. Also, the fact that the Lowes on multiple occasions within a short period of time failed to store meat properly calls into question whether the Lowes ever consistently ensure that the food they provide to ESA-protected animals is free from contamination and of sufficient quality to maintain all animals in good health.

In sum, there is extensive evidence that Defendants harmed and harassed ESA-protected Big Cats in violation of the ESA take prohibition. The United States will succeed on the merits.

**II.  Irreparable Harm Is Likely Absent An Injunction.**

Defendants' continued unlawful exhibition of animals—both through paid online platforms like Cameo and OnlyFans, and to in-person film crews—without federal oversight or compliance is creating irreparable harm to the animals in Defendants' possession.  This harm, harassment, and inadequate care is certain to continue absent a preliminary injunction.  *See*, *e.g.*, *Nat'l Wildlife Fed'n*, 23 F.3d at 1512.

Under the AWA, once a showing is made that an exhibitor is placing the health of any animal in serious danger in violation of the AWA's requirements, the Court must issue an injunction to restrain the violations. 7 U.S.C. § 2159(b) ("The court *shall*, upon a proper showing, issue a temporary restraining order or injunction under subsection (a) without bond.") (emphasis added); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) ("The Supreme Court and this circuit have made clear that when a statute uses the word 'shall,' Congress imposed a mandatory duty upon the subject of the command.") (citation omitted).  In other words, the statute mandates injunctive relief as a remedy for a violation of the statute, regulations, or standards that results in serious danger to the health of an animal.  In this circumstance, courts may presume irreparable injury.  *See First W. Cap. Mgmt. v. Malamed*, 874 F.3d 1136, 1140 (10th Cir. 2017) (holding that "[c]ourts may presume irreparable harm only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy for a violation of the statute).  As the Tenth Circuit has noted, "[w]hen Congress passes such a statute, it effectively withdraws the courts' traditional discretion to determine whether such relief is warranted."  *Id.*  Because the United States demonstrates that Defendants placed and are placing the health of the animals in their care, custody, possession, and control in serious danger, *see supra*, irreparable injury is presumed.

Regardless, placing the animals' health in serious danger, as well as taking ESA-protected Big Cats, constitutes irreparable harm for which there is no adequate remedy in law.  To show a threat of irreparable harm, a plaintiff must demonstrate "a significant risk" of harm "that cannot be compensated after the fact by monetary damages."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial."  *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019).  Irreparable harm also occurs if "the district court cannot remedy [the injury] following a final determination on the

merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

Here, as demonstrated above, Defendants' actions have a significant risk of injuring or even killing the animals in their care, custody, possession, or control. There is no evidence that this longstanding misconduct will abate voluntarily. This is not the type of injury that can be compensated after the fact by monetary damages. *See Kuehl v. Sellner*, No. 16-CV-2078-LRR, 2016 WL 9114915, at *2 (N.D. Iowa July 21, 2016) ("Dr. Ross states that 'the African lioness appears thin, has poor body condition, and displays abnormal posture. . . which could be indicators of compromised wellbeing.' Based on the affidavits, Plaintiffs have sufficiently demonstrated that irreparable injury may occur." (alteration in original)); *Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*, No. 2:13-CV-60-BO, 2014 WL 1922234, at *9 (E.D.N.C. May 13, 2014) ("Certainly money damages cannot remedy the red wolf mortalities brought about by coyote hunting . . .").

Unless the Court enjoins or restrains Defendants' conduct, the animals in their care, custody, possession, or control will suffer irreparable harm. Their health is in serious danger— and ESA-Protected Big Cats will continue to be harmed and harassed in violation of the ESA. It is beyond dispute that Defendants neither have an attending veterinarian nor have followed a program of veterinary care established and maintained with an attending veterinarian. Exh. F; Exh. G, ¶ 3; Exh. H, ¶¶ 4-5, 8; Exh. J., p. 1; Exh. P, p. 1. And, again, Defendants' habit, pattern, and practice of failing to provide adequate nutrition and timely veterinary care has resulted in injury and even death to a number of their animals, including ESA-protected animals such as Nala, Gizzy, Dot, Mama, Lizzie, Promise, Petunia, and Young Yi. Indeed, as recently as October 3, Defendants failure to have and follow adequate sedation protocols or have a qualified attending veterinarian present during such procedure resulted in the overdosing and untimely death of a female lion-tiger hybrid they were attempting to transport to the Tiger King Park in Thackerville. *See* Exh. O.

A preliminary injunction is necessary to determine and maintain the *status quo* pending the United States obtaining the relief it is seeking in the complaint; namely, termination of Defendants' rights to own and possess animals for exhibition. If USDA cannot determine exactly how many, and what, animals are present and require proper care during the litigation, some may die before this case is over. Even if the animals do not perish, the United States wants them to be in healthy condition when they are removed from Defendants' custody so that they

can have normal lives once they are placed elsewhere. In the absence of an injunction, Defendants' inadequate care will continue—or Defendants' may sell, destroy, or otherwise dispose of animals that are the subject and evidence of their violations.

III.   **The Balance of Equities and Public Interest Tip Sharply In Favor of Enjoining Defendants from Continuing to Place the Health of Animals in Their Care, Custody, Possession, or Control in Serious Danger.**

When weighing the equities and public interest, the scale strongly tips in favor of providing the United States the modest, preliminary injunctive relief now requested simply to determine the ongoing health and safety of Defendants' animals (though further relief might later be required). Congress made explicitly clear in its statement of policy for the AWA that animals used for exhibition must be treated and cared for in a humane manner. *See* 7 U.S.C. § 2131(2) (One purpose of the AWA is "to assure the humane treatment of animals"). Similarly, in passing the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). And it is always in the public interest to have citizens follow the law and not financially profit from their law-breaking endeavors. The public interest in preventing harm to animals, including ESA-Protected Big Cats, as evinced by Congress' intent in enacting both statutes, far outweighs the minimal impositions Defendants will incur if the presently sought preliminary injunction is granted.

The United States is only now asking for narrowly tailored and specific injunctive relief. It merely wishes to ensure that Defendants do not take unilateral action impacting the availability, health, and wellbeing of animals in their care, custody, possession, or control that will prevent the court from providing effective relief to the United States, including termination of Defendants' rights to own and possess animals, before the Court decides the merits of the case. *See* Fed. R. Civ. P. 65(d). Specifically, the United States requests that the Court:  (1) order Defendants to provide a complete and accurate inventory of the animals in its care, custody, possession, or control; and, for the term of the injunction, (2) prohibit Defendants from acquiring or disposing of any animals; (3) order Defendants to submit complete and accurate veterinary records to the undersigned attorneys within seven days of any animal being treated by a veterinarian; and (4) authorize USDA's Animal and Plant Health Inspection Services to conduct an immediate inspection of the Tiger King Park, and again every three weeks for the duration of

24

the injunction, to check on the health and well-being of the animals.[12]

Most of these requests are minor administrative tasks that will not impose a heavy burden on Defendants.  For example, under the AWA, Defendants have to keep an inventory of all animals, so asking them to update this list to reflect their current inventory should not be a burdensome task.  7 U.S.C. § 2140; 9 C.F.R. §§ 2.8, 2.75(b)(1)-(3); *see also* Exh. V & W. Similarly, submitting veterinary records, should there be any, is not so onerous when compared to ensuring the health, safety, and well-being of 100-200 animals.  Further, any prohibition on acquiring or disposing of animals amounts to a preservation of the status quo and cannot be said to negatively impact Defendants.  And, if Defendants are properly caring for their animals, then the inspections will only be a small imposition of time every three weeks.  For these reasons, the balance of equities and public interest tips strongly in favor of a preliminary injunction.

Based on the foregoing, the United States is entitled to a preliminary injunction prohibiting Defendants from violating the AWA by placing the health of the animals in their care in "serious danger."  Additionally, the United States is also entitled to a preliminary injunction prohibiting Defendants from violating the ESA by unlawfully taking ESA-protected Big Cats.

## CONCLUSION

For the aforementioned reasons, the United States requests that the Court grant the limited, preliminary injunction now requested.

---

[12] Based on information obtained by the United States during these inspection and disclosure activities, the United States may need to return to seek more specific, supplemental relief.