## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

          Plaintiff,

v.

                                    Case No. 20-cv-0423-JFH

JEFFREY LOWE, LAUREN LOWE,
GREATER WYNNEWOOD EXOTIC
ANIMAL PARK, LLC, and TIGER KING,
LLC,

          Defendants.

## OPINION AND ORDER

This matter is before the Court on the motion for preliminary injunction [Dkt. No. 27] and

the motion for temporary restraining order [Dkt. No. 31] filed by the United States of America (the

"United States") against Defendants Jeffrey Lowe a/k/a Jeff Lowe ("Jeff Lowe"), Lauren Lowe,

Greater Wynnewood Exotic Animal Park, LLC ("GWEAP, LLC") and Tiger King, LLC

(collectively referred to as "Defendants").  For the reasons set forth below, the Court grants the

preliminary injunctive relief requested by the United States in both motions.

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

This case arises from alleged violations by Defendants of the Endangered Species Act, 16

U.S.C. §§ 1531-44, ("ESA") and the Animal Welfare Act, 7 U.S.C. §§ 2131-59, ("AWA").  *See*

*generally* Dkt. No. 2.  From 2017 until approximately September 2020, Jeff Lowe and Lauren

---

[1] The facts contained in this section are undisputed, except as noted.  The Court deems uncontested facts established by affidavit or evidence as admitted for the purpose of deciding a motion for preliminary injunction.  *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir.2013).

Lowe (collectively, the "Lowes"), along with GWEAP, LLC, operated a roadside zoo in Wynnewood, Oklahoma ("Wynnewood Location")[2]  *See Big Cat Rescue*, No. CIV-16-155-SLP, 2020 WL 2842845, at *3 (requiring that the property be vacated 120 days from the June 1, 2020 Order). Dkt. No. 28-30 at 3-14.

Inspectors from the Animal and Plant Health Inspection Services ("APHIS"), United States Department of Agriculture ("USDA"), performed inspections of the Wynnewood Location on June 22, 2020 and July 8, 2020.  Dkt. No. 28-15; Dkt. No. 28-21.  Reports from those inspections document numerous instances of animals at the facility being provided inadequate food, shelter, and veterinary care in violation of the AWA.  *Id.*  As a result of the documented violations, Jeff Lowe's AWA license was suspended on August 13, 2020.  Dkt. No. 28-29 at 2-3.  On August 17, 2020, the USDA filed an administrative complaint seeking permanent revocation of Jeff Lowe's AWA license and imposition of civil penalties.  Dkt. No. 28-30.  Jeff Lowe voluntarily terminated his AWA license on August 21, 2020.[3]  Dkt. No. 28 at 20; Dkt. No. 54 at 1.  The USDA's administrative action against Jeff Lowe is still pending.  Dkt. No. 28-30.

In an unrelated case, the United States District Court for the Western District of Oklahoma issued an order requiring Defendants to vacate the Wynnewood Location by October 1, 2020.  *See Big Cat Rescue Corp. v. Schreibvogel*, No. CIV-16-155-SLP, 2020 WL 2842845, at *3 (W.D. Okla. June 1, 2020).  At some point in 2020, the Lowes, along with a business associate Eric Yano ("Yano"), formed Tiger King, LLC for the purpose of marketing their zoo which was to be moved

---

[2]  The zoo at the Wynnewood Location, for a period of time, was also operated by Joe Maldonado-Passage, also known as "Joe Exotic," featured in the Netflix® series "Tiger King: Murder, Mayhem and Madness."

[3]  Lauren Lowe does not have a USDA issued AWA exhibitors license; she and Defendant GWEAP, LLC had operated under Jeffrey Lowe's license.  Dkt. No. 54 at 1.

to, and operated from, a location in Thackerville, Oklahoma.  Dkt. No. 56-3 at 1.  According to

the United States, Defendants have established an unlicensed exhibition facility known as Tiger

King Park, in Thackerville, Oklahoma, which houses approximately 100 to 200 ESA protected

animals for the purpose of exhibiting their animals to the public (the "Thackerville Location" or

"Tiger King Park") .  Dkt. No. 2 at 5.

On November 19, 2020, the United States filed a complaint seeking declaratory and

injunctive relief.  Dkt. No. 2.  Specifically, the United States seeks an order: (1) declaring that

Defendants have violated the ESA and the AWA; (2) enjoining Defendants from interfering with

USDA inspections of their properties, exhibiting animals without a license and placing the

animals' health and safety at risk; and (3) requiring Defendants to relinquish possession of all ESA

protected animals.  *Id.* at 46-47.

On November 25, 2020, the United States filed its first motion for preliminary injunction

seeking an order: (1) requiring Defendants to provide a complete and accurate inventory of the

animals in their custody or control; (2) prohibiting Defendants from acquiring or disposing of any

animals without notice to the United States and consent of the Court; (3) requiring Defendants to

submit complete and accurate veterinary records to the United States' attorneys within seven days

of any animal's treatment; and (4) authorizing APHIS to conduct an immediate inspection of Tiger

King Park and inspections every three weeks thereafter for the duration of the injunction.  Dkt.

No. 9; Dkt. No. 10 at 31-32.  The Court set a hearing on the motion for December 16, 2020.  Dkt.

No. 14.

On December 14, 2020, the parties filed a stipulation in which they agreed, in pertinent

part, that:  (1) on or before December 15, 2020, Defendants would provide the United States with

a complete inventory of all ESA and AWA protected animals in their custody or control;[4] (2) during the pendency of the case, Defendants would not acquire or dispose of any ESA or AWA protected animal without first meeting and conferring with the United States and obtaining leave of Court; (3) APHIS would conduct routine inspections of Tiger King Park, the first of which would occur on December 15, 2020; and (4) thereafter, APHIS would conduct unnoticed inspections of Tiger King Park, not to exceed one inspection every 21 days, at USDA's discretion. Dkt. No. 23 at 2.[5] The Court approved the parties' stipulation and vacated the December 16, 2020 hearing. Dkt. No. 25.

On December 23, 2020, the United States filed a second motion for preliminary injunction, citing additional ESA and AWA violations following the December 15, 2020 inspection. Dkt. No. 27; Dkt. No. 28 at 13-14. In its motion, the United States requests that, pending adjudication of its claims, the Court order Defendants to: (1) immediately cease exhibiting animals without a valid exhibitor's license; (2) retain an attending veterinarian, as required under the AWA; (3) provide acquisition and disposition records for all animals missing since the June 2020 inspection; (4) submit veterinary records after treatment of an animal; and (5) submit acquisition and disposition records after any change to the December 16, 2020 inventory. Dkt. No. 27; Dkt. No. 28 at 33-34.

On December 30, 2020, the United States also filed a motion for a temporary restraining order. The United States claims that on or about December 21, 2020, Defendants authorized the euthanasia of a tiger cub with metabolic bone disease and secondary fracture without conferring with the United States or seeking leave of Court, in violation of the parties' stipulation. Dkt. No.

---

[4] Pursuant to the stipulation, the inventory was to include each animal's name, species name, location within facility, parents, birth date or acquisition date, sex, and owner. Dkt. No. 23 at 2.

[5] Common dogs, cats, guinea pigs, hamsters, and rabbits were exempted from the inventory and acquisition/disposition provisions of the stipulation. Dkt. No. 23 at 1.

32 at 23-24.  In its motion for temporary restraining order, the United States seeks an order requiring Defendants to relinquish custody and control of all Big Cat[6] cubs one year old or younger, along with the cubs' respective mothers, to the United States for temporary placement at reputable facilities selected by the United States.  Dkt. No. 32 at 32.

The Court held an evidentiary hearing on the United States' motion for preliminary injunction and motion for temporary restraining order on January 12, 2021.[7]  Dkt. No. 35.  Based on the parties' arguments and evidence, and for the reasons set forth below, the Court finds that the United States is entitled to the preliminary injunctive relief requested.

## II.    STANDARD

Except as to notice and duration, the legal standards governing a temporary restraining order ("TRO") and a preliminary injunction are the same.  *See People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) ("The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.").  The primary difference between a TRO and a preliminary injunction is that a TRO may issue without notice to the opposing party and that a TRO is of limited duration.  *See* Fed. R. Civ. P. 65(b).  Where, as here, a motion for a TRO is before the Court after notice to the opposing party and an

---

[6] For the purpose of the subject motions, "Big Cats" refer to lions, tigers and hybrids thereof.  Dkt. 31 at 1, n. 1.

[7] No live witness testimony was presented at the evidentiary hearing.  All witness testimony in this case has been presented by Declaration.  Dkt. No. 28-1; Dkt. No. 28-5; Dkt. No. 28-6; Dkt. No. 28-7; Dkt. No. 28-8; Dkt. No. 28-9; Dkt. No. 28-13; Dkt. No. 28-14; Dkt. No. 28-16; Dkt. No. 28-17; Dkt. No. 28-18; Dkt. No. 28-19; Dkt. No. 28-20; Dkt. No. 28-22; Dkt. No. 28-23; Dkt. No. 28-24; Dkt. No. 28-25; Dkt. No. 28-26; Dkt. No. 28-31; Dkt. No. 28-36; Dkt. No. 28-37; Dkt. No. 32-1; Dkt. No. 32-2; Dkt. No. 32-3; Dkt. No. 55-8; Dkt. No. 55-9; Dkt. No. 55-10; Dkt. No. 55-11; Dkt. No. 56-2; Dkt. No. 56-3; Dkt. No. 57-1; Dkt. No. 57-2.  *See also* Stipulation for Hearing, Dkt. 53 at 2.

evidentiary hearing, it is treated as a motion for preliminary injunction.  *See TLX Acquisition Corp. v. Telex Corp.*, 679 F. Supp. 1022, 1028 (W.D. Okla. 1987) (treating the application for a TRO as a motion for preliminary injunction where the defendants had notice of the application and the application was before the Court following an evidentiary hearing in which all parties participated); *see also Sampson v. Murray*, 415 U.S. 61, 86 (1974) (agreeing with the circuit court, which "held that a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions." (internal quotation marks and citation omitted)).  For these reasons, the United States has requested that its motion for TRO be treated as a motion for preliminary injunction.  The Court agrees that this is appropriate.

Whether sought through a TRO or a preliminary injunction, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have its request granted.  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

A party seeking preliminary injunctive relief must satisfy four factors:  (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest.  *Id.* at 1257.  The primary goal of a preliminary injunction is to preserve the pre-trial status quo.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).  "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."  *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (internal quotation marks and citation omitted).

Because the primary goal of a preliminary injunction is to preserve the pre-trial status quo, courts are especially cautious when granting mandatory preliminary injunctions, which require the nonmoving party to take affirmative action before a trial on the merits occurs. *See RoDa Drilling*, 552 F.3d at 1208. Therefore, to demonstrate the propriety of such relief, the movant must make a heightened showing of the four requisite factors. *Id.* This heightened standard is intended "to minimize any injury that would not have occurred but for the court's intervention." *Id.* While mandatory preliminary injunctions are traditionally disfavored, when the moving party demonstrates that the "exigencies of the case require extraordinary interim relief," the district court may grant the motion upon satisfaction of the heightened burden. *See Schrier*, 427 F.3d at 1258-59; *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

## III.  DISCUSSION

### A.  Motion for Preliminary Injunction

In this case, the United States argues that it is entitled to injunctive relief to preserve the relative positions of the parties until a trial on the merits can be held. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To this end, the United States requests that, pending adjudication of its claims, the Court order Defendants to: (1) immediately cease exhibiting animals without a valid exhibitor's license; (2) retain an attending veterinarian, as required under the AWA within fourteen days of the Court's order; (3) provide acquisition and disposition records for all animals missing since the June 2020 inspection within seven days of the Court's order; (4) submit veterinary records after treatment of an animal within seven days of the treatment; (5) submit acquisition and disposition records after any change to the December 16, 2020 inventory within seven days of the change; and (6) immediately relinquish all Big Cats one year old or younger, in

Defendants' custody, possession or control, as well as the animals' respective mothers to the United States for placement at reputable facilities.  Dkt. No. 27; Dkt. No. 28 at 33-34; Dkt. No. 31 at 1; Dkt. No. 32 at 32.

>    1.    **Likelihood of Success on the Merits**

>       a.  **The Endangered Species Act**

The ESA was enacted to provide a mechanism for the preservation of endangered species and the ecosystems upon which they rely.  16 U.S.C. § 1531(b).  The ESA prohibits the violation of any provision or regulation issued thereunder which pertains to an endangered or threatened species of fish or wildlife.  16 U.S.C. § 1538(a)(1)(G).  According to the United States, Defendants own the following ESA-protected animals:   tigers, *Panthera tigris* (50 C.F.R. § 17.11(h) (endangered)); ring-tailed lemurs, *Lemuridae catta* (50 C.F.R. § 17.11(h) (endangered)); one or both of the two lion subspecies, *Panthera leo* and *Panthera leo melanochaita* (50 C.F.R. §§ 17.11(h), 17.40(r) (endangered and threatened, respectively)); and jaguars, *Panthera onca* (50 C.F.R. § 17.11(h) (endangered)).  Dkt. No. 28-35.  Defendants suggest that their Big Cats are not subject to the ESA's provisions because they are supposedly subspecies hybrids. Dkt. No. 55 at 8. This position is unavailing.

Lions are listed at the subspecies level with subspecies, *Panthera leo* listed as endangered and subspecies *Panthera leo melanochaita* listed as threatened.  50 C.F.R. § 17.11.  Tigers are listed at the species level, but are protected as endangered species under the ESA, whether they are born in captivity or in the wild.  *See* 16 U.S.C. §§ 1538(b)(1); 1532(6); *see also* 81 Fed. Reg. 19923, 19923 (Apr. 6, 2016); 37 Fed. Reg. 6,476 (Mar. 30, 1972); *see also* 16 U.S.C. § 1532(16) (defining "species" as including "any subspecies"); *see also Kuehl v. Sellner*, 161 F. Supp. 3d 678, 688. (N.D. Iowa 2016) ("When an animal is listed as protected at the species level, all subspecies

8

of that animal are also protected."). Likewise, all tigers, whether they are "purebred" or "inter-subspecific crossed or generic" are protected Under the ESA. *Id.* at 19928. [8]

The offspring of two different ESA-listed species, such as a lion-tiger hybrid, are considered also protected "fish or wildlife" under the ESA. *See* 16 U.S.C. § 1532(8) (defining the term "fish or wildlife" to include "any member of the animal kingdom, including without limitation any mammal . . . and includes any . . . offspring thereof."); *Kuehl*, 161 F. Supp. 3d at 689 (recognizing that "[o]ffspring resulting from crossbreeding between protected species or subspecies are protected by the ESA."). And, as the United States notes, in another case in which Jeff Lowe is a defendant, the court recently issued an order rejecting the argument that Big Cat hybrids are not protected under the ESA. *People for the Ethical Treatment of Animals v. Wildlife in Need & Wildlife in Deed*, No. 4:17-cv-186, Dkt. 414 at 6-7 (S.D. Ind. Sept. 15, 2020).

Under the ESA, it is unlawful for any person to "take" an endangered "species of fish or wildlife." 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.21(d), 17.31(a). For purposes of the ESA, to "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Congress has interpreted this term in the "broadest possible manner." *Babbitt v. Sweet Home Chapter of Cntys. for a Great Or.*, 515 U.S. 687, 704-05 (1995). The term "harm" is defined by regulation as "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3(c)(3). The term "harass" is "less demanding." *Hill v. Coggins*, 867 F.3d 499, 511 (4th Cir. 2017). It requires only an "act or omission which creates the likelihood of injury to the wildlife by annoying it to such an extent as to significantly disrupt

---

[8] The ESA's regulations require that a person must obtain authorization from the U.S. Fish and Wildlife Service to take protected captive-bred wildlife, unless the species is exempted from captive-bred wildlife registration. *See* 50 C.F.R. §§ 17.22(a), 17.21(g)(1); 17.21(g)(6); 17.32(a). While "inter-subspecific crossed or generic tigers" were once exempted from captive-bred wildlife registration, they have since been removed from the exemption list. ESA 81 Fed. Reg. at 19923.

normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3(c).

Here, the United States argues that it is likely to succeed on the merits of its ESA claim because it can show that Defendants have "harmed" and "harassed" ESA protected animals by: (1) subjecting the animals to unsanitary conditions; (2) providing the animals with inadequate nutrition; and (3) failing to provide adequate and timely veterinary care. *Id.* As to the nutrient-deficient diets, the United States has submitted evidence regarding several ESA protected animals in Defendants' care while at the Wynnewood Location and also at Tiger King Park, now at the Thackerville Location.

### i.   Alleged Violations at the Wynnewood Location

#### a.   Unsanitary Conditions

During the June 22, 2020 inspection of the Wynnewood Location, inspectors observed a large pile of wood debris in the back of the park along with the partially burned carcass of Young Yi, a deceased tiger hybrid. Dkt. No. 28-15 at 6-7. There was "a foul odor of decomposing flesh and many flies present on the Board and surrounding areas." *Id.* The flies had caused fly strikes, which are "large patches of painful ulceration on the ears and legs," on "numerous lions, tigers, and wolves." *Id.* The ulcerated areas were red, scabbed, and some "exuded pus or fresher blood." *Id.* The affected areas were "missing hair, skin and/or deeper flesh." *Id.*

On June 22, 2020, inspectors also observed packages of chicken on a trailer in the sun that had flies on them. Dkt. No. 28-19 at 4. During the July 8, 2020 inspection of the Wynnewood Location, inspectors discovered an inoperable refrigerator truck containing open boxes of decaying meat. Dkt. No. 28-21 at 5, 11-15, 18. The temperature inside the truck was greater than 85 degrees

Fahrenheit. *Id.* at 5. The inspectors noted that there was no other functioning large refrigeration or freezer unit or other food source for carnivores on the property. *Id.*

### b. Inadequate Nutrition

Nala is a lion cub who was discovered in dire condition during the June 22, 2020 inspection of the Wynnewood Location. Dkt. No. 28-15 at 4. Due to Nala's poor body condition, inspectors believed her to be only 4 or 5 months old, when in fact, at the time, Nala was 10 months old. *Id.* During the inspection, Nala appeared "lethargic, depressed, and thin and would not get up out of the mud from the sitting position even after prompting." *Id.* "She had a string of purulent nasal discharge hanging from her right nostril and had an accumulation of green discharge in her eyes. Her respiration was shallow and rapid." *Id.* Nala was taken for immediate veterinary treatment. *Id.*

In September 2020, pursuant to a court order in another case, Nala and two other lion cubs were transported to a sanctuary in Colorado. [9] Dkt. No. 28-1 at 3. Upon arrival at the sanctuary, Nala was underweight and undersized for her age. Dkt. No. 28-17 at 3. Nala had difficulty standing and walking. *Id.* at 3. She was found to be severely deficient in vitamin A and thiamine levels to an extent that put her at risk for additional developmental deficits, changes in bone development, neurologic abnormalities, and death. *Id.* at 4. The evaluating veterinarian determined that these deficiencies were caused by her inadequate nutrition. *Id.*

---

[9] *See People for Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*, No. 4 17-CV-00186-RLY-DML, 2020 WL 4448481, at *13 (S.D. Ind. Aug. 3, 2020). In *Stark*, the court issued a preliminary injunction requiring the defendant, Timothy Stark, to maintain the status quo by not disposing of any animals in his possession. However, in violation of the court's order, Stark left four neonatal lions with the Lowes. Thereafter, the court granted a permanent injunction terminating Stark's ownership rights in various animals, including the four lions in the Lowe's custody. According to the United States, Nala was one of the lion cubs the Lowes obtained from Stark. Dkt. No. 27 at 7 n. 4.

Gizzy, an emaciated grizzly bear, was also discovered during the June 22, 2020 inspection of the Wynnewood Location. Dkt. No. 28-15 at 4. Investigators noted that Gizzy's spine and hip bones were easily visible, and she was exhibiting aggressive behavior. *Id.* at 5-6, 33. When Defendants vacated the Wynnewood Location, Gizzy was left behind. Dkt. No. 28-20 at 3. She was eventually transported to a sanctuary in Colorado. *Id.* Upon arrival, she was described as "stunted and underweight" and exhibited "behavior of ravenous eating." *Id.*; Dkt. No. 28-17 at 5. In photographs taken on November 21, 2020, Gizzy appears to have gained weight and her spine and hip bones are no longer visible. Dkt. No. 28-23.

Ayeesha was a lion-tiger hybrid cub who was euthanized in September 2020. After a review of Ayeesha's veterinary records, Dr. Laurie Gage, an APHIS veterinarian, concluded that "the Lowes' failure to provide her with proper nutrition and adequate veterinary care caused this animal to suffer greatly before she had to be euthanized at the age of ten months." Dkt. No. 28-16 at 5. At approximately two months of age, Ayeesha was hospitalized and placed on a feeding tube due to severe dehydration and malnutrition. Dkt. No. 28-11 at 78. As she developed, Ayeesha was consistently underweight and suffered multiple fractures. Dkt. No. 28-11 at 76.

In July 2020, consulting veterinarian Jennifer Devine Fritzler treated Ayeesha for roundworms and a fractured pelvis. Dkt. No. 28-9 at 4. Ayeesha was also diagnosed with metabolic bone disease. Dkt. No. 28-16 at 6. According to Dr. Gage, metabolic bone disease is "a painful disease that . . . occurs when an animal is fed an inappropriate diet devoid of calcium and vitamin D." Dkt. No. 28-16 at 6. In Big Cats, metabolic bone disease causes the "bones to become weak and susceptible to fractures, the animals to become painful and lame, and in some cases may result in fractures to the vertebral bodies that could result in serious neurological problems." *Id.* Metabolic bone disease "is easily preventable by feeding an appropriate, balanced

12

diet." Dkt. No. 28-16 at 6. Although metabolic bone disease is treatable when diagnosed and treated early, in Ayeesha's case, Dr. Gage determined that "the Lowes failed to provide her a proper diet containing calcium and other necessary nutrients to allow her to grow and the bones to develop normally [which] resulted in multiple painful fractures in several limbs that caused [her] to suffer needlessly." *Id.*

After treating Ayeesha's roundworms and broken pelvis, Dr. Fritzler advised the Lowes to keep Ayeesha confined to the medical building. However, on July 8, 2020, Dr. Fritzler was contacted by a veterinarian from the USDA who informed her that Ayeesha was observed in an outdoor enclosure contrary to her advice. *Id.* According to Dr. Fritzler, removing Ayeesha from the medical building likely contributed to Ayeesha suffering another fracture for which Dr. Fritzler treated her on July 11, 2020. *Id.* By September 2020, Ayeesha had deformities due to the multiple healing fractures and was immobile. Dkt. No. 28-11 at 76; Dkt. No. 28-16 at 6. She was ultimately euthanized due to her deteriorating condition. Dkt. No. 28-16 at 6.

### c. Inadequate and Untimely Veterinary Care

Dot was a female tiger whose veterinary records indicate she was bred five times between the ages of two and five years old. Dkt. No. 28-10 at 39. Her last three litters resulted in stillbirths. *Id.* Although multiple stillbirths are unusual in Tigers, the Lowes did not seek veterinary care for Dot and continued to breed her. Dkt. No. 28-16 at 4. On June 19, 2020, Dot required emergency surgery after her last litter of stillborn cubs and died two days later due to complications from the surgery. Dkt. No. 28-16 at 4.

Mama was a female tiger who had to be euthanized after a delay in care during a difficult birth. Dkt. No. 28-16 at 3-4. Veterinary records indicate that Mama was allowed to labor for 48 hours before a veterinarian was consulted. Dkt. No. 28-16 at 3-4. During this period, Defendants

gave Mama three doses of oxytocin, which increases the risk of uterine rupture. *Id.* Mama's uterus did in fact rupture, causing sepsis, and she had to be euthanized. *Id.* According to Dr. Gage, "it is possible that Mama's life and the lives of some of her offspring ma[y] have been saved had a C-section been performed by a trained veterinarian in a timely manner." Dkt. No. 28-16 at 4.

Lizzie was an 11-year-old tiger who suffered from a subluxated disc and was lame in one of her hind legs. *Id.* By the time Lizzie was treated by a consulting veterinarian over a month after the disc injury, she was unable to use her back legs and dragged them as she walked. *Id.*; Dkt. No. 28-9 at 110. This caused wounds through her muscles and even down to her bone in one place. *Id.* Lizzie was euthanized due to her condition. Dkt. No. 28-9 at 110-111; Dkt. No. 28-16 at 9. According to Dr. Gage, if Lizzie's condition had been addressed earlier, surgery may have been a viable option and if it wasn't, Lizzie could have been euthanized earlier, sparing her over one month of unnecessary suffering. Dkt. No. 28-16 at 9.

Promise was a 12-year-old tiger whose condition had apparently been declining for about a month before the Lowes sought treatment for him. Dkt. No. 28-9 at 46; Dkt. No. 28-25 at 38-39. Defendants attempted to treat him with cannabidiol ("CBD") oil, which was not recommended by the veterinarians occasionally consulted. *Id.*; Dkt. No. 28-13 at 2. By the time he was treated by a veterinarian, Promise had been unable to walk for two weeks and had large pressure sores on both hips and left stifle. Dkt. No. 28-25 at 38. At that point, the treating veterinarian assessed his chances of recovery as poor and he was euthanized. *Id.* at 39.

Petunia was a 5 or 6-year-old tiger. Her veterinary records indicate that she was euthanized for apparent renal failure. Dkt. No. 28-9 at 81-82; Dkt. No. 28-25 at 31. The Lowes contacted a consulting veterinarian regarding Petunia because she was not eating and was "pretty lethargic." Dkt. No. 28-16 at 8. Unable to see the consulting veterinarian, who was out of town, the Lowes

consulted a local food animal veterinarian who diagnosed Petunia with renal failure. *Id.* According to Dr. Gage, this veterinarian treated Petunia with an insufficient amount of fluids for an animal her size with renal failure. *Id.* Dr. Gage testified that the cause of renal failure should have been explored because the disease is rare in tigers Petunia's age and that with adequate and timely veterinary diagnostics and treatment, renal disease is typically a treatable condition in animals as young as Petunia. *Id.*

Young Yi was a 17-year-old tiger who apparently died on or around June 13, 2020. Dkt. No. 28-15 at 3. At the June 22, 2020 inspection, Young Yi's partially burned carcass was found in a pile of wood at the back of the Wynnewood Location. *Id.* at 6-7. Facility representatives told inspectors that Young Yi had been exhibiting signs of illness prior to his death, which were assumed to be renal failure because of his age. *Id.* at 3. However, no records indicate that any of the veterinarians typically consulted by Defendants had examined or treated Young Yi before his death. *Id.* [10]

After reviewing the veterinarian records for Nala, Ayeesha, Mama, Dot, Lizzie, Promise, and Petunia, Dr. Gage testified that, "[a] recurring issue related to the care provided to the Big Cats in the Lowes' possession is the delay in seeking adequate veterinary care, causing their animals to suffer unnecessarily." Dkt. No. 28-16 at 3. "At times, their delay in seeking care resulted in the animal's death." *Id.* According to Dr. Gage, in the cases of Ayeesha, Mama, Dot, Petunia, Lizzie, and Promise, the animals' conditions did not make their deaths inevitable. *Id.* Dr. Gage testified that "[t]he Lowes simply do not have the knowledge or expertise to care for their Big Cats without the regular assistance of a veterinarian with training and experience in the care

---

[10] While the United States claims that the Lowes provided to APHIS three falsified veterinary records, dated July 14, 2019, September 14, 2019, and May 18, 2020, these records do not appear to be in the record before this Court. Dkt. No. 28 at 20.

and management of Big Cats." *Id.* "This is evident in the fact that, at the most basic level, the Lowes have failed to even provide their Big Cats with a diet containing the necessary nutrients to allow them to grow properly and thrive." *Id.*

### ii.   Alleged Violations at Tiger King Park (the Thackerville Location)

#### a.   Unsanitary Conditions

APHIS inspectors conducted an inspection of Tiger King Park on December 15, 2020.  Dkt. No. 28-33.  Inspectors observed chicken breasts left on the ground outside to thaw, with some of the boxes open and not protected in any way from contamination from dirt or pests.  *Id.* at 7-8.

#### b.   Inadequate Nutrition

During the December 15, 2020, inspection, inspectors also noted a senior wolf whose "hip bones were easily visible" and a thin lion, whose "spin[e] and hip bones were easily visible." Dkt. No. 28-33 at 2-3.  It appeared to the inspectors that the Big Cats housed at the park were being fed a boneless chicken diet, which alone is insufficient to support bone health and development.  Dkt. No. 28-33 at 7.  According to the inspectors, feeding a boneless meat diet without calcium supplementation can result in nutritional deficiency, disease, malformed bones, gait abnormalities, and fractures."  *Id.*  And while facility representatives said that the Big Cats were also being fed deer and cows and receiving calcium and other supplements, inspectors found no evidence of this. *Id.* at 7-8.  When inspectors asked to see the supplements being provided to the Big Cats, they were shown a supplement called Gleam & Gain, which is a horse weight gain supplement and is not a complete supplement for Big Cats eating a boneless meat diet. *Id.* at 7.

On December 21, 2020, less than one week after the December 15, 2020 inspection, Daniel, a tiger cub, was euthanized due to his poor condition and prognosis related to metabolic bone disease, hyperthyroidism, and a secondary fracture of his hind leg.  According to the United States,

on the evening of December 21, 2020, the USDA received information that Defendants were looking for a veterinarian to euthanize a tiger cub. Dkt. No. 32 at 20. Because the parties' stipulation required Defendants to confer with the United States and seek leave of the Court prior to the disposition of any animal, counsel for the United States contacted Defendants' counsel to request information about the situation. *Id.* While Defendants' counsel responded saying that he "would look into it," the United States claims that it never received a substantive response from him. *Id.*

The United States later learned that on December 21, 2020, Eric Yano, a business associate of the Lowes, ("Yano") took a tiger cub named Daniel to veterinarian Ashley Durham. Dkt. No. 32-2. According to Dr. Durham, Daniel presented with lethargy, loss of appetite, and would not bear weight on his left hind leg. *Id.* Through physical and radiological examination, Dr. Durham determined that Daniel had a femoral fracture on his left rear leg and a decrease in bone density throughout his skeleton. *Id.* Daniel's abdomen was distended and painful to the touch, and he had diarrhea. *Id.* Dr. Durham concluded that Daniel's condition was due to metabolic bone disease likely caused by nutritional deficiencies. *Id.*

Dr. Durham testified that she inquired as to other cubs at Tiger King Park and advised Yano that nutritional changes for the cubs should be implemented immediately. *Id.* Dr. Durham also testified that she spoke with Yano about a referral to have Daniel's fracture and nutritional deficiencies evaluated, but she had concerns regarding compliance with her recommendations. *Id.* Due to Daniel's condition and poor prognosis, Dr. Durham believed euthanasia was the most humane option. *Id.*

According to Yano, while he was with Dr. Durham, he called Dr. Dan Danner for a second opinion. Dkt. No. 56-3 at 2. Dr. Danner, Dr. Durham, and Yano participated in a conference call

to discuss Daniel's condition and prognosis.  Afterward, the decision was made to euthanize Daniel.[11]  At no time during the appointment with Dr. Durham did Yano disclose the fact that Daniel was subject to the Court-approved stipulation requiring conferral with the United States and leave of court before the tiger could be euthanized.  Dkt. No. 32-2 at 3-4.  Rather, to the contrary, Yano represented that he had the authority to authorize euthanasia of Daniel.  *Id.*[12]  Defendants stipulated to the fact that the animal who was euthanized was, in fact, Daniel.  Dkt. No. 54 at 3.  According to the December 16, 2020 inventory, Daniel was approximately 17 weeks

---

[11] As the United States points out, Daniel's euthanasia was performed without conferring with the United States or seeking leave of Court, which is required under the parties' December 14, 2020 stipulation, which provides that:

> Pending resolution of the merits of the United States' claims in the Complaint, Defendants will not acquire or dispose of any animal covered by the ESA or any animal covered by the AWA, excluding common dogs, cats, hamsters, or rabbits, absent leave of court sought by duly-noticed motion.  Prior to seeking leave of court to acquire or dispose of any animal covered by this agreement, Defendants will meet and confer with the United States pursuant to the Local Rules of the Eastern District of Oklahoma.

Dkt. No. 23 at 2.


[12]  Although Dr. Danner agreed with Dr. Durham's diagnosis of metabolic bone disease and the ultimate decision to euthanize Daniel, he disagrees with her conclusion that Daniel's condition was caused by nutritional deficiencies.  Dkt. No. 56-2 at 2.  Based on information received from Yano, Dr. Danner understood that Daniel was a two-month-old cub who was still nursing.  *Id.* Based on this information and Yano's report that one of Daniel's siblings was also euthanized due to metabolic bone disease,  Dr. Danner believed that Daniel's condition was attributable to a genetic form of metabolic bone disease and "cannot be confirmed as the result of nutrition directly."  *Id.*  The United States claims that this information is false and that the only tiger cub sent to Tennessee to be euthanized for metabolic bone disorder was Ayeesha.  Dkt. No. 62 at 5. However, the Court was unable to definitively confirm this on the record before it.

old when he died.  Dkt. No. 28-35 at 14 (noting Daniel's birthday as August 21, 2020); Dkt. 32-3.[13]

Daniel's body was sent for a necropsy.  Dkt. No. 32-2 at 11.  The preliminary necropsy report supports Dr. Durham's diagnosis of nutritionally caused metabolic disease with a secondary fracture.  The report indicates a decrease in Daniel's bone mass and notes that his stomach contents included only boneless white meat.[14]  The preliminary necropsy report further states that "[t]he most common cause of metabolic bone disease in young, growing animals is . . . improper dietary ratios of calcium, phosphorus, and vitamin D."  *Id.*  The examiner noted that such deficiencies were indicated in Daniel's case by the finding of hyperthyroidism.  *Id.*[15]

---

[13] This fact is also concerning according to the testimony of Dr. Gage.  The veterinary records report that Daniel weighed 25 pounds.  However, according to Dr. Gage, this tiger cub was underweight for his age.  Dkt. No. 32-1 at 4-5.

[14] According to Dr. Durham's records from her December 21, 2020 examination of Daniel, it was reported to her that Daniel had been bottle fed since he was 2-3 weeks old.  Dkt. No. 32-2 at 6.

[15]  Having reviewed the Lowes' current and past inventories, veterinary records, the inspection report and photographs from the December 15, 2020 inspection, and facts stipulated to by Defendants, Dr. Gage provided testimony regarding Daniel's diagnosis.  Dkt. No. 57-2.  In Dr. Gage's opinion, Dr. Danner was likely provided incorrect information which, in part, led him to incorrectly diagnose Daniel.  Dr. Gage notes that Dr. Danner's opinion that Daniel's condition was not caused by nutritional deficiencies "appears to be based on the idea that Daniel was getting his nutrition from his mother."  *Id.* at 3.  However, as Dr. Gage points out, "just a week before Daniel's death, the inspectors observed the tiger in a small cage with two other young tigers.  There was no adult female tiger in the cage."  *Id.*  Dr. Gage also disputes Dr. Danner's testimony that nutritional metabolic bone disease often occurs in tigers between 4 to 6 years of age.  *Id.*  According to Dr. Gage, metabolic bone disease with secondary hyperthyroidism is most frequently seen in young growing tigers that are fed a calcium poor diet.  *Id.*  Dr. Gage testified that while metabolic bone disease and hypothyroidism "can be seen in adult nondomestic cats, it is much more prevalent in young growing animals as those animals are the ones that require the most calcium to support strong bone growth."  *Id.* at 4.  According to Dr. Gage, metabolic bone disease and hypothyroidism "occurs most frequently when nondomestic cats, such as tigers, are fed boneless meat diets, such as the boneless chicken seen at the Thackerville facility during the inspection, without the necessary supplements."  *Id.* at 5.  Dr. Gage further testified that "[t]he genetic form of metabolic bone disease[,] called Osteogenesis Imperfecta[,] is seen in humans but rarely in nondomestic cats."  *Id.*

### c.  Inadequate and Untimely Veterinary Care

According to Jeff Lowe, on December 16, 2020, just one day after the December 15, 2020 inspection, an eight-month-old tiger cub named Bubbles choked on a chicken bone and died.  Dkt. No. 28-27 at 23; Dkt. No. 55-10 at 2.  The United States submitted testimony by Dr. Gage as to the purported circumstances of Bubbles' death.  Dkt. No. 57-2 at 6.  According to Dr. Gage, "it is highly unlikely that a healthy tiger this age and size would choke to death on a chicken bone," especially since "the only food on the property on Dec 15, 2020, was boneless chicken."  *Id.*  Dr. Gage further testified that if a tiger were suffering from "Nutritional Secondary Hyperparathyroidism/ Metabolic Bone Disease," as Daniel was, it may not be able to chew bones well, which could have led to choking.  Dr. Gage also noted that there is no evidence that veterinary assistance was provided for Bubbles prior to his death.  *Id.*

Based on the totality of the evidence presented regarding the alleged ESA violations at the Wynnewood Location and at Tiger King Park (the Thackerville Location), the Court concludes that the United States can likely demonstrate that Defendants "harmed" or "harassed" numerous ESA protected animals and is therefore likely to succeed on the merits of its ESA claim.  50 C.F.R. § 17.3(c)(3) (defining "harm" in the context of the ESA as "an act which actually kills or injures wildlife."); 50 C.F.R. § 17.3(c) (defining "harass" in the context of the ESA as an "act or omission which creates the likelihood of injury to the wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."); *see Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 (9th Cir. 1994) ("Past takings are indeed instructive, especially if there is evidence that future similar takings are likely"); *Kuehl*, 161 F. Supp. 3d at 678 ("Any act which injures a protected animal constitutes 'harm' within the definition of 'take' in the [ESA]") (citation omitted)); *see also* 63

Fed. Reg. 48,634, 48,638 (Sept. 11, 1998) ("[M]aintaining animals in inadequate, unsafe or unsanitary conditions, physical mistreatment, and the like constitute harassment because such conditions might create the likelihood of injury or sickness [and] [t]he Act continues to afford protection to listed species that are not being treated in a humane manner").

### b.  The Animal Welfare Act

The AWA was enacted, in pertinent part, to "insure that animals intended . . . for exhibition purposes . . . are provided humane care and treatment."  7 U.S.C. § 2131(1).  The AWA is administered by the Secretary of Agriculture ("Secretary" or "USDA") through APHIS.  7 U.S.C. § 2132(b).  The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]."  As authorized by the AWA, regulations and standards have been promulgated to govern the humane handling, care, treatment, and transportation by exhibitors.  7 U.S.C. § 2151; 9 C.F.R. § 1.1-3.142.  These AWA provisions and related regulations set forth minimum requirements for the treatment of animals by dealers, research facilities, and exhibitors, including how animals are to be handled, housed, fed, transported, and provided veterinary care.  7 U.S.C. § 2143(a)(1)-(a)(2)(A); 9 C.F.R. § 3.1-.142.

Applicable here are the AWA's requirements for animal exhibitors.  Dkt. No. 2 at 22-23, 36-37.  Exhibitors must obtain and maintain a valid "Class C" license from the USDA.  7 U.S.C. § 2133; 9 C.F.R. §§ 1.1, 2.1-2.12.  Exhibitors must also maintain pertinent records and comply in all respects with the regulations and standards for the humane handling, care, treatment, housing, and transportation of animals.  7 U.S.C. §§ 2140, 2143; 9 C.F.R. §§ 2.8, 2.75(b)(1)-(3).

Under the AWA, the USDA is to conduct investigations or inspections as necessary to determine whether any exhibitor has violated or is violating any provision of the AWA or its regulations or standards.  7 U.S.C. § 2146(a) (The USDA "shall, at all reasonable times, have

access to the places of business and the facilities, animals, and those records required to be kept . . . of any . . . exhibitor."). If the USDA has reason to believe that any person licensed as an exhibitor has violated or is violating the AWA or its regulations or standards, it may temporarily suspend the exhibitor's license for up to 21 days, and may seek to revoke the license along with civil penalties after notice and opportunity for hearing. *Id.* §§ 2149(a)-(b). If an exhibitor "is placing the health of any animal in serious danger" in violation of the AWA, the USDA shall notify the Attorney General, who may seek a temporary restraining order or injunction to prevent any such person from operating in violation of the Act's requirements. 7 U.S.C. § 2159(a). The district court "shall, upon a proper showing, issue a temporary restraining order or injunction under subsection (a) without bond." *Id.* § 2159(b).

In this case, the United States argues that it is likely to succeed on the merits of its AWA claim because it can show that Defendants are exhibiting animals without a valid license and have failed to comply with the AWA's requirement that they employ an attending veterinarian under formal arrangements.[16] Dkt. No. 28 at 24-28.

With regard to exhibiting the animals without a valid license, Defendants contend that they are not exhibitors under the AWA and therefore are not subject to regulation by the USDA. Dkt. No. 55 at 7-8. Under the AWA, the term "exhibitor" means "any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation, as determined by the Secretary." 7 U.S.C. § 2132(h). The term includes "carnivals, circuses, and zoos exhibiting such animals whether operated for profit or not." *Id.* Here, Defendants argue that they do not fall within

---

[16] There is also a question about whether the animal's enclosures and the secondary barriers at Tiger King Park meet AWA standards. Dkt. No. 28 at 33. These additional issues also cause concern.

the statutory definition of "exhibitor" because the Tiger King Park is still under construction and is not operational.  Dkt. No. 55 at 7-8.  Defendants also argue that certain of their activities, such as posting videos of the animals through the paid subscription services Cameo and OnlyFans and allowing the animals to be filmed for a Netflix® documentary series do not constitute "exhibiting" for purposes of the AWA.  *Id.*  The Court does not agree with Defendants' position.

Under the AWA, "exhibitor" means "any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation, as determined by the Secretary."  7 U.S.C. § 2132(h).  The term includes: "carnivals, circuses, and zoos exhibiting such animals whether operated for profit or not."  *Id.*  In interpreting the term "exhibitor" as set forth in the AWA, the Court will look to the USDA's construction of the term absent compelling indications that it is incorrect.  *See N.L.R.B. v. Hendricks Cty. Rural Elec. Membership Corp.*, 454 U.S. 170, 177 (1981) ("[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially where Congress has refused to alter the administrative construction."); *Webb v. Hodel*, 878 F.2d 1252, 1255 (10th Cir. 1989) ("The court is required to give substantial weight to the interpretation made by the agency which is charged with the statute's administration.  We are obligated to regard as controlling a reasonable, consistently applied interpretation of the government.").

The USDA has determined that a person acts as an exhibitor "simply by making animals available to the public."  *In re Lloyd A. Good, Jr.*, 49 Agric. Dec. 156, 174 (1990).  For over three decades, the USDA has relied upon this interpretation to apply the AWA to fixed-site, intra-state exhibitors like Tiger King Park.  *See 907 Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*, 701 F.3d 1345, 1350 (11th Cir. 2012); *see, e.g.*, *In re Peter Gronbeck*, AWA Docket No. 05-0018.

23

This Court has no indication that this interpretation is unreasonable or incorrect and will therefore afford it deference.

In this case, it is undisputed that Defendants made their animals available to the public during the time that they operated the Greater Wynnewood Exotic Animal Park zoo from 2017 until approximately September 2020.  Dkt. No. 28-30 at 3-14; *see generally* Dkt. No 55.  It is also undisputed that the Lowes have moved most of their animals to Tiger King Park in Thackerville, where they are constructing another zoo facility.  Dkt. No. 55 at 7. [17]  The Lowes are currently promoting the opening of Tiger King Park sometime in 2021.  Dkt. No. 28-7; Dkt. No. 28-31; Dkt. No. 28-32.  Lauren Lowe has made images and/or videos of the animals available to the public through the paid subscription services Cameo and OnlyFans, as recently as September 2020.  Dkt. No. 28-7; Dkt. No. 55-10 at 2; Dkt. No. 55-11 at 1.[18]  In addition, Defendants have allowed other members of the public onto the Thackerville Location for the purpose of viewing and filming the animals.  *See* Dkt No. 28-31 at 2 (YouTube video).  Defendants attempt to minimize this video suggesting that it was filmed and posted by a "former nanny who lived with [the Lowes] in Las Vegas." Dkt. No. 55-10 at 1.  The video shows a person kissing a tiger cub and putting her hand inside a cage to pet one of the animals.  Dkt No. 28-31 at 2.  It also shows another film crew on the property.  *Id.* Defendants dismiss the video and suggest it to be insignificant.  However, it

---

[17]  At the December 15, 2020 inspection, inspectors noted that at least 60 of the approximately 200 animals listed on the August 2020 inventory were unaccounted for.  Dkt. No. 28-33 at 2.  The Lowes have not provided acquisition or disposition records that would account for this discrepancy.  *Id.*

[18]  In their briefing, Defendants suggested that the subject videos showing their animals were taken years earlier and at a time when Jeff Lowe had a USDA exhibitors license.  *See e.g.*, Dkt No. 55 at 4.  However, at the hearing on January 12, 2021, upon inquiry from the Court, Defendants' counsel represented that videos were taken and posted through subscription services Cameo and OnlyFans as recently as September 2020.  Defendants stipulated to the fact that Jeff Lowe voluntarily terminated his USDA license on August 21, 20202.  Dkt. No. 54 at 1.

would appear that this is the type of video that the Lowes embraced to provide promotion of their zoo operation.  Indeed, Lauren Lowe appears to be speaking to the viewing audience as she describes various parts of the property, shows some of the animals and proclaims that the Thackerville Location will also offer a "bed and breakfast."  *Id.*  Further, in early November 2020, filming for a Netflix® documentary series was conducted at the Thackerville Location.  Dkt. No. 55-10 at 1.  Defendants do not deny that the animals were filmed as part of that project.[19]  *See generally* Dkt. No. 55.  The Court concludes that these activities constitute "exhibiting" as contemplated by the AWA and applied by the Secretary.  Accordingly, the Court finds that Defendants have exhibited the animals without a USDA exhibitor's license.

To the extent that Defendants argue that Tiger King Park is not a "zoo" because it is not yet open to the public, the Court disagrees.  The AWA defines a "zoo" as "any park, building, cage, enclosure, or other structure or premise in which a live animal or animals are kept for public exhibition or viewing, regardless of compensation."  9 C.F.R. § 1.1.  There is no dispute, based on the Lowes' public representations that they intend to open Tiger King Park to the public in 2021, that the animals currently housed at the facility are kept for the purpose of public exhibition, regardless of whether such exhibition is currently taking place or to take place in the near future. Thus, even though Tiger King Park may not yet be completely open to the public, it is a "zoo" for purposes of the AWA and Defendants are therefore exhibitors, subject to the AWA's provisions. This conclusion reflects Congress' stated intent in promulgating the AWA, which was to "insure that animals intended … for exhibition purposes … are provided humane care and treatment".  7 U.S.C. § 2131.  *See Gallegos v. Lyng*, 891 F.2d 788, 797 (10th Cir. 1989) ("A statute must be

---

[19]  A video submitted by the United States appears to show Netflix film crews on site at Tiger King Park filming Lauren Lowe and the animals.  Dkt. No. 28-31.

interpreted to effect its evident purpose, and to be consistent with evidenced congressional intent." (internal quotation marks and citations omitted)). The Court is not persuaded that Defendants have ceased their zoo operation merely by the surrender of Jeff Lowe's USDA exhibitor's license and the movement of the animals from the Wynnewood Location to the Thackerville Location.

In this case, Jeff Lowe voluntarily terminated his exhibitor's license on August 21, 2020, after it was suspended by the USDA. Dkt. No. 54 at 1. Lauren Lowe has never been issued an exhibitor's license. *Id.* at 1. The undisputed evidence shows that after Jeff Lowe terminated his exhibitor's license, the Lowes have made their animals available to the public by displaying them online through Cameo and OnlyFans platforms for compensation and by permitting filming of Tiger King Park for a Netflix® documentary series. Dkt. No. 28-7; Dkt. No. 55-10 at 1-2; Dkt. No. 55-11 at 1. This constitutes exhibiting without a valid license, in violation of the AWA. *See* 7 U.S.C. § 2133; 7 U.S.C. § 2134; 9 C.F.R. §§ 1.1, 2.1-2.12.

As exhibitors, subject to the provisions of the AWA, Defendants are prohibited from exhibiting their animals without a valid exhibitor's license. *See* 7 U.S.C. § 2133; 9 C.F.R. §§ 1.1, 2.1-2.12. (requiring exhibitors to obtain and maintain a valid "Class C" license from the USDA); 7 U.S.C. § 2134 ("No dealer or exhibitor shall sell or offer to sell or transport or offer for transportation, in commerce, to any research facility or for exhibition or for use as a pet any animal, or buy, sell, offer to buy or sell, transport or offer for transportation, in commerce, to or from another dealer or exhibitor under this chapter any animals, unless and until such dealer or exhibitor shall have obtained a license from the Secretary and such license shall not have been suspended or revoked.").

The AWA requires that an exhibitor employ an attending veterinarian under formal arrangements who shall provide adequate veterinary care. 9 C.F.R. §§ 1.1, 2.40. "In the case of a

part-time attending veterinarian or consultant arrangements, the formal arrangements shall include a written program of veterinary care and regularly scheduled visits to the premises of the dealer or exhibitor." *Id.* Here, Defendants do not dispute that they do not employ an attending veterinarian under formal arrangements. Dkt. No. 50 at 21; Dkt. No. 55 at 6. They simply argue that their failure to do so is not a violation of the AWA since they are not exhibitors for purposes of the AWA. Having rejected this argument, the Court concludes that Defendant's failure to employ an attending veterinarian under formal arrangements is a violation of the AWA.

Based on the undisputed evidence in the record regarding Defendants' exhibiting of animals without a valid exhibitor's license, and the failure to employ an attending veterinarian, the Court concludes that the United States has demonstrated a substantial likelihood of success on the merits of its AWA claim.

### 2.      Likelihood of Irreparable Harm Absent Injunctive Relief

"Regarding irreparable harm, the movant "must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal quotation marks and citation omitted). "[C]ourts have consistently noted that because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered." *Id.* (alteration in original) (internal quotation marks and citation omitted). Demonstrating irreparable harm is "not an easy burden to fulfill." *Greater Yellowstone Coal.*, 321 F.3d at 1258.

"Although a party seeking a preliminary injunction generally must show all four elements, in limited circumstances courts may presume irreparable harm and grant injunctive relief." *First*

*W. Capital Mgmt.*, 874 F.3d at 1141. "When a statute mandates injunctive relief as a remedy for a violation—or impending violation—of the statute, it has effectively constrained the courts' traditional discretion to determine whether such relief is warranted." *Id.* In such cases, "courts presume irreparable harm and grant an injunction even if the moving party failed to show it." *Id.*

Relevant here, 7 U.S.C. § 2159, provides that the USDA shall notify the Attorney General when it has "reason to believe that any dealer, carrier, exhibitor, or intermediate handler is dealing in stolen animals, or is placing the health of any animal in serious danger in violation of [the AWA]." 7 U.S.C. § 2159(a). The Attorney General may then seek injunctive relief, to prevent any such person from operating in violation of the AWA, from the district court in which the dealer, carrier, exhibitor, or intermediate handler resides or conducts business. *Id.* Section 2159 expressly states that "[t]he court shall, upon a proper showing [that a dealer, carrier, exhibitor, or intermediate handler is dealing in stolen animals or is placing the health of any animal in serious danger in violation of the AWA], issue a temporary restraining order or injunction." *Id.*

As exhibitors subject to the provisions of the AWA, Defendants are required to employ an attending veterinarian as required by the AWA. 9 C.F.R. §§ 1.1, 2.40. They have not done so. Dkt. No. 50 at 21; Dkt. No. 55 at 6. The United States has presented testimony and evidence that: (1) Defendants are not providing adequate nutrition to the animals in their care; (2) Defendants' have repeatedly failed to provide adequate and timely veterinary care to their animals, causing unnecessary suffering and death; and (3) in many cases, such unnecessary suffering and death could have been avoided had an attending veterinarian been available to monitor, assess, and treat the animals. Based on this testimony and evidence, the Court agrees that Defendants' failure to employ an attending veterinarian places the health of the animals at serious risk. Dkt. No. 28 at 15. Accordingly, injunctive relief is mandated by 7 U.S.C. § 2159.

Regardless, the United States has shown that irreparable harm will result absent injunctive relief.  To show a threat of irreparable harm, a plaintiff must demonstrate "a significant risk" of harm "that cannot be compensated after the fact by monetary damages."  *RoDa Drilling*, 552 F.3d at 1210.  "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial."  *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019).  Irreparable harm is often suffered when "the district court cannot remedy [the injury] following a final determination on the merits."  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (alteration in original) (internal quotation marks and citation omitted).

As outlined above, the United States has demonstrated that Defendants are placing the health of their animals in serious danger by providing substandard care in violation of the ESA and by failing to comply with applicable AWA provisions and regulations.  Defendants' habit, pattern, and practice of providing inadequate nutrition and timely veterinary care, and failure to employ an attending veterinarian, has resulted in injury - and even death - to a number of their animals, including ESA-protected animals such as Nala, Gizzy, Dot, Mama, Lizzie, Promise, Petunia, and Young Yi.  Moreover, the recent deaths of two ESA protected tiger cubs, Daniel and Bubbles, less than one week apart (and even after the stipulation on the United States' first motion for preliminary injunction), indicate to the Court that the health and safety of the animals remaining in Defendants care continues to be at risk of irreparable harm absent injunctive relief.

### 3.    Balance of Equities and Public Interest

In its statement of policy for the AWA, Congress has made clear that animals intended for exhibition must be treated and cared for in a humane manner.  *See* 7 U.S.C. § 2131(2) (stating that one purpose of the AWA is "to assure the humane treatment of animals").  Similarly, in enacting the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been

struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).  And as the United States points out, "[i]t is always in the public interest for citizens to follow the law and not financially profit from their law-breaking endeavors."  Dkt. No. 28 at 33.

To that end, the United States is requesting the Court order Defendants to:  (1) immediately cease exhibiting animals without a USDA exhibitor's license; (2) retain a qualified attending veterinarian under formal arrangements within 14 days of the Court's Order; (3) provide acquisition and disposition records for any and all animals added to or missing from the Lowes' inventories since June 22, 2020 within seven days of the Court's order; (4) submit complete and accurate veterinary records to counsel for the United States within seven days of treatment; and (5) submit acquisition and disposition records to the counsel for the United States within seven days of any change to the December 16, 2020, animal inventory.  Dkt. No. 28 at 33-34.

Defendants have not articulated any specific harm that would result if this relief were granted. *See generally* Dkt. No. 55.  In fact, Defendants have indicated that they would agree to most of the requests.  As to the first request, Defendants maintain that they are not currently exhibiting their animals and would not lose any revenue if they are prohibited from doing so for the period of an injunction.  Dkt. No. 50 at 18, 22; Dkt. No. 55-10 at 3.  As to the second request, During the January 8, 2020 status conference, Defendants' counsel also represented to the Court that Defendants do not object to retaining an attending veterinarian under formal arrangements, provided that they are able to find one willing to serve in that capacity.  Dkt. No. 50 at 22.  And as to the remaining requests, Defendants indicated, in their response to the United States' motion for preliminary injunction, that they would agree to provide veterinarian records within seven days of treatment and to submit any change in the animal inventory within seven days of the change.  Dkt. No. 55 at 1.

The Court finds that such injunctive relief is necessary to maintain the status quo pending a resolution of the United States' claims.  Requiring Defendants to retain an attending veterinarian and provide the USDA accurate and up to date information regarding their animal inventory, acquisition and disposition of animals, and veterinary treatment will help ensure that the animals in Defendants' care are adequately cared for during the pendency of this litigation and prevent the improper sale, destruction, or other disposition of animals that are subject to the ESA and the AWA.  Moreover, this relief will not impose a heavy burden on Defendants and is not onerous compared to ensuring the health, safety, and wellbeing of the approximately 150 animals currently in Defendants care.

The United States is also seeking an order directing Defendants to immediately relinquish all Big Cats in Defendants' possession, custody or control, that are one year old or younger, along with their respective mothers, to the United States for placement at reputable facilities, pending final resolution of the United States' claims.  Dkt. No. 32 at 32.  Defendants do not dispute that their interest in maintaining the health and wellbeing of their animals is aligned with that of the United States and the public interest.  Dkt. No. 50 at 24.[20]  Although Defendants insist that they are capable of safeguarding the health and safety of the animals themselves, the troublesome pattern of placing the animals at risk, as exemplified by the recent deaths of Daniel and Bubbles since the filing of the complaint in this case, call that assertion into serious question.  Defendants have not articulated any harm that will result if the young Big Cats and their mothers are relocated to reputable facilities pending resolution of the United States' claims.  Defendants simply assert that they do not believe their property should be taken.  Dkt. No. 50 at 24; *see generally* Dkt. No. 56.  The Court finds this is insufficient to

---

[20] This representation was made by Defendants' counsel at the January 8, 2021 status conference. Dkt. No. 50 at 11.

outweigh the interest of the United States and the public in ensuring that the Big Cat cubs are cared for and maintained in healthy condition throughout the pendency of this litigation.

The Court finds that the United States has demonstrated that it is entitled to the injunctive relief requested in its motion for preliminary injunction and motion for temporary restraining order. Further, in light of the fact that Defendants' violated their stipulation with the United States by improperly authorizing the euthanasia of Daniel, less than a week after the stipulation was approved by the Court, the Court now finds it necessary to order compliance with the stipulation's terms.

## IV.   PARTIES SUBJECT TO THIS ORDER

Rule 65 of the Rules of Civil Procedure authorizes courts to enjoin certain nonparties to the litigation. Subsection (2)(B) authorizes courts to enjoin certain nonparty persons or entities that form an agency relationship with a party to a lawsuit. Fed. R. Civ. P. 65(2)(B); (*Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 847 (7th Cir. 2010) (recognizing that subsection (2)(B) provides that "officers, employees, and other agents of an enjoined party must obey the injunction—even though they are not named parties—when they act in their official capacities.") (internal citations, quotations, and alterations omitted)); *see S.E.C. v. Barraco*, 438 F.2d 97, 98 (10th Cir. 1971) ("[T]he officers of the corporation are realistically regarded as being the doers of the act or acts sought to be enjoined and as thus being directly subject to the injunction's prohibition"). This is "based on the idea that an order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents." *Id.*

Rule 65(d)(2)(C) also sets forth two exceptions to the general principle that injunctions may only bind parties to a lawsuit or their agents. *See Nat'l Spiritual Assembly*, 628 F.3d at 848. Under Subsection (2)(C), injunctions may reach nonparties if: (1) the nonparty "aids or abets a named defendant" in committing the underlying violation or disobeying the court's order, *Reliance*

*Ins. Co. v. Mast Const. Co.*, 84 F.3d 372, 377 (10th Cir. 1996) (citations omitted); or (2) the nonparty is "captured under the general rubric of privity, includ[ing] nonparty successors in interest and nonparties otherwise legally identified with the enjoined party," *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017) (citing *Nat'l Spiritual Assembly*, 628 F.3d at 848–49) (internal quotations omitted).  Eligible nonparties must "receive actual notice of the injunction to be bound by it," *Scalia v. Paragon Contractors Corp.*, No. 18-4147, 2019 WL 6652002, at *4 (10th Cir. Dec. 6, 2019) (unpublished), and the reach of an injunction to nonparties is still "ultimately bounded by due process," *Nat'l Spiritual Assembly*, 628 F.3d at 849 (citation omitted).  The undisputed evidence in the record demonstrates the involvement of Eric Yano and Stephens Lane, LLC in Defendants' business operation of its zoo and Tiger King Park to some extent and, specifically, in the euthanasia of Daniel.  Thus, this Order and the injunctive relief set forth herein shall be binding on Defendants, including anyone acting, directly or indirectly, through them or on their behalf, including Eric Yano and Stephens Lane, LLC.

For the foregoing reasons, it is hereby ORDERED that:

(1)  The motion for preliminary injunction [Dkt. No. 27] and the motion for temporary restraining order [Dkt. No. 31] filed by the United States of America are GRANTED;

(2)  Defendants, including anyone acting, directly or indirectly, through them or on their behalf, including Eric Yano and Stephens Lane, LLC, shall immediately cease exhibiting animals protected by the ESA and the AWA without a valid USDA exhibitor's license;

(3)  Defendants shall retain a qualified attending veterinarian under formal arrangements consistent with the requirements of 9 C.F.R. §§ 1.1, 2.40, no later than January 29, 2021;

(4)  Defendants shall provide acquisition and disposition records for any and all animals added to or missing from their inventories since June 22, 2020, no later than January 22, 2021;

33

(5)   Defendants shall submit complete and accurate veterinary records to counsel for the United States within 7 days of any animal being treated by a veterinarian;

(6)   Defendants shall submit acquisition and disposition records to counsel for the United States within 7 days of any change to the December 16, 2020 animal inventory, including the birth or death of any animal;

(7)   Defendants shall immediately relinquish all Big Cats one year old or younger, along with their respective mothers, to the United States to be transferred to reputable facilities, selected by the United States, pending final resolution of the United States' claims in this case;

(8)   Pending resolution of the merits of the United States' claims in the Complaint, Defendants, including anyone acting, directly or indirectly, through them or on their behalf, including Eric Yano and Stephens Lane, LLC, shall not acquire or dispose of any animal covered by the ESA or any animal covered by the AWA, excluding common dogs, cats, hamsters, or rabbits, absent leave of court sought by duly-noticed motion.  Prior to seeking leave of court to acquire or dispose of any animal covered by this agreement, Defendants shall meet and confer with the United States pursuant to the Local Rules of the Eastern District of Oklahoma;

(9)   APHIS shall be permitted to conduct routine inspections of Tiger King Park (the Thackerville Location) with 2-3 APHIS inspectors up to every three weeks, at USDA's discretion. While APHIS will not conduct more than 1 inspection every 21 days, APHIS will not provide Defendants prior advanced notice of the date and time of future inspections.  Defendants will not pay the cost of the inspections; and

(10)   The inspection reports from all APHIS inspections will be completed and provided to Defendants' counsel within seven days of each inspection.

IT IS FURTHER ORDERED that the United States shall serve of copy of this Order on Eric

Yano and Stephens Lane, LLC.

Dated this 15th day of January 2021.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE