## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>GREATER WYNNEWOOD EXOTIC ANIMAL PARK, LLC, TIGER KING LLC, BIG CAT INSTITUTE, JEFFREY LOWE, LAUREN LOWE, ERIK COWIE, CHERYL SCOTT, and ERIC YANO.<br><br>*Defendants.* | Case No. |

### PROPOSED VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.    INTRODUCTION

1.      Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") brings this lawsuit pursuant to Section 11(g)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44, and Oklahoma statutory and common law public nuisance law, Okla. Stat. tit. 50 § 1, *et seq.* Through this suit, PETA seeks to address ongoing violations of the ESA and its implementing regulations arising out of Defendants' operation of Tiger King Park in Thackerville, Oklahoma, and the now-defunct Greater Wynnewood Exotic Animal Park ("GW Park") in Wynnewood, Oklahoma. Additionally, PETA seeks to address the ongoing unlawful operation of Tiger King Park that offends decency, and therefore constitutes a public nuisance.

2.      Tiger King Park is an unaccredited roadside zoo that frequently confines more than ninety endangered and threatened species, including a jaguar, lions, tigers, lion-tiger hybrids (together, "Big Cats"), ring-tailed lemurs, and over fifty unlisted animals, such as mountain lions, bobcats, wolves, foxes, macaques, and a camel. In addition to the Big Cats and lemurs now confined at Tiger King Park, Defendants GW Park, Big Cat Institute, and Lauren and Jeffrey Lowe

**EXHIBIT 1**

also confined a grizzly bear (together with the jaguar, lions, tigers, lion-tiger hybrids, and ring-tailed lemurs, the "Listed Species") at GW Park.

3.      PETA brings suit against Defendants Greater Wynnewood Exotic Animal Park, LLC; Tiger King, LLC; Big Cat Institute; Jeffrey Lowe, individually and as the operator and owner of GW Park and Tiger King Park, and the registered agent of Big Cat Institute; Lauren Lowe, individually and as the operator of GW Park and operator and owner of Tiger King Park; Erik Cowie; Cheryl Scott; and Eric Yano (collectively "Defendants") for their chronic "takes" of Listed Species, which, at least with respect to the lemurs and Big Cats, are ongoing.

4.      Specifically, Defendants:

   a.    deny Listed Species timely, adequate veterinary care and adequately-implemented nutritional protocols;

   b.    maintain and house Listed Species in unacceptable conditions of confinement, including in unsanitary enclosures without appropriate space, shelter from the elements, enrichment, social groups, and environmental complexity;

   c.    prematurely separate Big Cats and lemurs from their mothers and force them into direct contact with the public;

   d.    intentionally crossbreed Big Cats;

   e.    expose Big Cats to unsafe handling practices and disease hazards; and,

   f.    on information and belief, have trafficked in Listed Species, all in violation of the ESA and its implementing regulations.

5.      Additionally, by neglecting and denying Listed Species and the other animals kept at Tiger King Park necessary veterinary care, shelter, and nutrition, in repeated and ongoing violation state and federal animal protection laws, and in a manner that offends decency, Defendants have created a public nuisance. *See* Okla. Stat. tit. 50 §§ 1, 2. Thus, PETA brings this suit on its own behalf to ask the Court to enjoin Defendants' unlawful conduct that offends decency.

## II.    JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331.

7.      With the exception of Defendant Yano, PETA provided notice regarding the violations alleged in this Complaint and its intent to file suit ("Notice of Intent"), attached hereto

– 2 –

as Appendix 1, to Defendants, the Secretary of the Interior, and the Director of the U.S. Fish and Wildlife Service ("FWS") on September 21, 2020. Defendant Yano was served with the Notice of Intent on December 29, 2020. PETA served the Notice of Intent at least sixty days prior to the filing of this action. 16 U.S.C. § 1540(g)(2)(A)(i).

8.      Defendants have not remedied the violations set out in the Notice of Intent.

9.      The Secretary of the Interior has not commenced an action against Defendants to impose a penalty pursuant to the ESA or its implementing regulations, and the United States has not commenced a criminal prosecution against Defendants to redress a violation of the ESA or its implementing regulations. *See* 16 U.S.C. § 1540(g)(2)(A)(ii)–(iii). However, on November 19, 2020, the United States filed a civil complaint for declaratory and injunctive relief for violations of the ESA and the Animal Welfare Act ("AWA") in the United States District Court for the Eastern District of Oklahoma against four of the Defendants named herein: Jeffrey Lowe, Lauren Lowe, Greater Wynnewood Exotic Animal Park, LLC, and Tiger King, LLC. *Compl.*, *United States v. Lowe et al.*, Case No. 6:20-cv-423-JFH (E.D. Okla. Nov. 19, 2020), ECF No. 2. The Department of Justice's civil action does not preclude PETA's citizen suit. *See generally* 16 U.S.C. § 1540(g)(2).

10.     Venue is proper in the Eastern District of Oklahoma because many of the ESA violations at issue have occurred, and continue to occur, within this judicial district. *See* 16 U.S.C. § 1540(g)(3)(A).

11.     This Court has supplemental jurisdiction over the Oklahoma state law claims under 28 U.S.C. § 1367(a) because this Court has original jurisdiction under 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331, and the state law claims are so related to the underlying federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

### III.   The Parties

12.     PETA is a Virginia nonstock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code. PETA's principal place of business is located at 501 Front Street, Norfolk, Virginia 23510.

13.     Defendant Greater Wynnewood Exotic Animal Park, LLC, is an Oklahoma domestic limited liability company that operated at 25803 North County Road 3250, Wynnewood, Oklahoma 73098. Until on or about October 4, 2020, the Listed Species in Defendants' custody and control were located at GW Park.

14.     Defendant Big Cat Institute is an Oklahoma domestic not for profit corporation with its principal place of business at 25803 N County Road 3250, Wynnewood, Oklahoma 73098.

15.     Defendant Tiger King, LLC, which has the Trade Name "Tiger King Park," is an Oklahoma domestic limited liability company with its principal place of business located at 21469 Jimbo Road, Thackerville, Oklahoma 73459. As of October 2020, the Listed Species in Defendants' custody and control were relocated to 21469 Jimbo Road, Thackerville, Oklahoma 73459 and/or 21619 Jimbo Road, Thackerville, Oklahoma 73459 ("Tiger King Park").

16.     Defendant Jeffrey Lowe is the registered agent of Big Cat Institute, the co-operator and sole member of Greater Wynnewood Exotic Animal Park, LLC, and the co-operator and co-owner of Tiger King Park. He oversees day-to-day operations, including animal care and nutrition, enclosure construction, and supervising staff members. Mr. Lowe is a citizen and resident of Love County, Oklahoma, and is believed to reside at 21469 Jimbo Road, Thackerville, Oklahoma.

17.     Defendant Lauren Lowe is the purported Vice President of the Greater Wynnewood Exotic Animal Park, LLC, and the co-operator of GW Park. Defendant Lauren Lowe is also the co-operator and co-owner of Tiger King Park. Among other things, she participates in animal care, prepares animals' food, and "handle[s] the records for inventory, acquisition, [and] disposition" of the animals in Defendants' custody and control. On information and belief, Mrs. Lowe is a citizen and resident of Love County, Oklahoma, and is believed to reside at 21469 Jimbo Road, Thackerville, Oklahoma.

18.     Defendant Erik Cowie was a long-time employee at GW Park and is currently employed at Tiger King Park. At both facilities, Defendant Cowie's responsibilities included animal care. On information and belief, Defendant Cowie is a citizen and resident of Love County, Oklahoma.

19.     Defendant Eric Yano is a purported Executive Partner in Tiger King LLC and is, on information and belief, funding and involved with staffing Tiger King Park, assists with animal care, including the animals' veterinary care, and is a citizen and resident of Nevada. Defendant Yano's involvement with Tiger King LLC, Tiger King Park, and animal care for Listed Species at issue is so extensive that he has asserted both individual and corporate ownership of Big Cats at issue.

20.     Defendant Cheryl Scott owns the parcel of property located at 21619 Jimbo Road, Thackerville, Oklahoma and is, on information and belief, a resident of Oklahoma.

– 4 –

## IV.    STATUTORY BACKGROUND

### A.    The Endangered Species Act

21.    The ESA defines an "endangered species" as "any species which is in danger of extinction," 16 U.S.C. § 1532(6), and a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future," *id*. § 1532(20).

22.    The ESA prohibits the "take" of any endangered species, or any threatened species unless otherwise provided by a Section 4(d) special rule, within the United States. *Id.* § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c), 17.31(a).

23.    The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

24.    The term "harm" is defined by regulation as an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" is defined by regulation to include an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.* The term "wound" means to inflict a physical injury, including but not limited to the piercing or laceration of an animal's skin. *PETA v. Wildlife in Need and Wildlife in Deed, Inc. ("WIN"),* 476 F. Supp. 3d 765, 776 (S.D. Ind. 2020); *Graham v. San Antonio Zoological Society*, 262 F.Supp.3d 711, 741 n.15 (W.D. Tex. 2017).

25.    Additionally, it is also unlawful to possess any endangered species, or any threatened species unless otherwise provided by a Section 4(d) special rule, that has been unlawfully taken. 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d), 17.31(a).

26.    Subject to limited exceptions not applicable here, the ESA also makes it unlawful for a person to "possess, sell, deliver, carry, transport, or ship, by any means whatsoever," any ESA-protected species who has been unlawfully taken, and "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity," or "sell or offer for sale in interstate or foreign commerce" any ESA-protected species. 16 U.S.C. § 1538(a)(1)(D)–(G); 50 C.F.R. §§ 17.21(d)–(f), 17.31. *See also* 50 C.F.R. §§ 17.40(b), (r), 17.84(l) (grizzly bear and lion special rules).

– 5 –

27.   Tigers, jaguars, and lemurs are listed as "endangered" under the ESA. 50 C.F.R. § 17.11(h). Grizzly bears are listed as threatened in the lower 48 states, with limited exceptions not applicable here. *Id*. §§ 17.11(h), 17.40(b), 17.84(l). Lions are listed as either "endangered" or "threatened" depending upon their subspecies—the subspecies *Panthera leo leo* is listed as "endangered" and the subspecies *Panthera leo melanochaita* is listed as "threatened." *Id*. § 17.11(h). Plaintiff does not know the subspecies of the lions at issue; however, the take and the possession of unlawfully taken members of both subspecies is prohibited by the ESA. 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c), 17.31, 17.40(r).

28.   The ESA authorizes the Secretary of the Interior to issue a permit for any act that is otherwise prohibited by 16 U.S.C. § 1538, but, as relevant here, only if such act is "for scientific purposes or to enhance the propagation or survival of the affected species" and other strict requirements are met. 16 U.S.C. § 1539(a)(1)(A), (c), (d).

29.   The ESA allows citizens to bring suit "to enjoin any person . . . who is alleged to be in violation" of the statute or of a regulation promulgated under the statute. *Id*. § 1540(g)(1)(A).

**B.   Oklahoma Public Nuisance and Animal Protection Laws**

30.   In Oklahoma, a "nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission" "offends decency." Okla. Stat. Ann. tit. 50, § 1. A nuisance constitutes a "public nuisance" when it "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." *Id*. § 2.

31.   In Oklahoma, it is a crime to "deprive any . . . animal of necessary food, drink, shelter, or veterinary care to prevent suffering," "cause, procure or permit any such animal to be so . . . deprived of necessary food, drink, shelter, or veterinary care to prevent suffering," or "willfully set on foot, instigate, engage in, or in any way further any act of cruelty to any animal, or any act tending to produce such cruelty." Okla. Stat. Ann. tit. 21, § 1685.

**V.   FACTUAL BACKGROUND**

32.   Defendants Jeffrey and Lauren Lowe, GW Park, and Big Cat Institute, with the assistance of Defendant Cowie and, upon information and belief, Defendant Yano (together, the "Wynnewood Defendants"), operated GW Park—a now-defunct unaccredited roadside zoo in Wynnewood, Oklahoma—where they exhibited numerous animals, including the Listed Species, to the public in exchange for payment. The Wynnewood Defendants charged a fee for admission

– 6 –

to GW Park and a separate fee for patrons to physically interact with Big Cat cubs, ring-tailed lemurs, and other non-ESA animals.

33. After being ordered to vacate GW Park, *see Big Cat Rescue Corp. v. Schreibvogel*, No. CIV-16-155-SLP, 2020 WL 2842845, at *3 (W.D. Okla. June 1, 2020), Defendants Mr. and Mrs. Lowe relocated several of the animals to Tiger King Park, an unaccredited roadside zoo in Thackerville, Oklahoma. The species held by Defendants at Tiger King Park include one or more members of the following species: lion, tiger, lion-tiger hybrid, jaguar, mountain lion, lynx, caracal, bobcat, fisher, red/silver/cross fox, arctic fox, bat-eared fox, gray/timber wolf, jackal, coyote, ring-tailed lemur, tamarin, marmoset, rhesus macaque, pig-tailed macaque, bush baby, kinkajou, opossum, ferret, raccoon, African porcupine, hedgehog, camel, alpaca, sheep.

34. Many animals—including, on information and belief, Listed Species—were harmed, harassed, wounded, and killed during the multi-year process of constructing and transferring animals to the Thackerville facility that became Tiger King Park. For example, in 2019 Defendants induced a prospective business partner to transport more than 100 animals on a more than 800-mile journey from Charlestown, Indiana to Thackerville. Defendant Jeffrey Lowe admits that approximately 100 animals were transported from Charlestown to Thackerville on July 19, 2019 in what he estimates was an enclosed "100 degree trailer with no A/C unit" and "no water." Defendant Jeffrey Lowe's own estimate is that 30 animals died during this trip. He also admits that animals that survived the trip "were in horrible condition," including "massive brain damage from the heat," "open seeping wounds," that "[s]ome animals started chewing their tails off their bodies," and that "sloths were chewing their own feet off." He further admits that additional animals "dropped dead" shortly thereafter.

35. Many of the animals at Tiger King Park are frequently denied the most basic necessities, including adequate veterinary care, adequate nutrition, appropriate social groups, and safe, appropriate handling. If not confiscated or, on information and belief, unlawfully trafficked, animals who remain in Defendants' custody are confined to unsanitary and wholly inadequate enclosures void of proper enrichment.

36. Defendants also intentionally breed Big Cats, including Big Cats of different species, and lemurs. In violation of the ESA, Defendants have routinely and prematurely separated Big Cat cubs and lemur pups from their mothers and transported them to other roadside zoos and/or forced them into direct contact with the public.

37.   Defendants do not possess a permit from the Secretary of the Interior to take Listed Species under 16 U.S.C. § 1539(a)(1)(A).

38.   During the past year, the U.S. Department of Agriculture ("USDA") has issued Defendant Jeffrey Lowe numerous citations for failing to meet even the most minimal requirements for proper care of its animals under the AWA. Following Mr. Lowe's continued and repeat non-compliance with the AWA, the USDA suspended his exhibitor license on August 13, 2020 and filed an administrative complaint seeking permanent revocation of his license on August 17, 2020. On August 21, 2020, Defendant Lowe voluntarily terminated his AWA exhibitor license. While the administrative action remained pending, the United States filed a civil action against the Lowes, GW Park, and Tiger King Park for violations of the ESA and the AWA on November 19, 2020. The federal government's civil action remains pending.

39.   Without an AWA license, Defendants cannot lawfully exhibit any regulated animals to the public. However, according to the Department of Justice, the Lowes continue to exhibit animals to the public at Tiger King Park. *See, e.g.*, Mem. in Supp. of Mot. for Prelim. Inj. at 21, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Dec. 23, 2020), ECF No. 28. On information and belief, despite the apparent unlawful exhibitions, Defendants' inability to monetize Tiger King Park and the animals confined there has significantly impaired their financial viability. Such financial difficulties also appear to have manifested in Wynnewood Defendants inability to pay taxes owed to the State of Oklahoma in a timely manner, and in all Defendants' documented inability to, as discussed above and below, pay for adequate veterinary care, staffing, nutrition, equipment, or facilities. In this regard, Defendants are, on information and belief, financially unable to provide adequate veterinary care, staffing, nutrition, equipment, or facilities for the animals in their possession on an ongoing basis.

40.   Additionally, on information and belief, despite Defendants' apparent lack of financial wherewithal to care for the animals already in their possession and a court order prohibiting the breeding of listed Species, Defendants continue to allow Big Cats to breed. *See, e.g., U.S. v. Lowe*, No. 20-CV-0423-JFH, 2021 WL 1087805, at *5 (E.D. Okla. Mar. 22, 2021) (holding that "any failure of Defendants to prevent breeding of the animals at the Thackerville Facility is in violation of the Court's January 15, 2021 Order").

## VI.   DEFENDANTS TAKE LISTED SPECIES IN VIOLATION OF THE ENDANGERED SPECIES ACT

### A.   Defendants take Listed Species by denying them adequate veterinary care.

41.     Defendants harm, harass, wound, and kill Listed Species in their custody by depriving them of adequate veterinary care, leading to injury and death, as well as the disruption of species-typical behavioral patterns, in a manner that is likely to cause further injury—all in violation of the ESA.

42.     Defendants have a pattern and practice of failing to provide timely and appropriate veterinary care, contrary to generally accepted standards of animal care and in violation of USDA regulations. *See* 9 C.F.R. § 2.40(a). This pattern and practice is evidenced, in part, by the following examples:

a.  On January 20, 2021, the USDA cited Defendant Jeffrey Lowe for failing to provide adequate, timely veterinary care to a tiger cub named Bubbles who purportedly died by choking. Despite "never act[ing] right" after an initial choking incident, Bubbles never received timely veterinary care. The tiger cub purportedly choked a second time and later died.

b.  The USDA cited Defendant Jeffrey Lowe for failing to provide a geriatric lion named Simba, who was observed to be thin and have areas of hair loss on his upper back legs, with adequate veterinary care. According to the USDA's Inspection report, Simba "received no medical assessment and care from a veterinarian for his . . . conditions" as the agency had previously instructed on its last inspection report.

c.  A Big Cat named Django was observed to be limping, a condition that indicates the animal is in pain, or enduring impaired mobility preventing expression of expected species-typical behaviors. After instructing Defendant Jeffrey Lowe to communicate Django's condition to a veterinarian, he was cited by the USDA for failing to do so. Instead, contrary to basic tenets of animal care, Django was put on a course of prescription medication that was not approved by a veterinarian. As the USDA noted in its inspection report, "[t]he use of medications not approved by a veterinarian can result in the failure of the condition to be addressed and for unintended side effects from the medication." On information and belief, Defendants' neglect and failures with respect to the underlying source of Django's

– 9 –

injury, Django's condition, and Django's veterinary care are likely to result in further harm, harassment, wounding, and even death.

d.  The jaguar named Bagheera is also denied adequate veterinary care. Bagheera suffers from hair loss on the end and sides of his tail, and has been observed sucking on his tail by Defendant Cowie. In January 2021, the USDA cited Defendant Jeffrey Lowe for failing to consult with a veterinarian regarding Bagheera's condition, which, as the USDA noted, can be caused by problems such as, but not limited to, trauma, parasites, stress, and other dermatological medical problems. Such trauma and stress, on information and belief, likely stems from inadequate conditions of confinement, including but not limited to lack of space or adequate enrichment.

e.  Defendant Jeffrey Lowe was cited by the USDA in June 2020 for failing to provide adequate veterinary care to a male Big Cat named Young Yi who was not examined, diagnosed, or treated by the attending veterinarian, despite obvious signs of illness. Young Yi subsequently died. Defendant Jeffrey Lowe admitted in August 2020 that Wynnewood Defendants also did not have any form of necropsy performed on Young Yi because they (wrongly) dismissed his condition as an inevitable result of the aging process.

f.  In June 2020, the USDA cited Defendant Jeffrey Lowe for failing to provide adequate veterinary care to a young lion named Nala who was "lethargic, depressed, and thin" and suffered from obvious signs of respiratory illness. Nala—who suffered from painful ear ulcerations from fly strike and was later diagnosed with an upper respiratory infection, dehydration, and a urinary tract infection—was subsequently transferred to a wildlife sanctuary in Colorado, in accordance with a court order in an unrelated ESA matter. Following her transfer, Nala was found to be underweight, lame, suffering from both a critical vitamin A deficiency and a chronic fracture of her right humerus.

g.  Other Big Cats in the Lowes' custody have also suffered from severe flystrike, which was left ineffectively treated, resulting in painful ulcerations on the ears and legs of numerous Big Cats. In June 2020, the USDA cited Defendant Jeffrey Lowe for causing flystrike afflictions in numerous Big Cats by leaving partially burned and decomposing carcasses of deceased Big Cats lying in the facility, causing "a

foul odor of decomposing flesh" resulting in "an attractant for flies and other pests." Additionally, the USDA cited Defendant Jeffrey Lowe for allowing this entirely preventable condition to progress to such a state, and for failing to otherwise address and manage an excessive amount of insect activity in a timely manner. For example, the June 2020 USDA citation observes that "no fly traps were present in the back areas of the park during the inspection."

h.  The Wynnewood Defendants also denied adequate veterinary care to a tiger named Promise, who appeared recumbent, unable to stand or ambulate, and suffered from what appeared to be a deep ulcerated lesion on the right hip and atrophy of the hind limbs that indicate that the condition had been present for a prolonged period of time. Promise was euthanized after her condition was reported to the authorities.

i.  The Wynnewood Defendants also denied a grizzly bear named Gizzy adequate veterinary care. As noted in the USDA's June 2020 inspection report, Gizzy was emaciated. While in the Lowes' care, Gizzy's coat was also chronically patchy and unkempt—signs of inadequate diet, environment, and/or an underlying health condition that had not been properly diagnosed or treated. Gizzy, on information and belief, is also among the animals exposed to harm, harassment, and wounding via conditions of transport—such as by dehydration, sweltering heat, and other physical and psychological injuries—between Indiana and Oklahoma in 2019. An accredited sanctuary rescued Gizzy before Defendants permanently moved to Thackerville.

j.  The Wynnewood Defendants also failed to provide adequate veterinary care to two Big Cat cubs who were transported from GW Park to Las Vegas, Nevada, and subsequently confiscated by authorities. Following confiscation, the Big Cat cubs were reportedly treated for ringworm, giardia, urinary tract infections, and pancreatic insufficiency.

k.  The Wynnewood Defendants also failed to provide adequate veterinary care for a lemur who had visible areas of hair loss on the base of his tail.

43.  On information and belief, similar failures and inadequacies have also caused the recent deaths of other Big Cats including, but not limited to, Big Cats named Bone Digger, Dot, Kahari, and Maynor.

44.     Defendants' failure to provide Listed Species with adequate veterinary care is exacerbated by their failure to have an attending veterinarian with species-specific training or experience consistently maintain a written program of veterinary care, follow the program of veterinary care when one is in place, provide preventative veterinary care, and, as the USDA and the Department of Justice have alleged, Defendants' routine falsification of veterinary records, including records for Big Cats. *See, e.g.*, Compl. ¶¶ 17-18, *In re: Jeffrey Lowe, et al.*, AWA Docket Nos. 20-J-0152 and 20-J-0153 (U.S.D.A. Aug. 17, 2020); Compl. ¶ 111, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Nov. 19, 2020), ECF No. 2 (alleging, in part, that "the veterinary records presented by the Lowes were forged"). In addition to the failures of veterinary care specifically alleged by the USDA and Department of Justice, unqualified veterinarians consulted and used by Defendants in the care of Listed Species have also, among other failures, inflicted harm, harassment, and wounding on Big Cats via provision of dangerous items purportedly for enrichment, lack of necessary vaccinations, improper dosage of prescribed medications, improper care of cubs prematurely separated from their mothers without medical necessity, and failure to perform necropsies on a regular basis.

45.     As the Department of Justice has alleged in its ESA Complaint, "[t]he Lowes' animals have suffered from and continue to suffer from easily preventable or treatable conditions, which in some cases has caused the untimely death of animals. Indeed, in the last two years, many animals have not been seen and/or treated by a veterinarian at all." Compl. ¶ 14, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Nov. 19, 2020), ECF No. 2. Such failure to provide appropriate veterinary care causes Listed Species in Defendants' custody injuries and death, as well as the likelihood of further injury, in patent violation of the ESA.

**B.      Defendants take Listed Species by denying them adequately implemented nutritional protocols.**

46.     Basic tenets of animal care mandate that animals be provided a species-appropriate, nutritionally complete diet. The AWA's bare minimum standards of care require that "food . . . be wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain all animals in good health," and "[t]he diet . . . be prepared with consideration for the age, species, condition, size, and type of the animal." 9 C.F.R. § 3.129(a); *see also id*. § 3.82(a) (nutrition requirements for primates). Defendants fail to comply with this this basic, minimum requirement.

– 12 –

47.     Instead, Defendants provide Listed Species in their custody inappropriate diets that lead to weight issues, life-threatening conditions, including critical nutritional deficiencies and metabolic bone disease, and even death.

48.     Defendants have fed Big Cat cubs, specifically lion cubs, Kitten Milk Replacer ("KMR") mixed with water exclusively for four months. Not only is KMR nutritionally inadequate, but it also deprives the lions of a species-appropriate weaning process. In its December 2020 inspection report, the USDA noted that Big Cats were being fed a boneless chicken meat diet, which "without calcium supplementation can result in nutritional deficiency, disease, malformed bones, gait abnormalities, and fractures."

49.     According to the Department of Justice, a young male tiger named Daniel was "was deprived of sufficient calcium" and "resultantly suffered a broken leg." Mem. in Supp. of Mot. for TRO at 10, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Dec. 30, 2020), ECF No. 32. Daniel's condition, which was "caused by Defendants' continued failure to provide adequate nutrition and a balanced diet for animals at the facility," was preventable malnutrition that led to his euthanasia. *Id*. Daniel's necropsy confirmed that he suffered from metabolic bone disease, and "notes that the most common cause in young, growing animals 'is due to improper dietary ratios of calcium, phosphorous, and vitamin D.'" *Id*. at 16.

50.     Defendants failed to provide a Big Cat cub named Ayeesha with "adequate nutrition, including calcium and other necessary nutrients, to allow her to grow and the bones to develop normally. This has resulted in many painful fractures that have impaired her mobility." Compl. ¶ 176, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Nov. 19, 2020), ECF No. 2.

51.     Upon their removal from GW Park, juvenile Big Cats, Nala, Amelia, and Leo were also deemed to be underweight and undersized for their age. As noted above, Nala was diagnosed with a severe vitamin A deficiency, pathologic fractures, and a "poor body condition" that were "likely due to poor nutrition." *Id*. ¶ 106.

52.     Several Big Cats at Tiger King Park are overweight—a sign of inadequate diet and environment. Specifically, when asked during a deposition whether Big Cats named Pandora, Rocky, and Jagger had any distinguishing features or physical abnormalities, Defendant Cowie described the individual big Cats as "very round," "fat," "huge, fat," and, with respect to Jagger, as having "a little bit of a weight problem." Defendant Cowie also identified a Big Cat named Thunder as the "[f]at guy" and Big Cats Charlie Brown, Axyl, Rocky, Sasha, and Merlin and "The

Fat Five." On information and belief, Defendants do not engage in any regular or systematic monitoring of Big Cat body condition scores, how much each Big Cat is ingesting, or whether any individual Big Cats are out-competing enclosure mates for food. Left unchecked, poor body conditions can impair Big Cats' physical health by, for example, leading to or exacerbating osteoarthritis and other orthopedic issues, and significantly disrupting natural behaviors in a manner likely to cause injury.

53.     Contrary to industry standards, which provide that lemurs should be provided with fresh browse daily "to promote natural feeding behaviors," the lemurs in Defendants' custody are communally fed from a suspended bucket, which interferes with normal feeding behaviors such as foraging. Additionally, on information and belief, Defendant Jeffrey Lowe forcibly administered alcohol to at least one lemur, in direct contravention of the most basic standards of animal care.

54.     A critical part of maintaining a bear's health and meeting the animal's nutritional needs requires properly addressing the bear's seasonal physiological and nutritional cycles, by, for example, working with a veterinarian or nutritionist to formulate and provide seasonally appropriate diets. Despite this, the Wynnewood Defendants, on information and belief, failed to provide for seasonally-appropriate nutrition and husbandry accommodations for an emaciated grizzly bear, Gizzy, while she was in their custody. As the Department of Justice has asserted, Gizzy's "malnutrition proved preventable." Mem. in Supp. of Mot. for Prelim. Inj. at 18, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Dec. 23, 2020), ECF No. 28.

55.     In addition to feeding Listed Species nutritionally unsound diets, Defendants' food handling practices fail to meet generally accepted husbandry standards and the AWA's minimum standards of care. For example, in July 2020, the USDA cited Defendant Jeffrey Lowe for failing to maintain the only food source for the facility's carnivores under proper refrigeration. At the time of the inspection, the only refrigerated storage for the animals' food was a broken refrigerator truck, which contained boxes of decaying meat and emanated an odor of decaying flesh. According to the UDSA's report, the temperature inside the truck was similar to the ambient temperature, which exceeded 85 degrees Fahrenheit. The USDA again cited Defendant Jeffrey Lowe in December 2020 after the agency observed a large amount of packaged chicken being thawed on the ground and unprotected "from contamination for dirt or pets." Allowing meat to sit in unsafe temperatures risks contamination and disease, and violates the AWA's minimum requirements.

*See* 9 C.F.R. § 3.129(a); *see also* USDA, APHIS, *Nutrition for Nondomestic Felids*, Policy No. 16 (2011).

56.     By denying Listed Species adequately implemented nutrition protocols—which are fundamental to the physical and psychological well-being of any captive animal—Defendants harm and harass Listed Species in violation of the ESA.

**C.      Defendants take Big Cats and lemurs by denying them species-appropriate social groups.**

57.     Contrary to generally accepted standards of animal care, Defendants routinely deny Big Cats and lemurs species-appropriate social groups. As a result, Defendants violate the ESA by physically and psychologically harming the animals, and depriving them of the ability to engage in species-typical behaviors in a manner that is likely to result in further physical and psychological injury.

58.     Defendants' pattern and practice of failing to provide Big Cats and lemurs species-appropriate social groups has resulted in physical and psychological injuries to the animals and even death. This pattern is evidenced, in part, by the following examples:

   a.   According to the Department of Justice, "[t]he tiger Jughead was attacked by tigers from the neighboring enclosure who either gained access to Jughead's enclosure or dragged him through the fence to their enclosure. The tiger had puncture wounds and an abscess on his face. He died three days later at the park." Compl. ¶ 169, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Nov. 19, 2020), ECF No. 2.

   b.   According to Defendant Cowie, approximately eighteen inches of a Big Cat named Ima Sweetie Pie's tail was "bitten off by another tiger."

   c.   According to Defendant Cowie, a lion named Jax is housed with tigers, despite his propensity to "torment and pester" the tigers "from time to time."

   d.   According to Defendant Lauren Lowe, a lemur named TJ, suffered from a "busted lip," after getting "into a fight" with his brother, which required the Lowes to separate the incompatible lemurs.

   e.   On information and belief, the Big Cat named Django's limping was likely caused by attacks by one or more tigers with whom he shared an enclosure.

f.  On information and belief, a juvenile lion, Amelia, had to have one of her toes amputated on April 22, 2020, after being bitten by another animal, likely another Big Cat with whom she shared an enclosure.

g.  Until on or about January 20, 2021, the jaguar, Bagheera, was confined with two female lions, Allana and Aurora. Although Bagheera was physically separated from the lions, he still does not have visual privacy from other Big Cats. On information and belief, these inappropriate and harmful conditions have caused Bagheera physical and psychological injury, as evidenced, in part, by the fact that he engages in abnormal behaviors, including sucking on his tail and feet.

h.  According to Defendant Cowie, Allana has a permanent "nick" near her spine approximately halfway between her shoulder blades and her hips due to a "scuffle" she had with an enclosure-mate "over a piece of chicken" in the fall of 2020.

59.  These dangers are exacerbated by Defendants' inadequate enclosures, inadequate program of environmental enrichment, and approach to behavioral monitoring. For example, when asked during a deposition whether he or anyone else at his facility monitors Big Cats to ensure they do not fight, Defendant Jeffrey Lowe dismissed it as "a dumb-ass question." Nor, according to Defendant Jeffrey Lowe, do Defendants keep any records of Big Cat social groupings or compatibility.

60.  Not only do these inappropriate and forced social groupings lead to physical and psychological injury, they also deny Listed Species opportunities to engage in species-typical behaviors, including, for example, avoidance behaviors, in a manner that is likely to result in further physical and psychological injury.

61.  Defendants' housing and maintenance of the Big Cats and lemurs also fails to account for each species' unique social needs.

62.  Tigers, for example, are generally solitary animals who typically leave their mother's side at age two or three to find their own territory. As such—absent very specific conditions where animals are able to exercise a high degree of autonomy—group housing of adult tigers is contrary to generally accepted animal husbandry practices. Despite this, Defendants group house tigers in a manner that denies them the ability to have a necessary degree of autonomy, and interferes with their natural behaviors, including, for example, social avoidance behaviors. Adult tigers who are housed in this manner at Tiger King Park include, for example: (1) Charlie Brown,

Axyl, Shash, Merlin, and Rocky; and (2) Nova, who is housed with purported Big Cat hybrids, Mayte and Grace.[1]

63.     Unlike tigers, lions are highly social animals and are typically found in large social groups called prides. Thus, meeting the physical and psychological needs of captive lions requires, among other things, providing them with the opportunity to socialize with compatible lions and engage in species-appropriate behaviors such as grooming, and playing. Despite the social needs of lions, Defendants' confine lions, including, for example, Jax and Lyla, without any conspecifics. Instead, Defendants' confine these lions with tigers, a species that, as described above, have entirely different social needs.

64.     Ring-tailed lemurs are highly social animals who typically live in large social groups called conspiracies, ranging in size from eight to twenty individuals. In order to ensure their physical and psychological health, captive lemurs must be provided with the opportunity to socialize with other lemurs and otherwise engage in species-typical social behaviors, including bonding, grooming, exploring, playing, as well as other social interactions and adjustments.

65.     Despite this, and in defiance of generally accepted animal husbandry practices, the Wynnewood Defendants engaged in a practice of socially isolating baby lemurs. For example, the Lowes transported a solitary lemur pup named Clutch from GW Park to Las Vegas, Nevada. The lemur was subsequently confiscated by Las Vegas authorities in November 2017. The Lowes also held in isolation a lemur who was used for public encounters at Neon Jungle OKC—a now-defunct operation where Defendant Jeffrey Lowe would exhibit and allow members of the public to pay to interact with young exotic animals at a mall in Oklahoma City.

66.     Failure to provide Listed Species with appropriate social groups is detrimental to the animals' physical and psychological health, including by causing injuries and permanent physiological changes resulting from psychological distress. In Big Cats, psychological distress can often leave the animals with higher blood cortisol levels, which can trigger apathy, learned helplessness, or displacement behaviors—activities animals engage in when they are prevented from performing behaviors they are highly motivated to perform. Different stressors also disturb

---

[1]     As discussed further below, *see* Section VI.F, *infra*, Defendants' inconsistent identification and practice of Big Cat hybridization increases the likelihood of health and welfare problems likely to manifest in harm, harassment, wounding, and death as Defendants fail to meet these Big Cats' needs as determined by the Big Cats' individual genetic predispositions, characteristics, and care parameters.

normal physiological functions of different organs and leave animals susceptible to illness and disease. Lemurs can also suffer from injuries resulting from distress and psychological detachment, as well as other acute and chronic physical and psychological injuries.

67.     Defendants' failure to provide Big Cats and lemurs with adequate social groups subjects these animals permanent psychological and physical injury, and deprives them of the ability to engage in normal behavioral patterns, creating the likelihood of further injury, including deleterious effects associated with chronic stress, in direct violation of the ESA.

**D.      Defendants take Listed Species by denying them appropriate enclosures and adequate enrichment.**

68.     Defendants harm and harass Listed Species by housing the animals in wholly inadequate, unsafe enclosures void of proper enrichment. By doing so, Defendants cause Listed Species to suffer physical and psychological injury, and deprive Listed Species the ability to engage in normal behavioral patterns in a manner that is likely to cause further injury.

**(1)      Defendants harm and harass Big Cats by denying them safe, appropriate housing and enrichment.**

69.     To meet the basic needs of Big Cats in captivity, generally accepted animal husbandry standards mandate that the animals be provided with large, environmentally rich, naturalistic spaces that allow them to express a wide range of species-typical behaviors.

70.     Enrichment plans for tigers must be designed to allow the animal to express a wide-range of species-typical behaviors, including feeding and hunting behaviors. Species-appropriate plans aim to provide stimulating physical and mental activities by introducing a variety of environmental enrichment items such as bones or deceased whole prey items for feeding, pools or ponds for swimming, devices designed to encourage natural behaviors that are kept novel by changing them regularly, different substrates to investigate and lie in, the introduction of new smells, enclosure rotations, platforms, opportunities to retreat from the public and other animals, and adequate space to run. According to the Association of Zoos and Aquariums ("AZA"), the typical tiger exhibit is between 2,500 and 10,000 square feet, with an average of 5,500 square feet. Ass'n of Zoos & Aquariums, *Tiger* (Panthera tigris) *Care Manual* 12 (2016).

71.     In addition to providing for lions' social needs by providing them with the opportunity to socialize with compatible lions, lions must be provided with spacious enclosures that are designed to create opportunities for the expression of complex behaviors, as well as

– 18 –

encouraging a wide-range of species-appropriate behaviors such as resting, hunting, stalking, grooming, and playing. Lion enclosures should also provide social privacy that allows them to retreat from other Big Cats and zoo guests through the use of visual barriers that do not limit the animal's access to food, water, shade, or heat. According to the AZA's 2010 Lion Species Survival Plan Space Survey, the majority of lion exhibits are over 10,000 square feet, which "should be considered the minimum size for new exhibits." Ass'n of Zoos & Aquariums, *Lion* (Panthera leo) *Care Manual* 18–19 (2012).

72.     Generally accepted animal husbandry practices dictate that jaguar exhibits be designed to encourage natural behaviors including, for example, hunting, resting, territoriality, scent marking, digging, scratching, climbing, swimming, and defense of home range against conspecifics. They should also be provided with elevated perches, high nesting sites, and other incorporated climbing structures to stimulate natural behaviors. In 2014, the average primary habitat area for a single jaguar exceeded 2,600 square feet, and the AZA recommends, at a minimum, that the heights of jaguar enclosures range from 10 to 12 feet. Ass'n of Zoos & Aquariums, *Jaguar* (Panthera onca) *Care Manual* 18-19 (2016).

73.     As with the enclosures itself, all items introduced as enrichment must be routinely cleaned. They must also be routinely rotated, evaluated, and reassessed to ensure the promotion of daily expression of a range of natural behaviors. Enrichment items and attachment methods must also be regularly assessed for safety concerns, minimizing the risk of injuries or fatalities.

74.     Big Cats are vulnerable to stress in captivity, which may result from an inability to express species-typical behaviors, such as stalking and hunting. It is standard animal husbandry practice to provide environmental and behavioral enrichment opportunities for all individuals and species, thereby providing opportunities to exercise choice, express species-typical behaviors, and minimize the development of harmful or abnormal repetitive or stereotypical behaviors such as self-mutilation, fence chewing, pacing, and rubbing.

75.     Captive environments that do not provide the environmental enrichment necessary to promote the expression of a full range of species-typical behaviors have a detrimental effect on the animals' physical and psychological well-being. For example, when Big Cats experience long periods of inactivity or mindless activity permanent long-term changes to the body, brain, neural, and endocrine systems results. Additionally, barren environments can cause Big Cats psychological distress, which, as described in Section VI.C, *supra*, can often leave Big Cats with

higher blood cortisol levels, and even severe physical and psychological injuries. Nevertheless, Defendants and their staff have no knowledge in, and, on information and belief, no interest in learning, how to provide environments sufficient to meet Big Cats' safety and enrichment needs.

76.     Despite the established authority on the environmental needs of Big Cats, Defendants confine over eighty Big Cats to small, wholly inadequate enclosures that are so deficient that they fail to provide for the animals' physical, social, and psychological well-being.

77.     As cited in the USDA's January 2021, inspection report, many Big Cats at Tiger King Park are "being housed in enclosures that measure 8 feet wide by 14 feet long by 7 feet tall." Such small enclosures—which fail to meet even the bare minimum standards provided by AWA regulation and are a gross departure from generally accepted industry standards—harm and harass the Big Cats by preventing them from making normal postural and social adjustments, including for example, stretching, getting adequate exercise, and avoiding other cats in the same or adjacent cages. The inability of some Big Cats to avoid cage mates and/or Big Cats in adjacent enclosures has already proven injurious and likely fatal. *See* Section VI.C, *supra*.

78.     The enclosures are so deficient at Tiger King Park that they fail to provide Big Cats with adequate shelter from the elements—a violation of the minimum requirements set forth in AWA regulation. *See* 9 C.F.R. § 3.127. In January 2021, the USDA cited Defendant Jeffrey Lowe for failing to provide animals, including Big Cats, with adequate shelter from inclement weather. Denying captive Big Cats appropriate shelter physically harms them, and significantly disrupts their normal behaviors, including sheltering and resting behaviors, in a way that puts their physical and psychological well-being at risk of injury.

79.     Many of the cages at Tiger King Park have wood or concrete substrates that fail to protect Big Cats from injury, in violation of the AWA's minimum requirements, *see* 9 C.F.R. 3.125(a), and the ESA. As noted in the USDA's January 2021 inspection report, at least two cats at Tiger King Park "were observed to have hair loss and thickening of the skin on their elbows (elbow calluses)" which "usually occurs when the elbows are subjected to continuous trauma from laying on hard surfaces." The USDA's citation confirmed Defendant Cowie's deposition testimony that Big Cats suffer from "elbow calluses" and "water elbow," the latter of which may be caused by prolonged pressure or trauma.

80.     The harms caused by the inadequate space and shelter are further exacerbated by the sheer lack of complexity, privacy, and opportunities to exercise choice and control over their

environment, preventing the animals' ability to engage in a wide range of species-typical behaviors that are critical to the Big Cats' physical and psychological health. Indeed, Defendants confine Big Cats to virtually barren enclosures, with dirty objects like a plastic dog igloo, balls, chains, barrels, and tires that, on information and belief, are not regularly varied or assessed for effectiveness and, in many cases, are affirmatively dangerous by creating high risk of harm, harassment, wounding, and death. Alone, these objects do not encourage the Big Cats to engage in a wide range of natural behaviors such as simulated predatory behaviors, investigatory behaviors, and social avoidance behaviors, including the autonomy to choose to engage with or avoid others, and are therefore inadequate to provide for the animals' physical and psychological well-being.

81.     As a result of the improper environment, including inadequate enrichment, Big Cats have been observed engaging in abnormal and harmful behaviors, including abnormally repetitive pacing and ear-, tail-, and paw-sucking. For example, Defendant Cowie admits that a number of Big Cats, including Ima Sweetie Pie and Clay, are permanently missing hair following rubbing incidents he describes as "like a kid getting a skinned knee." Defendant Cowie also admits that the Big Cat Patronus has "got a couple scrapes from cage rubbing," and that Thunder "every once in a while . . . walks into the side of the cage[.]" Indeed, even the USDA, during its limited time at Tiger King Park during inspections, observed at least four Big Cats exhibiting repetitive pacing that "did not appear to be excitement in response to [the inspectors'] presence." These behaviors indicate psychological distress, likely caused by inadequate space and enrichment, and if left unaddressed can lead to further physical and psychological injury.

82.     In addition to denying animals adequate enrichment, Defendants have deliberately introduced, or caused to be introduced through their willfulness and recklessness, hazardous objects into Big Cat enclosures, which pose serious, and even life-threating dangers to Big Cats, including risk of ingestion, which creates serious choking, intestinal blockage, and inhalation hazards. On at least two occasions, Big Cats required surgery after ingesting hazardous objects: Nala ingested a broken plastic toy and, according to Defendant Cowie's deposition testimony, Django "ate a blanket or a stuffed animal." Defendant Jeffrey Lowe has admitted that, in 2020, members of the public were able to get close enough to Big Cats under his care to feed Nala a foreign object. According to Mr. Lowe, his attitude toward security is that precautions are futile because "[y]ou can't fix stupid," "people are dumb," and even "the Bronx Zoo can't stop people from climbing over into the lion cages." Defendant Jeffrey Lowe also disclaimed any desire to

take preventive measures such as visible surveillance. This is consistent with reports from members of the public in May 2020 that they were allowed to roam the Wynnewood facility without restriction or sufficient instruction.

83.     Prior to relocating to Thackerville, Oklahoma, the Big Cat enclosures at GW Park were so deficient that Big Cats escaped, leading to the death of one tiger who was reportedly shot and killed to prevent the tiger from escaping the facility. The USDA also cited Defendant Lowe in July 2020 after a female juvenile lion was observed balancing on the top of the enclosure fencing.

84.     The Wynnewood Defendants also have a long history for failing to maintain Big Cat enclosures in proper repair. For example, Defendant Lowe was repeatedly cited in June and July 2020, when the metal reinforcement on a tiger enclosure was no longer closely adhered to the metal fence, thus creating a hazard for limb entrapment.

85.     The risks of inadequate and unsecure Big Cat enclosures are further exacerbated by Defendants' willful refusal to microchip any of their Big Cats. Use of transponder microchips for individual identification is a generally-accepted industry practice.

86.     Additional environmental irritants, resulting in harm and harassment, include the foul odor of decomposing flesh reported by the USDA in a June 2020 inspection report. The smell of putrefying flesh is a likely source of annoyance that can cause serious psychological and ultimately physiological harm, as Big Cats may fear that exposed carrion will attract other dangerous animals. In addition, as Big Cats' sense of smell is orders of magnitude more acute than that of humans, Big Cats likely experience such odors as highly aversive. On information and belief, Defendants have continued the practice of disposing of animal carcasses via ad hoc burn piles at Tiger King Park, exposing Listed Species to further harm and harassment.

87.     These inadequate conditions wholly fail to meet the Big Cats' physical, social, and psychological needs, and cause the Big Cats to suffer physical and psychological injury. The conditions in which these Big Cats are kept thus constitute, and will continue to constitute, a take in violation of the ESA.

> **(2)     Defendants harm and harass Lemurs by denying them safe, appropriate housing and enrichment.**

88.     Generally accepted husbandry practices dictate that primates be provided with extensive, varied, and well-planned environmental enrichment in order to provide animals with opportunities to engage in a wide range of species-typical behaviors. Even the AWA's minimum

standards of care require animal exhibitors to "develop, document, and follow an appropriate plan for environmental enhancement adequate to promote the psychological well-being of nonhuman primates." 9 C.F.R. § 3.81. These mandatory environmental enhancement plans must include "specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature." *Id*. § 3.81(a). In addition, "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities." *Id*. § 3.81(b).

89.     Defendants and their staff largely disclaim knowledge of and, on information and belief, have no interest in learning how to provide environments sufficient to meet lemurs' safety and enrichment needs. As a result, Defendants fail to comply with generally accepted husbandry practices. Instead, they confine lemurs in inappropriate environments and without appropriate enrichment, and therefore fail to meet the lemurs' complex cognitive or social needs and provide the essential elements of captive primate husbandry.

90.     Specifically, Defendants confine the lemurs indoors in small, metal cages with a concrete or similarly unyielding substrates. At least one of the lemur enclosures is so deficient that parts of it are rusted—which, as the USDA noted in its December 2020 inspection report, "creates a surface that cannot be adequately cleaned and sanitized" and thus "plays a role in disease transmission."

91.     Each enclosure is littered with a few plastic balls, ropes, slings, and cinder blocks, which, on information and belief, are not routinely cleaned, rotated, or assessed for effectiveness.

92.     Such conditions are harmful to the lemurs' physical and psychological health, and cause or are likely to cause injury, including multiple acute and chronic psychological and physiological injuries resulting from their inability to express a full range of species-appropriate, non-injurious behaviors, including, but not limited to: foraging, scent marking, sunbathing, and deriving intellectual stimulation from a varied habitat. The vertical nature of the enclosures also deprive the lemurs opportunities to express species-appropriate roaming behaviors because, unlike others species of lemurs, ring-tailed lemurs spend a significant amount of time on the ground. Deprivation of species-appropriate environmental enrichment also causes a likelihood of injury by driving potential development of aberrant and repetitive behaviors, including, for example, social withdrawal, displaced aggression, excessive grooming, mutilation, and changes in motivation and learning.

93.     Further, the pervasive odor of decomposing flesh described above, *see* Sections VI.A, VI.D(1) *supra*, interferes with the lemurs' olfactory senses and directly inhibits their ability to properly communicate. The inability to appropriately investigate the environment or communicate, including communication via scent glad mechanisms, can cause psychological and physiological harm to lemurs, and interfere with species-typical behaviors (including olfactory communication) in a manner likely to cause further injury.

94.     The conditions in which these ring-tailed lemurs are kept thus constitute, and will continue to constitute, a take in violation of the ESA.

### (3)   The Wynnewood Defendants' harmed and harassed a grizzly bear by denying her adequate space and enrichment.

95.     Defendants' failure to provide Listed Species with appropriate enclosures and enrichment is further evidenced, in part, by the conditions in which the Wynnewood Defendants confined a grizzly bear named Gizzy before her rescue by an accredited sanctuary.

96.     Generally accepted animal husbandry practices dictate that brown bears be provided with large, complex, environments designed to meet their physical, social, behavioral, and psychological needs. *See, e.g.*, Global Federation of Animal Sanctuaries, Standards for Bear Sanctuaries (June 2013).

97.     Despite this, Gizzy was confined at GW Park to a small, virtually barren enclosure, with little to no variance, choice, or control. By depriving Gizzy appropriate space and enrichment, the Wynnewood Defendants' harmed and harassed Gizzy by significantly disrupting her ability to engage in species-appropriate behaviors such as digging, climbing, bathing, foraging, hunting, denning, resting, and playing, in a manner likely to lead to further injury to her physical, behavioral, and psychological health.

98.     Due to a lack of drainage, mud also accumulated in the static environment. Accumulation of mud and other substrates can compromise the integrity of containment barriers and lead to injury or escape. Enclosures are already small and lacking complexity, and now sections are rendered inappropriate for use by the animals due to excess water and mud. Having to lie in water or mud can affect an animal's ability to properly thermoregulate, which can result in both short- and long-term health issues. Standing water and mud also create breeding situations for pests, such as mosquitoes, that can be vectors for parasite and disease transmission.

99.     Indeed, the enclosure confining Gizzy was so deficient that it did not prevent members of the public from touching her. Public contact with a grizzly bear is extremely dangerous for the animals and the public, and contravenes the most basic standards of animal care and AWA regulations. *See, e.g.*, 9 C.F.R. § 2.131(c)(1).

100.    The deficiencies at GW Park were so egregious that Gizzy engaged in multiple severe abnormal repetitive behaviors, including biting the bars of her cage and frantic stereotypic pacing behavior. These harmful behaviors are recognized as indicators of compromised well-being and psychological distress, and can lead to physical injuries such as arthritis, ulcerated foot pads, broken teeth, and other associated health issues.

101.    The conditions in which Gizzy was maintained denied her any meaningful opportunity to exercise choice or express species-typical behaviors, failed to satisfy generally accepted standards of care, physically and psychologically injured the bear, and significantly disrupted her normal behavioral patterns in a manner likely to cause further injury. The Wynnewood Defendants therefore committed an unlawful take of Gizzy by harming and harassing her in violation of the ESA.

**E.      Defendants take Big Cats and lemurs by prematurely separating them from their mothers and allowing direct public contact with the animals.**

102.    The Wynnewood Defendants have a long history of taking Big Cats by prematurely separating cubs from their mothers and bringing Big Cat cubs as young as, or younger than, four weeks old into direct contact with the public. On information and belief, Defendants continue to engage in these practices at Tiger King Park. Separation of cubs from their mothers as infants, well before they are naturally weaned, causes distress to the cubs and their mothers, and other physical and psychological harm. For example, premature maternal separation disrupts the cubs' behavioral development, and alters the cubs' normal feeding behaviors and other species-typical behaviors that cubs should learn from their mothers at appropriate developmental stages.

103.    As described in Section V, *supra*, the Wynnewood Defendants have also prematurely separated lemur pups from their mothers. As the Department of Justice has explained, "[r]emoval of a ring-tailed lemur from [their] social group, even for a brief period of time, can cause a reshuffling of the social structure causing the briefly removed ring-tailed lemur to be ousted from or even attacked by the conspiracy." Compl. ¶ 155, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Nov. 19, 2020), ECF No. 2. Premature maternal separation also interferes with the lemur pups'

normal behaviors, including feeding behaviors and appropriate developmental learning of species-specific social norms.

104.    In addition to taking Big Cat cubs and lemurs by premature maternal separation, the Defendants force the animals to engage in abnormal and injurious behaviors through public handling sessions, which harm and harass the animals by severely disrupting their normal behavioral patterns, including feeding, sleeping, and sheltering, so as to create the likelihood of injury. This conduct significantly disrupts the animals' normal behavioral patterns by making it impossible for them to hide or otherwise seek shelter from fear-inducing stimuli, and not only causes them psychological injury but is so distressing that it also places the animals at significant risk for physical injury. Indeed, as the Department of Justice has alleged, "[s]tress in animals may compromise immunity, impair coronary health, alter brain structure and function, impair reproduction, stunt growth, reduce body weight, shorten lifespan, or increase abnormal behaviors." Compl. ¶ 134, *U.S. v. Lowe*, 6:20-cv-00423-JHF (Nov. 19, 2020), ECF No. 2.

105.    In addition, direct physical contact between the public and Big Cats increases the animals' chances of contracting diseases capable of human to animal transmission, such as SARS-CoV-2 (the virus that causes COVID-19 in humans). In that regard, the USDA has issued an Advisory Note requesting that: animal care staff "don extra protective equipment and practice physical distancing when possible;" members of the public keep at least six feet away from nondomestic cats "and optimally, be required to wear a mask when in the vicinity;" and "[h]ands-on encounters with nondomestic cats. . . be suspended until it can be assured that members of the public do not pose any risk of infection to the animals." U.S. Dep't of Agriculture, Advisory Note, *Limiting Close Contact Between Members of the Public and Nondomestic Cats* (May 14, 2020), https://www.aphis.usda.gov/animal welfare/downloads/draft-advisory-note-for-felids-oa.pdf.

106.    Despite this clear advisory, Defendants continue to engage in direct contact with Big Cats and, on information and belief, despite the suspension of Defendant Jeffrey Lowe's USDA license, allow members of the public to handle Big Cat cubs, all while appearing not to regularly use, or require, adequate social distancing or adequate use of personal protective equipment.[2] For example, as recently as January 22, 2021, the Lowes, Defendant Cowie, and

---

[2]    Defendant Jeffrey Lowe's prior sworn testimony regarding cessation of public handling has proven false. For example despite testifying in August 2020 that he implemented the USDA's

Jeffrey Lowe's son, Taylor Lowe—who were not wearing any personal protective equipment—were observed sticking their hands through Big Cat enclosures and directly contacting and petting big Cats for no apparent purpose. A former staff member was also authorized to take Big Cat cubs offsite, which she did, according to Defendant Jeffrey Lowe, "a few times," including in the fall of 2020. Additionally, despite not having a valid exhibitor's license, a member of the public was documented kissing a Big Cat Cub at Tiger King Park—a blatant violation of the USDA's advisory note. When still in operation, the Wynnewood Defendants also conducted public handling sessions without any precautions, including mandatory social distancing or mandatory personal protective equipment. Such practices significantly increase the risk of disease transmission, as well as significantly interfere with the animals' species-typical behaviors, creating a likelihood of further injury to the animals.

107.    Not only are animals handled without personal protective equipment at an increased risk of contracting diseases, but they may also become vectors for diseases if returned to an enclosure with other conspecifics.

108.    Defendants' practice of prematurely separating Big Cat cubs and lemurs from their mothers and history of forcing cubs and lemurs to participate in public-handling sessions and other harmful public contact contravenes generally accepted animal husbandry practices and constitutes a take in violation of the ESA.

**F.    Defendants harm and harass Big Cats by intentionally crossbreeding.**

109.    For the purpose of interspecies breeding, Defendants intentionally house sexually mature and intact Big Cats of different species together including lions and tigers, and, until recently, a jaguar and two lions. Defendants' also house lion-tiger hybrids with lions and tigers to encourage further crossbreeding. Such intentional interspecies breeding harms and harasses Big Cats in violation of the ESA.

110.    Specifically, Defendants' intentional confinement of lions with tigers and a jaguar with lions for the purpose of interspecies breeding physically and psychologically injures the Big Cats, endangers their safety, and creates a likelihood of further injury by significantly interfering with each species' expression of genetically predisposed behaviors. Defendants' practice also fails to comply with generally accepted animal husbandry practices. For example, jaguars are generally

---

guidance in early June 2020, social media posts by members of the public show Wynnewood Defendants staging public handling sessions later that same month.

considered to be a solitary species and "are not recommended for mixed-species exhibits." Ass'n of Zoos & Aquariums, *Jaguar* (Panthera onca) *Care Manual* 11, 33 (2016). Similarly, as discussed above, jaguars, lions, and tigers have distinct, genetically predisposed social needs. Despite this, Defendants confined a male jaguar, who exhibits abnormal behaviors indicative of distress, *see* Section VI.C, *supra*, with two female lions in an apparent attempt to breed the animals. Other injurious housing arrangements at Tiger King Park include, for example, a tiger named Opi and a lion named Lyla, who Defendant Cowie observed mating. Indeed, in January 2019, Defendant Jeffrey Lowe announced publicly that he was intentionally breeding "hybrid cats" and that he was "working on Jaglions," i.e., offspring between a jaguar and a lion.

111.    Given the unique needs of each species, Defendants' pattern of mixing species in the same enclosures with the intent to breed them denies each animal the opportunity to express a wide range of species-typical behaviors in a manner that is likely to cause injury. The physical and psychological harm resulting from the inability of the animals in Defendants' custody to express distinct range of behaviors is exacerbated by the fact that the current enclosures at Tiger King Park do not provide the space and complexity that a single species would require, let alone two species, or hybrids of species, who have unique and diverging needs.

112.    Additionally, the offspring produced by intentional crossbreeding often suffer from serious complications including lameness and other musculoskeletal problems. Such reckless crossbreeding may also expose the animals to lower immune system responses, congenital deformities, decline in overall fitness, increased susceptibility to disease and infection, shortened lifespan, or still birth.

113.    Defendants' intentional crossbreeding subjects the animals to physical and psychological injury, and the likelihood of further injury by significantly interfering with each species' normal behavioral patterns, in violation of the ESA.

G.    **Defendants take Big Cats by engaging in unsafe and injurious handling practices.**

114.    Defendants unlawfully harm and harass Big Cats by engaging in dangerous, unsafe handling practices.

115.    For example, as recently as January 22, 2021, Defendants' staff was observed grinding or welding a structure that enclosed a tiger named Patronus. While the staffer was

operating the machine, there was no barrier protecting the Big Cat from the shower of sparks and molten debris.

116.    Additionally, on information and belief, Defendant Jeffrey Lowe dragged a Big Cat by the animal's neck after losing control of the animal—who was reportedly only restrained by a leash—during a public exhibition at GW Park.

117.    Further, on information and belief, Defendants shoot Big Cats with pellet guns to force the animals to shift enclosures. On at least one occasion, a tiger presented with a wound congruent with projectile trauma on his or her forehead—an injury reportedly caused by Defendant Jeffrey Lowe, who shot the tiger with a pellet gun while he and at least one other staff member were trying to force the animal to move into a different space.

118.    Not only do such practices injure Big Cats and violate generally accepted standards of animal care, but they also severely disrupt the Big Cats' normal behavioral patterns, including sheltering and avoidance behaviors, so as to create the likelihood of further injury. Such gross mishandling harms, harasses, and wounds Big Cats in direct violation of the ESA.

**H.    Defendants have unlawfully trafficked in ESA-protected species.**

119.    The Wynnewood Defendants have trafficked in ESA-protected species in violation of the ESA.

120.    On information and belief, the Wynnewood Defendants have sold, delivered, carried, transported, or shipped, or induced, aided, or abetted the sale, delivery, carrying, transportation, or shipment of Big Cat cubs and a lemur taken in violation of the ESA and sold, delivered, received, carried, transported, or shipped, or induced, aided, or abetted the sale, deliver, carrying, transportation, or shipment of, at least two Big Cats in interstate commerce in the course of commercial activity.

121.    Specifically, on information and belief, Defendant Jeffrey Lowe reportedly sold seven cubs, including at least one lion cub, to Scotty Brown of Zootastic Park in Troutman, North Carolina, transported, delivered and/or sold at least on tiger cub to Kayla and Karl Mitchel in Pahrump, Nevada, and transported a solitary, unlawfully taken lemur from GW Park to Las Vegas, Nevada.

122.    The Wynnewood Defendants have also shipped at least one neonatal Big Cat cub to Special Memories Zoo in Greenville, Wisconsin, and a neonatal Big Cat cub to Robert Engesser in Trenton, Florida.

123. Defendant Lowe's apparent sale, delivery, and/or transfer of at least one lion cub and one tiger cub in interstate commerce violates the ESA. *See* 16 U.S.C. § 1538(a)(1)(E)–(G); 50 C.F.R. §§ 17.21(e), (f), 17.31, 17.40(r).

124. Additionally, by pulling at least two neonatal Big Cat cubs from their mothers and subsequently shipping them, and by transporting a solitary lemur from GW Park to Las Vegas, GW Park and the Lowes have unlawfully shipped and transported Listed Species who have been taken in violation of the ESA. *See* 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d), 17.31, 17.40(r).

125. As discussed further above, *see* Section V, *supra* Defendant Jeffrey Lowe also induced a potential business partner in Tiger King Park to transport more than 100 animals— including, on information and belief, Listed Species—more than 800 miles from southern Indiana to Oklahoma in February and July of 2019. By Defendant Jeffrey Lowe's admission, a number of these animals died during transport. Defendant Jeffrey Lowe further admits that the surviving animals arrived in "horrible conditions," including, but not limited to, "[s]ome animals [who] started chewing their tails off their bodies[.]"

126. The Wynnewood Defendants' history of trafficking in Listed Species is underscored by their well-documented history of failing to maintain animal acquisition and disposition records, falsifying records related to the transfer and veterinary care of the animals at issue, changing the names of animals without documenting those changes, and threatening, committing, aiding, and abetting spoliation of evidence related to Big Cats in separate litigation in the Southern District of Indiana and the Middle District of Florida.

127. Indeed, as recently as January 20, 2021, the USDA issued a repeat citation for Defendant Lowe's for failing to maintain appropriate acquisition and disposition records for at least sixty animals in his care, including at least two Listed Species, one lion and one tiger, who could not be accounted for.

## VII. DEFENDANTS' ONGOING MISTREATMENT OF ANIMALS CONSTITUTES A PUBLIC NUISANCE BY VIOLATING STATE AND FEDERAL LAW AND OFFENDING DECENCY

128. In addition to failing to provide adequate care to the Listed Species discussed in above, Defendants fail to provide adequate care, including adequate veterinary care, shelter, and nutrition, to the other animals they confine at Tiger King Park. As explained below, these failures

violate state law and the AWA's bare minimum requirements, offend decency, and thus constitute a public nuisance.

**A.    Defendants' failure to provide animals with adequate veterinary care violates state and federal law and constitutes a public nuisance.**

129.    Contrary to clear state and federal requirements, Defendants fail to provide animals with necessary veterinary care.

130.    Oklahoma law prohibits depriving animals, "whether wild or tame," necessary "veterinary care to prevent suffering" or "caus[ing], procur[ing] or permit[ing] . . . animal[s] to be . . . deprived of necessary . . . veterinary care to prevent suffering." Okla. Stat. Ann. tit. 21, § 1685.

131.    Federal law likewise mandates that exhibitors, like Defendants Jeffrey and Lauren Lowe, employ an attending veterinarian "who shall provide adequate veterinary care to its animals . . ." 9 C.F.R. § 2.40.

132.    Indicative of Defendants' repeat and ongoing failure to provide animals with adequate veterinary care, the USDA has cited Defendant Jeffrey Lowe for regularly depriving animals of timely and appropriate medical care.

133.    In June 2020, the USDA cited Defendant Jeffrey Lowe for failing to provide two arthritic, geriatric wolves with adequate veterinary care. At the time of the inspection, one of the wolves "was very reluctant to rise and the other had pressure sores on both rear hocks." Despite their condition, Defendant Jeffrey Lowe failed to follow "the instructions of the veterinarian to provide medication and bedding for the wolves." Instead, the wolves were confined to an enclosure with a concrete substrate—which "can exacerbate pain and discomfort"—with"[a] few strands of hay" deemed "insufficient for bedding as prescribed by the veterinarian." According to the USDA's inspection report, "[a]rthritis can be painful[,] affecting the animal's mobility and willingness to participate in daily activity . . . and may interfere with obtaining water and food if reluctant to rise." Wolves at the park also suffered from "large patches of painful ulceration" from fly strike, similarly caused by the conduct described in Section VI.A, *supra*, resulting in patches that were "missing hair, skin and/or deeper flesh."

134.    In July 2020, the USDA issued a repeat citation for Defendant Jeffrey Lowe's failure to provide the same wolves with adequate veterinary care. Despite clear veterinary recommendation, the arthritic wolves—one of whom "was still reluctant to rise"—remained confined to concrete substrate with "insufficient [hay] for bedding as prescribed by the

veterinarian." The USDA noted that the arthritis "may affect an animal's ability to move normally," which "has a negative impact on quality of life and can lead to other health problems such as reluctance to move to obtain food and water, and the development of pressure sores or other injuries."

135.    The USDA again cited Defendant Jeffrey Lowe in January 2021 for his failure to provide animals, including a geriatric wolf, with adequate veterinary care. The wolf—whose hip bones were "easily visible" and who "was observed to be extremely thin" during a prior USDA inspection—had died without receiving any "medical assessment and care from a veterinarian addressing his condition" as the USDA had previously instructed.

136.    In June and July 2020, the USDA repeatedly cited Defendant Jeffrey Lowe for failing to provide adequate veterinary care to a fisher, who "was lame on [their] left rear leg" and "had extreme thinning of the hair on [their] tail." Not only did Defendant Jeffrey Lowe fail to bring the animal's condition to the attention of the veterinarian, the condition "had not been observed or reported by facility representatives."

137.    In June 2020, Defendant Jeffrey Lowe was cited by the USDA for failing to provide a black bear named Eve with adequate veterinary care. At the time of the inspection, Eve was observed to be underweight and "exhibiting a heightened activity level," including "lunging at the cage edges and reaching through the bars at anything close to [the bear's] enclosure[.]"

138.    In January 2021, the USDA cited Defendant Jeffrey Lowe for failing to provide an artic fox, who was observed limping, with adequate veterinary care. According to the USDA, the medical condition was not observed by the facility, let alone reported to a veterinarian. According to the USDA, gait abnormalities, which are generally indicative of pain, "can result from problems such as but not limited to injury, orthopedic disease, and other neurologic medical problems."

139.    On information and belief, similar veterinary deficiencies exist with respect to the other animals in Defendants' care. This is evidenced, in part, by the Wynnewood Defendants' failure for multiple years to "employ an attending veterinarian to provide adequate veterinary care to their animals, and fail[ure] to establish and maintain programs of adequate veterinary care that included the use of appropriate methods to prevent injury and disease, daily observation of all animals to assess their health and well-being, and a mechanism of communication with the attending veterinarian." Indeed, in December 2020, the USDA issued a repeat citation for Defendant Jeffrey Lowe's failure to employ an attending veterinarian under formal arrangements.

140.    To date, the absence of an attending veterinarian meeting the standards of state and federal law has not been remedied.

141.    By depriving animals of necessary veterinary care, or by causing, procuring, or permitting animals to be deprived of necessary veterinary care, Defendants cause suffering, violating state and federal law and creating a public nuisance by offending decency.

**B.    Defendants' failure to provide animals with adequate shelter constitutes a public nuisance.**

142.    Defendants have a pattern and practice of denying the animals in their custody basic necessities including adequate shelter in violation of state and federal law.

143.    Oklahoma law prohibits depriving animals "necessary . . . shelter" or "caus[ing], procur[ing] or permit[ing] . . . animal[s] to be . . . deprived of necessary . . . shelter." Okla. Stat. Ann. tit. 21, § 1685.

144.    Under the AWA, enclosures for captive animals must "be structurally sound," "maintained in good repair to protect the animals from injury," provide appropriate shelter from the elements, and "provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement." 9 C.F.R. §§ 3.125–3.128; *see also id.* §§ 3.75–3.78 (housing requirements for primates).

145.    Despite these clear requirements, Defendants confine animals to inadequate and unsafe housing.

146.    For example, in February 2021, Defendant Jeffrey Lowe was cited by the USDA for housing several animals, including two mountain lions, one coyote, and one wolf, in "box cage" enclosures, many of which measured "7' tall x 8' wide x 14' long." These enclosures are wholly inadequate for the animals contained therein and deprive the animals of "sufficient space to allow each animal to make normal postural and social adjustments in order to prevent boredom and stress." Indeed, during the inspection, USDA inspectors observed "two bobcats, a wolf and a coyote pacing back and forth in their enclosure"—an abnormal repetitive behavior often indicative of psychological distress, generally resulting from inadequate space, barren surroundings, and nonexistent or inappropriate enrichment.

147.    Not only are animals denied adequate space, but they are also denied adequate shelter from the elements. Indicative of this practice, the USDA cited Defendant Jeffrey Lowe in

January 2021 because "[m]any of the outdoor enclosures housing the animals do not provide shelter from inclement weather."

148.    Additionally, in February 2021, the USDA issued a repeat citation after Defendant Jeffrey Lowe deprived several animals, including two wolves named Heuy and Nanook, adequate shelter from inclement weather. The wolves, who were housed outdoors, were given a single, non-insulated dog igloo that was inadequate to protect the wolves from local climatic conditions, including wind, rain, and snow.

149.    In December 2020, the USDA also cited Defendant Jeffrey Lowe for housing two macaques in outdoor enclosures. The macaques were observed to be "not well acclimated" to outdoor housing during the winter. As the USDA noted, "[f]ailure to have correctly acclimated nonhuman primates housed in outdoor conditions can lead to hyperthermia or hypothermia." In contravention of clear regulations regarding the provision of adequate shelter for primates, one macaque was provided with a metal crate and the other a plastic barrel that was open at each end. The metal shelter conducted "cold in a manner that could harm the animals," "especially the digits on the hands and feet in cold weather." The macaques' "ears and tail are also at risk of frost bite." Indeed, so deficient was the shelter that "[o]ne macaque was observed sitting hunched up with [their] limbs pulled very close to [their] body, as one does when they are very cold and trying to conserve body heat."

150.    The deficiencies of the enclosures are exacerbated by the fact that several of them are also in disrepair.

151.    For example, in June 2020, the USDA cited Defendant Jeffrey Lowe for failing to maintain porcupine, wolf, and fisher enclosures in good repair. The metal grate sub-floors of the enclosures were exposed, risking entrapment or injury to the animal, including "fracture or soft tissue injury that can be painful and become infected." As explained in Section VII.A, *supra*, at least one of the animals, specifically the fisher, was already lame.

152.    Defendant Jeffrey Lowe was also cited in June 2020 for failing to maintain a kangaroo enclosure in good repair, where "a piece of metal fencing ha[d] an exposed vertical edge" that "ha[d] the potential for limb entrapment between [them] and the wooden fence." On information and belief, the kangaroo enclosure was so deficient that the kangaroo was attacked by a wolf in October 2020. According to Dr. Lauren Thielen, the kangaroo's "left arm appear[ed]

hanging by a thread [and] right arm [wa]s also injured." This kangaroo had to be euthanized because of these injuries.

153.    By depriving animals of necessary shelter, or by causing, procuring, or permitting animals to be deprived of necessary shelter, Defendants cause suffering, violating state and federal law and creating a public nuisance by offending decency.

###### C.    Defendants' failure to provide animals with appropriate nutrition violates state and federal law and constitutes a public nuisance.

154.    Defendants fail to provide animals in their custody with appropriate nutrition.

155.    Oklahoma law prohibits depriving animals of "necessary food" or "drink" or "caus[ing], procur[ing] or permit[ing] . . . animal[s] to be . . . deprived of necessary food[ or] drink." Okla. Stat. Ann. tit. 21, § 1685.

156.    Federal law similarly mandates that captive animals be provided with food that is "wholesome, palatable, and free from contamination and of sufficient quality and nutritive value to maintain all animals in good health," 9 C.F.R. § 3.129(a), and that diets be "prepared with consideration for the age, species, condition, size, and type of the animal." *Id.*; *see also id.* § 3.82 (nutrition requirements for primates).

157.    Defendants do not comply with these straightforward mandates. For example, as explained in Section VI.B, *supra*, the USDA cited Defendant Jeffrey Lowe in July 2020 for failing to maintain the only food source for the facility's carnivores—including, for example, the mountain lions, bobcats, caracals, lynx, fisher, and ferrets—under proper refrigeration. As a result of this failure, the meat was decaying and emanated an odor of decaying flesh.

158.    By depriving animals of adequate nutrition, or by causing, procuring, or permitting animals to be deprived of adequate nutrition, Defendants cause suffering, violating state and federal law and creating a public nuisance by offending decency.

## VIII.    DEFENDANTS' ACTIONS PERCEPTIBLY IMPAIR PETA'S ACTIVITIES AND PROGRAMS, AND HAS FORCED IT TO DIVERT RESOURCES.

159.    PETA is dedicated to protecting animals, including animals used in entertainment, from abuse, neglect, and cruelty. PETA's motto, which summarizes its mission, reads, in part: "Animals are not ours to . . . use for entertainment[] or abuse."

160.    By mistreating and neglecting captive animals, and therefore increasing the number of animals subject to abuse and neglect in entertainment, Defendants have directly frustrated, and

continue to directly frustrate, PETA's mission to eliminate the abuse and neglect of captive animals.

161.    To achieve its objectives of ending the abuse and neglect of animals, including animals used for entertainment, PETA pursues many programs, including public education, cruelty investigation, research, animal rescue in conjunction with reputable sanctuaries, legislation, special events, celebrity involvement, and protest campaigns. It brings this suit on its own behalf to protect its programs, which have been perceptibly impaired by Defendants' actions.

162.    By unlawfully harming, harassing, wounding, and killing federally-protected animals and confining them and other neglected animals to unlawful conditions for years without repercussion, Defendants created, and will continue to create, the incorrect public impression that the conditions in which these animals are kept are humane and lawful and that Defendants can lawfully abuse, neglect, and mistreat animals. This public misimpression was exacerbated by the Lowes' once-robust social media presence and media appearances, all of which significantly increased public exposure to Defendants' unlawful acts. This has frustrated and will continue to frustrate PETA's programs by making it harder to persuade the public that it should exclusively support reputable facilities and should not tolerate Defendants' unlawful mistreatment of the animals who are the subject of this action and the use of animals in entertainment.

163.    As a result, PETA has been forced to divert resources in order to counteract the public impression that Defendants' practices are lawful and consistent with animal welfare. In order to counteract this public impression, PETA has been and continues to be forced to, among other activities: submit complaints about Defendants' operations to government agencies, including agencies in South Carolina, Oklahoma, and Nevada; publish multiple posts on the PETA.org blog; review and respond to complaints from the public about Defendants; compile and publish information on PETA's website about Defendants' history of animal welfare violations; hold public demonstrations; and distribute press releases on Defendants' animal welfare violations. These activities, necessitated by Defendants' violations of the ESA at issue, required PETA to divert significant resources that PETA would have otherwise used to advocate for other animals, including, for example, animals held in other roadside zoos, traveling animal exhibits, and in other industries, by addressing the manner in which those animals are commonly, and, in many instances, lawfully used.

164.    In order to compile accurate information about GW Park and Tiger King Park to share with the public and its members, as well as to counteract the public misimpression that Defendants' practices are lawful and consistent with animal welfare, PETA has been and continues to be forced to: track and gather Defendants' USDA inspection reports and related USDA filings; monitor Defendants' and third-parties' social media pages; monitor Defendants' websites; submit multiple public records requests related to Mr. Lowe's various animal-related businesses; and review and analyze numerous responsive documents. These activities, necessitated by Defendants' violations of the ESA at issue, required PETA to divert significant resources that PETA would have otherwise used to advocate for other animals, including, for example, animals held in other roadside zoos, traveling animal exhibits, and in other industries, by addressing the manner in which those animals are commonly, and, in many instances, lawfully used.

165.    Before commencing this action, PETA also litigated a petition to perpetuate evidence under Federal Rule of Civil Procedure 27, and compiled an accurate inventory of the Listed Species in Defendants' custody and control through a court-ordered site inspection of Tiger King Park. This was necessitated by Defendants' past practices, as documented above, below, and in PETA's petition to perpetuate evidence under Rule 27, with respect to Listed Species. *See* Rule 27 Petition, *PETA v. Lowe*, No. 5:20-CV-01076-D, (W.D. Okla. Oct. 22, 2020), ECF No. 1. Litigating PETA's petition to perpetuate evidence under Rule 27 forced PETA to divert significant resources that PETA would have otherwise used to advocate for other animals, including, for example, animals held in other roadside zoos, traveling animal exhibits, and in other industries, by addressing the manner in which those animals are commonly, and, in many instances, lawfully used.

166.    Defendants' practices with respect to the animals now at issue also forced PETA to divert significant resources that PETA would have otherwise used to combat the abuse and neglect of animals in other contexts for litigation against, and discovery of, Defendants in other jurisdictions.

167.    For example, Mr. Lowe aided and abetted the attempted spoliation of Listed Species in violation of a court order in litigation in the Middle District of Florida, resulting in the deaths of Big Cat cubs. *See, e.g.*, Am. R. & R., *PETA v. Dade City's Wild Things, Inc.*, 8:16-cv-02899-CEH-AAS (M.D. Fla., Jul. 30, 2019), ECF No. 282 (recommending sanctions and default judgment on pre-amended complaint against defendants following bad faith, willful transfer of

– 37 –

Listed Species in ESA litigation to Mr. Lowe); PETA's Emergency Appl. for TRO and Prelim. Inj. or, in the Alternative, Emergency Mot. for Order Prohibiting Spoliation and Preserving Evid., *PETA v. Dade City's Wild Things, Inc.*, 8:16-cv-02899-CEH-AAS (M.D. Fla., July 14, 2017), ECF No. 67 (detailing the role Mr. Lowe's facility played in receiving spoliated animals). As a result, PETA was required to take discovery of Defendant Jeffrey Lowe relating to these actions, and explore other potential avenues for relief from Defendant Jeffrey Lowe relating to these actions, as part of its litigation in the Middle District of Florida.

168.    Mr. Lowe also took possession of the lion cubs Amelia, Leo, Nala, and Kahari in violation of multiple court orders from the Southern District of Indiana in August 2019 from a defendant in litigation PETA was prosecuting in that jurisdiction. *PETA v. WIN,* 476 F. Supp. 3d 765, 774 (S.D. Ind. 2020). As a result, Mr. Lowe made himself a required party under the Federal Rules of Civil Procedure. *Id.* at 774 n.4. PETA is still litigating claims over Defendant Jeffrey Lowe's ESA violations with respect to these four lions—one of whom, Kahari, died under suspicious circumstances that PETA has been compelled to extensively investigate—in the Southern District of Indiana.[3] *See, e.g.*, Mot. for Leave to File Suppl. Auth., *PETA v. WIN,* No. 4:17-cv-00186-RLY-DML (S.D. Ind. Apr. 16, 2021), ECF No. 442; Mot. for Leave to File Suppl. Evid., *PETA v. WIN,* No. 4:17-cv-00186-RLY-DML (S.D. Ind. Mar. 2, 2021), ECF No. 441; Mot. for Leave to File Suppl. Evid., *PETA v. WIN,* No. 4:17-cv-00186-RLY-DML (S.D. Ind. Dec. 2, 2020), ECF No. 440; Reply Br. in Supp. of Summ. J., *PETA v. WIN,* No. 4:17-cv-00186-RLY-DML (S.D. Ind. Oct. 30, 2020), ECF No. 438; Br. in Supp. of Mot. for Leave to File Suppl. Evid., *PETA v. WIN*, No. 4:17-cv-00186-RLY-DML (S.D. Ind. Oct. 13, 2020), ECF No. 432; Br. in Supp. of Mot. for Summ. J., *PETA v. WIN,* No. 4:17-cv-00186-RLY-DML (S.D. Ind. Sept. 11, 2020), ECF No. 407.

169.    PETA has also rehomed thirty-nine tigers, three bears, two baboons, two chimpanzees, and three lions previously in Mr. Lowe's custody and control to reputable facilities. These actions, which were necessitated both by PETA's mission and by the practices of Wynnewood Defendants with respect to animals now at issue, forced PETA to divert significant

---

[3]    PETA is also still prosecuting Defendant Lauren Lowe's contempt of court orders from the Western District of Oklahoma in an enforcement proceeding relating to the Southern District of Indiana litigation. *See, e.g.*, Order, *PETA v. Lauren Lowe*, No. 5:20-CV-00612-PRW (W.D. Okl. Dec. 17, 2020), ECF No. 17.

resources that PETA would have otherwise used to combat the abuse and neglect of animals in other contexts.

170.    PETA continues to be forced to undertake all of the actions listed in the preceding paragraphs, and is therefore compelled to divert resources on an ongoing basis, to address Defendants' unlawful mistreatment of the animals who are the subject of this action.

171.    PETA suffers an injury different in kind and degree than the general public due to the perceptible frustration of its programs caused by Defendants' unlawful conduct and nuisance, which makes it harder for PETA to persuade the public that it should not tolerate the use of animals in entertainment and should not tolerate animal abuse and neglect. Unlike other members of the public, PETA has been forced to, and continues to be forced to, expend resources to investigate and counteract Defendants' unlawful treatment and neglect of animals, and to counteract the public impression that Defendants' treatment of animals is lawful and consistent with animal welfare, when it is in fact illegal, cruel, and offensive to public decency. Specifically, the expenses incurred identifying and counteracting Defendants' illegal activity and related public misimpression has forced PETA to divert resources away from campaigns against other non-accredited roadside zoos and traveling animal shows with egregious records of animal neglect and abuse, and from funding animal rescues, among other efforts.

172.    If PETA prevails in this action, Defendants will no longer be able to maintain animals in conditions that are unlawful and inconsistent with animal welfare, and PETA will no longer have to divert resources to counteract the incorrect public impression caused by Defendants' unlawful acts or to counteract the unlawful acts themselves. Nor would PETA's additional efforts and the resulting expenditures be necessary but for Defendants' unlawful treatment of animals. Given this, appropriate legal condemnation, injunctions, and surrender of the animals in Defendants' possession to reputable facilities would adequately redress PETA's impairment.

173.    Plaintiff is in a position to secure new homes at bona fide wildlife sanctuaries or otherwise appropriate zoological facilities or homes for all affected animals.

IX.    **CLAIMS FOR RELIEF**

<u>**Count I – Unlawful Take of Listed Species**</u>

174.     PETA incorporates by reference all allegations of the Complaint.

175.    The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B), (G) and its implementing regulations, 50 C.F.R. §§ 17.21(a), (c), 17.31(a), (c), 17.40(b), (r), prohibit the take of "any [listed]

– 39 –

species" not otherwise provided for by a Section 4(d) special rule, within the United States without a permit.

176.     Defendants have violated the ESA and its implementing regulations by taking a grizzly bear, ring-tailed lemurs, and Big Cats, without a permit, at GW Park. Defendants continue to violate the ESA and its implementing regulations by taking ring-tailed lemurs and Big Cats without a permit at Tiger King Park.

177.     This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and ordering them to relinquish possession of Listed Species to appropriate reputable sanctuaries. 16 U.S.C. § 1540(g)(1)(a).

## Count II – Unlawful Possession of Listed Species

178.     PETA incorporates by reference all allegations of the Complaint.

179.     Subject to limited exceptions not applicable here, the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(D), (G) and implementing regulations, 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(b), (r), prohibit the possession, by any means whatsoever, of any species taken in violation of the ESA.

180.     Defendants have violated the ESA and its implementing regulations by possessing an unlawfully taken grizzly bear, ring-tailed lemurs, and Big Cats at GW Park. 16 U.S.C. § 1538(a)(1)(D), (G) 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(b), (r). Defendants continue to violate the ESA and its implementing regulations by continuing to possess unlawfully taken ring-tailed lemurs and Big Cats at Tiger King Park. 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(r).

181.     This Court has the authority to issue an injunction prohibiting Defendants from continuing to possess unlawfully taken ring-tailed lemurs and Big Cats in violation of 16 U.S.C. § 1538(a)(1)(D) and (G) and 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(r), and ordering them to relinquish possession of these animals to appropriate reputable facilities. 16 U.S.C. § 1540(g)(1)(A).

## Count III – Unlawful Delivering, Carrying, and/or Transporting of Unlawfully Taken Listed Species

182.     PETA incorporates by reference all allegations of the Complaint.

183.    Defendants have violated and will continue to violate the ESA, 16 U.S.C. § 1538(a)(1)(D), (G), 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(r), by delivering, carrying, and/or transporting unlawfully taken animals.

184.    Unless enjoined, Defendants are likely to continue to deliver, carry, and/or transport unlawfully taken animals in violation of the ESA.

185.    This Court has the authority to issue an injunction prohibiting Defendants from continuing to deliver, carry and/or transport unlawfully taken ring-tailed lemurs and Big Cats in violation of 16 U.S.C. § 1538(a)(1)(D) and (G) and 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(r), and ordering them to relinquish possession of these animals to appropriate reputable facilities. 16 U.S.C. § 1540(g)(1)(A).

### Count IV – Unlawful trafficking of Listed Species

186.    PETA incorporates by reference all allegations of the Complaint.

187.    Defendants have violated and will continue to violate the ESA, 16 U.S.C. § 1538(a)(1)(E)–(G), 50 C.F.R. §§ 17.21(e), (f), 17.31, 17.40(r), by delivering, carrying, and/or shipping in interstate commerce, and in the course of commercial activity, endangered and threatened animals, and by selling or offering for sale in interstate commerce any endangered or threatened animals.

188.    Unless enjoined, Defendants are likely to continue to deliver, carry, and/or ship in interstate commerce, and in the course of commercial activity, and sell or offer for sale in interstate commerce ESA-protected animals.

189.    This Court has the authority to issue an injunction prohibiting Defendants from continuing to violate the ESA, and ordering them to relinquish possession of these animals to appropriate reputable facilities. 16 U.S.C. § 1540(g)(1)(A).

### Count V – Public Nuisance

190.    Plaintiff incorporates by reference all allegations of the Complaint.

191.    Defendants' operation of Tiger King Park, including the treatment of animals contained therein, violates Oklahoma's cruelty to animals statute, Okla. Stat. Ann. tit. 21, § 1685, the Animal Welfare Act, 7 U.S.C. §§ 2131–2159, and its regulations.

192.    These violations of law offend decency and therefore support a finding of public nuisance under Oklahoma statutory and common law. Okla. Stat. tit. 50 § 1, *et seq.*

193.   As a direct and proximate result of Defendants' creation of a public nuisance, PETA has suffered harm different in kind and degree than that suffered by members of the public.

194.   PETA has incurred economic damages including but not limited to the use of its resources to investigate and counteract Defendants' unlawful conduct and to counteract the incorrect public impression caused by Defendants' unlawful acts.

195.   If unabated, Defendants' unlawful conduct will continue to offend public decency and PETA's rights. Equitable relief, including transfer of the animals to bona fide sanctuary or otherwise appropriate zoological facilities or homes and an injunction prohibiting Defendants from obtaining other animals, would redress ongoing harms to PETA by Defendants' conduct at Tiger King Park.

196.   If equitable relief were granted, PETA would cease incurring costs related to investigating and counteracting Defendants' unlawful conduct and the resulting public misimpressions.

## **Relief Requested**

WHEREFORE, PETA respectfully requests that this Court:

A.   Declare that Defendants have violated and continue to violate the ESA by illegally taking Listed Species, 16 U.S.C. §§ 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(a), (c), 17.31(a), (c), 17.40(b), (r);

B.   Declare that Defendants have violated and continue to violate the ESA by possessing Listed Species who have been illegally taken, 16 U.S.C. §§ 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21 (a), (d)(1), 17.31(a), (c), 17.40(b), (r);

C.   Declare that Defendants have violated and continue to violate the ESA by delivering, carrying, and/or transporting unlawfully taken animals, 16 U.S.C. § 1538(a)(1)(D), (G), 50 C.F.R. §§ 17.21(a), (d)(1), 17.31(a), (c), 17.40(r);

D.   Declare that Defendants have violated and continue to violate the ESA by delivering, carrying, and/or shipping in interstate commerce, and in the course of commercial activity, endangered and threatened animals, and by selling or offering for sale in interstate commerce any endangered or threatened animals, 16 U.S.C. § 1538(a)(1)(E)–(G), 50 C.F.R. §§ 17.21(a), (e), (f), 17.31, 17.40(r);

E.   Enjoin Defendants from continuing to violate the ESA and its implementing regulations with respect to ring-tailed lemurs, a jaguar, lions, tigers, and lion-tiger hybrids,

including the prohibitions on taking a listed species, trafficking a listed species, and possessing a listed species that has been unlawfully taken;

F.    Enjoin Defendants from owning or possessing endangered or threatened species in the future;

G.    Enjoin Defendants from maintaining a public nuisance, namely by confining endangered, threatened, and non-endangered animals in unlawful conditions that offend decency;

H.    Enter a permanent injunction against Defendants that terminates all Defendants' ownership and possessory rights in the animals at issue;

I.    Appoint a special master or guardian ad litem to identify reputable wildlife facilities and to determine the most appropriate placement for the forfeited animals, consistent with the animals' best interests;

J.    Award PETA reasonable attorneys' fee and litigation costs for this action, 16 U.S.C. § 1540(g)(4); and

K.    Grant PETA such other and further relief the Court deems just and proper.

Date   April 26, 2021                Respectfully submitted,

                                     /s/ Heather L. Hintz
                                     Thomas G. Wolfe, OBA NO. 11576
                                     Heather L. Hintz, OBA No. 14253
                                     Mark E. Hornbeek, OBA No. 33198
                                     PHILLIPS MURRAH P.C.
                                     Corporate Tower, 13th Floor
                                     101 North Robinson
                                     Oklahoma City, Oklahoma 73102
                                     Telephone: (405) 235-4100
                                     Facsimile: (405) 235-4133
                                     tgwolfe@phillipsmurrah.com
                                     hlhintz@phillipsmurrah.com
                                     mehornbeek@phillipsmurrah.com

                                     and

                                     Asher Smith (pro hac vice pending leave to intervene)
                                     PETA FOUNDATION
                                     1536 16th Street NW
                                     Washington, DC 20036
                                     Telephone: (202) 483-7382
                                     ashers@petaf.org

– 43 –

and

Caitlin Hawks *(pro hac vice pending leave to intervene)*
Zeynep Graves *(pro hac vice pending leave to intervene)*
PETA FOUNDATION
2154 W Sunset Blvd.
Los Angeles, CA  90026
Telephone:  (323) 210-2263
Facsimile:  (213) 484-1648
*caitlinh@petaf.org*
*zeynepg@petaf.org*

***Attorneys for Plaintiff People for the Ethical Treatment of Animals, Inc.***

**VERIFICATION**

I, Brittany Peet, declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on: __April 26, 2021_____

People for the Ethical Treatment of Animals, Inc.

By: _____

Brittany Peet
Digitally signed by Brittany Peet
DN: cn=Brittany Peet, o=FSAP,
ou=Captive Animal Law Enforcement,
email=brittanyp@petaf.org, c=US
Date: 2021.04.26 13:35:41 -04'00'

Brittany Peet

# Appendix 1



September 21, 2020

**Via e-mail, first-class mail and certified mail return receipt requested**

Jeffrey & Lauren Lowe
Greater Wynnewood Exotic Animal
Park, LLC
25803 N. County Rd. 3250
Wynnewood, OK 73098
REDACTED

Big Cat Institute
25803 N. County Rd. 3250
Wynnewood, OK 73098

Tiger King, LLC
500 W. 7th St.
Tulsa, OK 74119

Erik Cowie
25803 N. County Rd. 3250
Wynnewood, OK 73098

Cheryl L. Scott
REDACTED

Eric Yano
REDACTED
REDACTED

The Honorable David Bernhardt
Secretary of the Interior
U.S. Department of the Interior
1849 C St. NW
Washington, DC 20240
secretary_of_the_interior@ios.doi.gov

Aurelia Skipwith
Director, U.S. Fish & Wildlife Service
1849 C St. NW, Rm. 3331
Washington, DC 20240
Aurelia_Skipwith@fws.gov

Re:    Notice of Intent to File Citizen Suit Pursuant to the Endangered
       Species Act

The Power of a Strategic Partner.®

Corporate Tower  |  Thirteenth Floor  |  101 N. Robinson  |  Oklahoma City, Oklahoma 73102
405.235.4100  |  Fax 405.235.4133  |  phillipsmurrah.com

**EXHIBIT 1**

Notice of Intent
September 21, 2020
Page 2 of 20

This letter constitutes notice, pursuant to Section 11 of the Endangered Species Act ("ESA"),[1] that People for the Ethical Treatment of Animals, Inc. ("PETA") intends to file suit after sixty days against the Greater Wynnewood Exotic Animal Park, LLC, an Oklahoma Domestic Limited Liability Company located at 25803 N. County Rd. 3250, Wynnewood, Oklahoma; Big Cat Institute, an Oklahoma Domestic Not For Profit Corporation; Tiger King, LLC, an Oklahoma Domestic Limited Liability Company; Jeffrey Lowe as an individual and in his capacity as the operator and sole member of Greater Wynnewood Exotic Animal Park, LLC and the registered agent of Big Cat Institute; Lauren Lowe; Erik Cowie (together with Jeffrey Lowe, Greater Wynnewood Exotic Animal Park, LLC, Big Cat Institute, Tiger King LLC, and Lauren Lowe, "GW Park"); Eric Yano; and Cheryl Scott (together, the "Parties") in federal district court pursuant to 16 U.S.C. § 1540(g)(1)(A) for ongoing and imminent future violations of the ESA and its implementing regulations.[2]

Jeffrey and Lauren Lowe, with the assistance of long-time animal care staffer, Erik Cowie, currently operate the Greater Wynnewood Exotic Animal Park in Wynnewood, Oklahoma (the "Wynnewood Facility"), a roadside zoo that confines several species of animals, and has a long history of routinely allowing members of the public to contact and handle exotic animals. The Lowes are building a second animal facility at 211619 Jimbo Road, Thackerville, Oklahoma (the "Thackerville Facility")—a parcel of property owned by Ms. Scott—and have announced their intention to close the Wynnewood Facility and move the animals to the Thackerville Facility in 2020. On information and belief, Mr. Yano is funding and involved with staffing the Thackerville Facility.

Following the expiration of the sixty day notice period, PETA intends to file suit against the Parties to enjoin GW Park's current and ongoing "take" of ring-tailed lemurs, a grizzly bear, a jaguar, and tigers, lions, and hybrids thereof[3] (collectively, the "Listed Species") at the Wynnewood facility, and to enjoin the Parties' imminent future takes at the Thackerville facility.

If the Parties wish to correct the ESA violations described below and avoid litigation under that statute, they should immediately contact the undersigned attorney to effectuate the transfer of these animals within sixty days to reputable facilities. PETA will arrange for the placement, transport, and veterinary care necessary for the animals' relocation to reputable facilities, where they may express species-typical behaviors in safe, sanitary, and enriching environments, in exchange for an

---

[1] 16 U.S.C. § 1540(g)(2)(A)(i).

[2] *Id.* § 1538(a)(1)(B), (D)-(G); 50 C.F.R. §§ 17.21, 17.31, 17.40(b), (r).

[3] The tigers, lions, and hybrids thereof will be collectively referred to as "Big Cats."

P|M

agreement that the Parties shall not own, possess, buy, sell, transfer, transport, or in any way handle or have contact with ESA-listed species in perpetuity.

## I.   The Endangered Species Act

The ESA prohibits the "take" of endangered and most threatened species within the United States.[4] Lemurs, jaguars, and tigers are listed as "endangered" under the ESA.[5] Grizzly bears are listed as threatened in the lower 48 states, with limited exceptions not applicable here.[6] African lions are listed as either "endangered" or "threatened" depending upon their subspecies—the subspecies *Panthera leo leo* is listed as "endangered" and the subspecies *Panthera leo melanochaita* is listed as "threatened"[7]—and the "take" prohibition applies to each.[8]

Congress defined "take" "in the "broadest possible" manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife."[9] "Take" is defined by statute to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[10]

"Harm" and "harass" are defined by regulation. "Harm" is "an act which actually kills or injures wildlife," including "by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."[11] "Harass" is "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[12]

---

[4] *See id.* § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21, 17.31.

[5] 50 C.F.R. § 17.11(h).

[6] *Id.* §§ 17.11(h), 17.40(b), 17.84(l) (special rule for designated Bitterroot Grizzly Bear Experimental Population Area that extends through portions of Idaho and Montana, in which bears have nonessential experimental status).

[7] *Id.* § 17.11(h).

[8] 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(a), 17.31(a), 17.40(r).

[9] *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704-05 (1995) (citing S. Rep. No. 93-307, p. 7 (1973); U.S. Code Cong. & Admin. News 1973, pp. 2989, 2995); *see also* H.R. Rep. No. 93-412, p. 154, 150 (1973) ("the broadest possible terms" were used to define restrictions on takings and to include "harassment, whether intentional or not").

[10] 16 U.S.C. § 1532(19).

[11] 50 C.F.R. § 17.3.

[12] *Id.*

Additionally, the ESA makes it unlawful for a person to "possess, sell, deliver, carry, transport, or ship, by any means whatsoever," any species that has been taken in violation of the Act.[13] Nor may a person "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity," or "sell or offer for sale in interstate or foreign commerce" any listed species.[14]

## II.  GW Park Takes Federally Protected Animals at the Wynnewood Facility in Violation of the ESA.

GW Park takes the Listed Species by prematurely removing Big Cats from their mothers, denying Listed Species adequate veterinary care, confining the Listed Species in conditions that fail to meet their social, physical, and psychological needs, and, although possibly interrupted by the suspension of Mr. Lowe's U.S. Department of Agriculture ("USDA") license in August 2020, forcing Big Cats and lemurs to engage in encounters with the public—all of which results in or creates a likelihood of injury to the animals by significantly disrupting normal behavioral patterns.

### A.  GW Park takes Big Cats by denying them adequate veterinary care.

GW Park harms and harasses Big Cats by depriving them of adequate veterinary care, leading to the injury of Big Cats in its custody and the disruption of normal behavioral patterns, in a manner that creates a likelihood of further injury. Most recently, in June and July 2020, the USDA repeatedly cited Mr. Lowe for failing to provide several species of animals at the Wynnewood Facility with adequate veterinary care and for failing to follow the facility's own program of veterinary care. In an administrative complaint filed on August 17, 2020, the USDA also alleged that the Lowes routinely falsify veterinary records, including records for Big Cats.[15]

GW Park has a pattern and practice of failing to provide Big Cats appropriate, timely veterinary care, resulting in injury and the likelihood of further injury. For example, several Big Cats at the Wynnewood Facility are suffering from severe flystrike, an entirely preventable condition that was left ineffectively treated, resulting in painful ulcerations on the ears and legs of numerous Big Cats. By allowing the condition to progress to such a state, and by failing to timely address and manage an excessive amount of insect activity, including by improperly disposing Big Cat carcasses, GW

---

[13] 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d), 17.31, 17.40(r).

[14] *Id.* § 1538(a)(1)(E)-(G); 50 C.F.R. §§ 17.21(e), (f), 17.31, 17.40(r). *But see* 50 C.F.R. §§ 17.40(b), 17.84(l) (grizzly bear special rules).

[15] Compl., In re: Jeffrey Lowe, et al., AWA Docket Nos. 20-J-0152 and 20-J-0153 at ¶¶ 17-18 (U.S.D.A. Aug. 17, 2020).

Park harms and harasses the Big Cats in violation of the ESA.[16] Further, Mr. Lowe was cited by the USDA for failing to provide adequate veterinary care to a seventeen year-old male Big Cat named Young Yi who was not examined, diagnosed, or treated by the attending veterinarian, despite obvious signs of illness, and a young lion named Nala who was "lethargic, depressed, and thin" and suffered from obvious signs of respiratory illness. GW Park also denied adequate veterinary care to a tiger named Promise, who appeared recumbent, unable to stand or ambulate, and suffered from what appeared to be a deep ulcerated lesion on the right hip and atrophy of the hind limbs that indicate that the condition had been present for a prolonged period of time. Promise was euthanized after her condition was reported to the authorities. GW Park also failed to provide adequate veterinary care to two Big Cat cubs who were brought from the Wynnewood Facility to Las Vegas, Nevada, and subsequently confiscated by authorities. Following confiscation, the Big Cat cubs were reportedly treated for ringworm, giardia, urinary tract infections, and pancreatic insufficiency.

GW Park has also, in contravention of clear discovery obligations in separate, pending litigation, refused to make complete disclosures regarding veterinary care administered to Listed Species.[17] This refusal reflects, on information and belief, the fact that whatever veterinarians are available to GW Park lack the training, expertise, or scientific, technical, and specialized knowledge to provide adequate veterinary care to Listed Species. Should GW Park engage in similar contumacy during the anticipated lawsuit regarding discovery of veterinary care for Listed Species, this lack of adequate veterinary care may be taken as established, or provide basis for a judgment that GW Park has violated the ESA, under Federal Rule of Civil Procedure 37(b)(2)(A)(i)-(vii).

GW Park's failure to provide appropriate veterinary care causes Big Cats in its custody injuries and trauma, and interferes with their normal behavioral patterns in

---

[16] *See People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 424 F. Supp. 3d 404, 426, 432 (D. Md. 2019), *appeal docketed,* Case No. 20-1010 (4th Cir. Jan. 7, 2020) (finding that roadside zoo's failure to provide a captive tiger with adequate veterinary care, including adequate care for the tiger's ears which were so afflicted by biting flies that it appeared that her ears had been "surgically truncated," harmed and harassed her in violation of the ESA); *see also Kuehl v. Sellner,* 161 F. Supp. 3d 678, 712 (N.D. Iowa 2016), *aff'd,* 887 F.3d 845 (8th Cir. 2018) (finding that roadside zoo's care and housing of lemurs—which included chronic sanitation problems and excessive amount of fly activity—resulted in an unlawful taking).

[17] See, e.g., Order on Plaintiff's Motion to Compel as to Defendant Lowe, *PETA v. Wildlife in Need and Wildlife in Deed, Inc., et al.*, No. 4:17-CV-00186-RLY-DML (S.D. Ind. Sept. 18, 2017), ECF No. 362.

a manner that is likely to cause further injury, in unequivocal violation of USDA regulations, generally accepted practices of animal care, and the ESA.[18]

**B.** **GW Park takes Big Cats by prematurely separating them from their mothers and by allowing direct public contact with the animals.**

For captive animals such as Big Cats, "forced proximity to or contact with humans can be deleterious to animal well-being."[19] Yet GW Park routinely prematurely separates Big Cat cubs from their mothers, brings Big Cat cubs and induces other exhibitors to separate Big Cat cubs from their mothers in preparation for their transport to GW Park, and, until Mr. Lowe's recent USDA license suspension, has brought Big Cat cubs as young as, or younger than, four weeks old into direct contact with the public. Separation of cubs from their mothers as infants, well before they are naturally weaned, causes distress to the cubs and their mothers, and other physical and psychological health problems. Maternal separation alters the cubs' normal feeding behaviors and other natural behaviors that, had they been allowed to remain with their mothers, the cubs would have learned from their mothers.

Further, the use of Big Cat cubs in public-handling sessions harms and harasses the animals in violation of the ESA by physically abusing them and causing severe disruption to their normal behavioral patterns, including feeding, sleeping, and sheltering, so as to create the likelihood of injury. This conduct significantly disrupts the animals' normal behavioral patterns by making it impossible for them to hide or otherwise seek shelter from fear-inducing stimuli, and not only causes them psychological injury but is so distressing that it also places the animals at significant risk for physical injury.

In addition, direct physical contact between the public and Big Cats increases the animals' chances of contracting zoonotic diseases capable of human to animal transmission, such as SARS-CoV-2 (the virus that causes COVID-19). In that regard, the USDA has issued an Advisory Note requesting that: animal care staff "don extra protective equipment and practice physical distancing when possible;" members of the public keep at least six feet away from nondomestic cats "and optimally, be required to wear a mask when in the vicinity;" and "[h]ands-on encounters with nondomestic cats. . . be suspended until it can be assured that members of the public

---

[18] *See, e.g.*, 9 C.F.R. § 2.40(a); Ass'n of Zoos & Aquariums, *Lion* (Panthera leo) *Care Manual* 65 (2012).

[19] Kathleen Morgan & Chris Tromborg, *Sources of Stress in Captivity*, 102 Applied Animal Behav. Sci. 262, 280 (2007); *see also* Matt W. Hayward & Gina J. Hayward, *The Impact of Tourists on Lion* Panthera Leo *Behaviour, Stress and Energetics*, 54 Acta Theriologica 219 (2009) (finding that lions were significantly more likely to exhibit disturbance-indicating behaviors and signs of stress when tourists were present).

do not pose any risk of infection to the animals."[20] Despite this clear advisory, GW Park continues to engage in direct contact with Big Cats and, although possibly interrupted by the suspension of Mr. Lowe's USDA license, allows members of the public to handle Big Cat cubs, all while appearing not to regularly use, or require, adequate social distancing or adequate use of personal protective equipment. For example, GW Park has been photographed conducting public handling sessions without any precautions, including social distancing or personal protective equipment.[21] Two visitors to the Wynnewood Facility reported that they were given only "one rule to follow: 'don't stick your arms in the cage'" and that "[t]here also didn't appear to be any staff making sure that visitors were abiding by that rule."[22] That rule also seems not to be followed by GW Park personnel: Erik Cowie, who was not wearing any personal protective equipment, was documented sticking his hand through Big Cat enclosures and directly contacting and petting Big Cats for no apparent purpose. Such practices significantly increase the risk of disease transmission, as well as significantly interfere with the animal's species-typical behaviors, creating a likelihood of further injury to the animals.

GW Park's ongoing practice of prematurely separating Big Cat cubs from their mothers and long history of forcing the cubs to participate in public-handling sessions and other harmful public contact contravenes generally accepted husbandry practices and constitutes a "take" in violation of the ESA.[23]

---

[20] U.S. Dep't of Agriculture, Advisory Note, *Limiting Close Contact Between Members of the Public and Nondomestic Cats* (May 14, 2020), https://www.aphis.usda.gov/animal_welfare/downloads/draft-advisory-note-for-felids-oa.pdf.

[21] C. Roundtree and A. Butterfield, EXCLUSIVE: It's grrrreat! Hundreds flock to Joe Exotic's infamous zoo for its reopening, DailyMail.com (May 6, 2020).

[22] R. Clark, 'Big Brother': Cody Nickson and Jessica Graf Visit 'Tiger King' Zoo, Soap Dirt (May 9, 2020). *Available at* https://soapdirt.com/big-brother-cody-nickson-jessica-graf-visit-tiger-king-zoo/.

[23] Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries*, at § P-6.b (July 2013). *See also* Final Judgment & Permanent Injunction, *People for the Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, Case No. 8:16-2899 (Mar. 23, 2020) (entering final judgment and permanent injunction, and confirming that prematurely separating tiger cubs from their mothers and forcing them into public encounters violates the ESA's "take" prohibition, as PETA contended); *People for Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*, No. 417CV00186RLYDML, 2020 WL 4448481, at *12 (S.D. Ind. Aug. 3, 2020) (holding, in part, that "prematurely separating Cubs and using them in Tiger Baby Playtime violates the ESA.").

C.   **GW Park takes Big Cats and a jaguar by denying them appropriate enclosures, social groups, and enrichment.**

Tigers are generally solitary animals and, in the wild, typically leave their mother's side at age two or three to find their own territory. As such—absent very specific conditions where animals have a high degree of autonomy—group housing of adult tigers is contrary to generally accepted animal husbandry practices. Tigers in captivity are also commonly unable to roam the vast and varied territories they evolved to occupy. Since captive conditions that thwart carnivores' hunting prospects appear to cause carnivores like tigers to suffer stress,[24] reputable facilities develop enrichment plans designed to allow the animals to express natural feeding and hunting behaviors.[25] These plans aim to provide stimulating physical and mental activities by introducing a variety of environmental enrichment items such as bones or deceased whole prey items for feeding, pools or ponds for swimming, devices designed to encourage natural behaviors and are kept novel by changing them regularly, scratch logs, different substrates to investigate and lie in, the introduction of new smells, enclosure rotations, and adequate space to run. According to the Association of Zoos and Aquariums ("AZA"), the typical tiger exhibit is between 2,500 and 10,000 square feet, with an average of 5,500 square feet.[26]

Lions are highly social animals and are typically found in large social groups called prides. Thus, meeting the physical and psychological needs of captive lions requires providing them with the opportunity to socialize with compatible lions, and providing them with necessary environmental enrichment. The AZA recommends that lions be provided with "large spacious enclosures designed to encourage species-appropriate behaviors such as resting, walking, hunting, stalking, grooming, playing, breeding, etc."[27] All enclosures should allow lions to "retreat from conspecifics through the use of visual barriers, such as rock outcroppings, hills, and foliage, without limiting an animal's access to food, water, heat, or shade."[28] In addition to providing social privacy, enclosures should include "various substrates, surfaces to mark, deadfall for scratching, and other aspects in their enclosure that will change their pathways and create complex behavioral opportunities."[29] According to the AZA's 2010 Lion Species

---

[24] Morgan & Tromborg, *supra* n.12, at 284.

[25] Letícia S. Resende et al., *The Influence of Feeding Enrichment on the Behavior of Small Felids* (Carnivora: Felidae) *in Captivity*, 26 Zoologia 601 (2009).

[26] Ass'n of Zoos & Aquariums, *Tiger* (Panthera tigris) *Care Manual* 12 (2016).

[27] Ass'n of Zoos & Aquariums, *Lion* (Panthera leo) *Care Manual* 18 (2012).

[28] *Id*.

[29] *Id*.



Survival Plan Space Survey, the majority of lion exhibits are over 10,000 square feet, which "should be considered the minimum size for new exhibits."[30]

Jaguars too have unique physical, social, behavioral, and psychological needs. To meet their complex needs in captivity, the AZA recommends that exhibits be designed to reflect natural behaviors including, for example, hunting, resting, territoriality, scent marking, digging, scratching, climbing, swimming, and defense of home range against conspecifics.[31] Unlike lions, jaguars are generally considered to be a solitary species and "are not recommended for mixed-species exhibits."[32] Jaguars, who are known to spend time in trees and other elevated locations, should be provided with environments with varying heights, including vertical perches and high nesting sites, as well as incorporated climbing structures like live or dead trees.[33] In 2014, the average primary habitat area for a single jaguar exceeded 2,600 square feet, and the AZA recommends, at a minimum, that the heights of jaguar enclosures range from 10 to 12 feet.[34] Because jaguars prefer territory in close proximity to water sources, the AZA recommends that jaguars in captivity be provided with at least one water source for drinking, playing, and temperature regulation.[35]

GW Park does not provide Big Cats or the jaguar at its facility with appropriate, natural, and complex enclosures or varied enrichment. Instead, it confines them to small, virtually barren enclosures, with little to no shelter from the elements, variety, privacy, choice or control. Many of the Big Cat enclosures contain dirty objects such as balls and tires, which, on information and belief, are not regularly varied or assessed for effectiveness. Alone, these objects do not encourage the Big Cats to engage in natural behaviors and are therefore inadequate to provide for the Big Cats' physiological and psychological well-being. In addition to denying animals adequate enrichment, GW Park has, on at least one occasion, deliberately introduced potentially hazardous objects, i.e., balloons, into a Big Cat enclosure. These and other objects GW Park has introduced into these enclosures pose serious, and even life-threating dangers to Big Cats, including risk of ingestion, which creates serious choking, intestinal blockage, and inhalation hazards.

GW Park's Big Cat enclosures are so deficient that the facility is unable to properly contain the animals therein. For example, in the past three years, at least two Big

---

[30] *Id.*

[31] Ass'n of Zoos & Aquariums, *Jaguar* (Panthera onca) *Care Manual* 18-19 (2016).

[32] *Id.* at 11, 33.

[33] *Id.* at 18.

[34] *Id.* at 18-19.

[35] *Id.* at 19.

Cats have escaped from enclosures at the Wynnewood Facility, leading to the death of one tiger, who was reportedly shot and killed to prevent the tiger from escaping the facility. Most recently, in July 2020, Mr. Lowe was cited by the USDA after a female juvenile lion was observed balancing on the top of the enclosure fencing. The inadequacy of the enclosures is further evidenced by a 2018 USDA Inspection Report, which cited the Wynnewood Facility for failing to maintain a Big Cat enclosure in proper repair. Specifically, the wires at the bottom of the fence had become disengaged leaving an opening where the Big Cats were able to pass a paw through the caging. Mr. Lowe was repeatedly cited for a similar issue in June and July 2020, when the metal reinforcement on a tiger enclosure was no longer closely adhered to the metal fence, thus creating a hazard for limb entrapment.

Unsafe, small environments and lack of enrichment harass Big Cats and jaguars by significantly disrupting their ability to engage in important natural behaviors such as swimming, stalking, avoidance, and predation. Likewise, this deprivation causes ongoing harm to the animals' physical and psychological well-being.[36] Indeed, felids in sterile environments like the ones at issue here experience long periods of inactivity or mindless activity, which results in permanent long-term changes to the body, brain, neural, and endocrine systems. Psychological distress can often leave felids with higher blood cortisol levels, which can trigger displacement behavior, apathy, learned helplessness, and even severe capture myopathy. Enrichment is necessary to deter harmful behaviors like self-mutilation, and stereotypical behaviors[37] such as pacing, which has been observed in the Big Cats at issue. Harmful behaviors such as self-mutilation and pacing, in addition to evidencing psychological distress, can lead to other physical injuries. In the wild or in a reputable sanctuary, a lion, tiger, or jaguar would have the ability to exercise, explore, and engage in other species-typical behaviors.

GW Park also denies several Big Cats and a jaguar appropriate social groups. Contrary to generally accepted standards of animal care, GW Park confines a jaguar with two lions, and thus denies the jaguar the opportunity to engage in species-typical behaviors including, for example, avoidance behaviors, in a manner that is likely to result in injury. GW Park also confines tigers who were documented fighting in the same enclosure—a clear sign that the Big Cats are incompatible and ill-suited for group housing at the Wynnewood Facility. Improper social groups physically and psychologically harm the animals, and deprive them of the ability to engage in normal

---

[36] *See* Morgan & Tromborg, *supra* n.12, at 264; *see also* Monika S. Szokalski et al., *Enrichment for Captive Tigers* (Panthera tigris*): Current Knowledge and Future Directions*, 139 Applied Animal Behav. Sci. 1 (2012).

[37] Stereotypies, which are commonly recognized as a sign of psychological distress, are identified by the lack of function for the behavior.

behavioral patterns, creating the likelihood that the Big Cats and jaguar will suffer further injury, thereby taking them in violation of the ESA. On information and belief, GW Park's lack of appropriate social groups for Big Cats is further illustrated by a juvenile lion, Amelia, who had to have one of her toes amputated on April 22, 2020 after being bitten by another animal, likely another Big Cat with whom she shared an enclosure. Other Big Cats at the facility, including at least two tigers, also suffer from injuries that are likely a result of improper social groups or self-mutilation due to environmental inadequacies.

By confining Big Cats and a jaguar in unsafe enclosures that do not allow the animals to exercise choice, experience autonomy, or express natural behaviors, and by denying the animals the psychological stimulation fundamental to their physical, social, and psychological well-being, GW Park fails to satisfy generally accepted standards of care, causes the Big Cats and jaguar physical and psychological injuries, and significantly disrupts the animals' normal behavioral patterns in a manner likely to cause further injury in violation of the ESA.[38]

### D. GW Park takes Big Cats by engaging in unsafe and injurious handling practices.

GW Park unlawfully harms and harasses Big Cats by engaging in unsafe handling practices, such as exhibiting Big Cats on leashes or chains, and using improper means to shift or move animals. For example, on information and belief, Mr. Lowe recently dragged a Big Cat by the animal's neck after losing control of the animal—who was reportedly only restrained by a leash—during a public exhibition. Further, on information and belief, GW Park shoots Big Cats with a pellet gun to force the animals to shift enclosures. On at least one occasion, a tiger presented with a wound congruent with projectile trauma on his or her forehead—an injury reportedly caused by Mr. Lowe, who shot the tiger with a pellet gun while he and at least one other staff member were trying to shift the animal.

Not only do such practices injure Big Cats and violate generally accepted standards of animal care, but they also severely disrupt the Big Cats' normal behavioral patterns, including sheltering and avoidance behaviors, so as to create the likelihood of further injury. Such gross mishandling harms and harasses Big Cats, in direct violation of the ESA.

---

[38] *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. § 17.11(h), 17.21(c)(1).

PM

### E.  GW Park takes Big Cats by denying them adequately implemented nutritional protocols.

GW Park denies Big Cats adequate and appropriate diets, thus interfering with their normal feeding behaviors. For example, in July 2020, the USDA cited Mr. Lowe for failing to maintain the only food source for the facility's carnivores under proper refrigeration. At the time of the inspection, the only refrigerated storage for the animals' food was a broken refrigerator truck, which contained boxes of decaying meat and emanated an odor of decaying flesh. According to the UDSA's report, the temperature inside the truck was similar to the ambient temperature, which exceeded 85 degrees Fahrenheit. Likewise, GW Park's failure to provide Big Cats with adequate nutrition is further evidenced by the fact that the Lowes fed lion cubs Kitten Milk Replacer mixed with water exclusively for four months. Such a diet is not only nutritionally inadequate, but also deprives the lions of a species-appropriate weaning process.

GW Park's practices fail to meet generally accepted husbandry standards and the AWA's minimum standards of care, which require that food "be wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain all animals in good health," and that "diet[s] . . . be prepared with consideration for the age, species, condition size, and type of the animal." 9 C.F.R. § 3.129(a).

Proper nutrition is fundamental to the physical and psychological well-being of captive Big Cats. Denying captive Big Cats a species and age appropriate diet creates a likelihood of injury to them by significantly disrupting their normal feeding behaviors. Therefore, by failing to provide Big Cats an adequate and appropriate diet, GW Park harms and harasses them in violation of the ESA.

### F.  GW Park takes ring-tailed lemurs by denying them adequate space and enrichment and forcing them to engage in public encounters.

GW Park harms and harasses lemurs by depriving them of appropriate space and enrichment, leading to injury and the likelihood of further injury, in violation of the ESA. Generally accepted husbandry practices require that animals be provided enclosures with adequate space, complexity and enrichment to foster engagement in a full range of species-appropriate behavior. Even the AWA, which sets forth the bare minimum standards of care, requires that enclosures "provide sufficient space for the nonhuman primates to make normal postural adjustments with freedom of movement."[39] The AWA also requires that animal exhibitors "develop, document, and follow an appropriate plan for environmental enhancement adequate to promote the



[39] 9 C.F.R. § 3.80(a)(2)(xi).



Notice of Intent
September 21, 2020
Page 13 of 20

psychological well-being of . . . primates."[40] These environmental enhancement plans must include "specific provisions to address the social needs of . . . primates of species known to exist in social groups in nature."[41] And "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing non-injurious species-typical activities." [42] The aim of such mandatory programs is to give primates "an environment in which they can express the wide range of behaviors practiced by others of their species in nature."[43] When enhancements support the ability of captive primates to express a "normal repertoire" or a "full range" of normal behavior, "the intent of the Animal Welfare Act to promote their psychological well-being will be fulfilled."[44]

Despite the established authority on the environmental needs of ring-tailed lemurs and the minimum standards provided by AWA regulation, GW Park subjects ring-tailed lemurs to a life without adequate space or enrichment. It confines lemurs in its custody to a small, static environment, denying them the ability to express normal behaviors such as foraging, roaming, and deriving intellectual stimulation from a varied habitat. The inadequacy of the lemurs' environment at GW Park is underscored by the presence of: choking hazards, i.e., small loops of rope, in the lemur enclosure; disease hazards, i.e., free roaming animals that have access to the lemurs' primary enclosure; and other unsafe conditions, including metal resting platforms that rusted through.

In addition, GW Park has a history of forcing lemurs to engage in abnormal and injurious behaviors through public handling sessions, which harm and harass the animals by severely disrupting their normal behavioral patterns, including feeding and sheltering, so as to create the likelihood of injury. Such harmful practices cause the animals psychological injury and put the animals at significant risk for physical injury due to the distressing nature of public contact. Once returned to their troops, lemurs used in public encounters may also become vectors for zoonotic diseases and are at risk of being injured or abandoned by other members of their troop.

Moreover, on at least one occasion, Mr. Lowe transported a solitary, juvenile lemur to Las Vegas, Nevada, where the lemur was used in public encounters and allegedly forcibly administered alcohol by Mr. Lowe. The harms caused by the public

---

[40] *Id*. § 3.81.

[41] *Id*. § 3.81(a).

[42] *Id*. § 3.81(b).

[43] USDA, Animal & Plant Health Inspection Serv., *Final Report on Env't Enhancement to Promote the Psychological Well-Being of Nonhuman Primates* § II.E (1999).

[44] *Id*.

encounters were compounded by the fact that the lemur was held in social isolation—
"an extremely harmful proceeding," which does not meet the generally accepted
animal husbandry practices in ring-tailed lemur care, causes permanent
psychological and physical injury, and violates the ESA.[45] Mr. Lowe's history of
denying lemurs adequate social groups is further evidenced by the fact that he also
held a juvenile lemur in social isolation while exhibiting the lemur at Neon Jungle
OKC—a now-defunct operation where Mr. Lowe would exhibit and allow members of
the public to pay to interact with young exotic animals at a mall in Oklahoma City.

GW Park wholly fails to meet the lemurs' complex cognitive needs, prevents the
lemurs from engaging in species-specific behaviors, and fails to ensure the physical,
psychological, and social health of the lemurs in its custody by providing inadequate
enrichment and space, and by engaging in harmful practices such as socially isolating
lemurs from conspecifics and forcing them into public encounters. The conditions at
the Wynnewood Facility and GW Park's practices defy generally accepted animal
husbandry practices and the AWA's minimum requirements, physically and
psychologically harm the lemurs, and deprive them of the ability to engage in normal
behavioral patterns, creating the likelihood that the lemurs will suffer further injury,
in direct violation of the ESA.

### G. GW Park takes ring-tailed lemurs by denying them adequately implemented nutritional protocols.

GW Park denies endangered ring-tailed lemurs an adequate and appropriate diet,
thus interfering with their normal feeding behaviors.

AWA regulations require that primate diets be "appropriate for the species, size, age,
and condition of the animal, and for the conditions in which the nonhuman primate
is maintained, according to generally accepted professional and husbandry practices
and nutritional standards." 9 C.F.R. § 3.82(a). Food must also "be clean, wholesome,
and palatable to the animals" and "of sufficient quantity and have sufficient nutritive
value to . . . meet its normal daily nutritional requirements." *Id.*

A lemur nutritional plan produced by Mr. Lowe in separate litigation—which simply
states "Fruits and vegetables. Monkey crunch. Occasionally mealworms"—is wholly
inadequate to meet the nutritional needs of lemurs. Not only is the plan itself
deficient and divorced from generally accepted animal husbandry standards, its
apparent implementation is also inadequate. For example, according to industry

---

[45] *See Kuehl*, 161 F. Supp.3d at 710-11; *Tri-State Zoological Park of W. Maryland, Inc.,* 424
F. Supp. 3d at 414 ("Forcing a lemur to live a solitary existence . . . visits permanent
psychological and physical injury on a species born to engage in constant interaction with his
kind.").

P|M

guidelines, lemurs should be provided with fresh browse daily "to promote natural feeding behaviors."[46] Despite this basic standard, the lemurs at GW Park are communally fed from a suspended bucket, which interferes with normal feeding behaviors such as foraging behaviors. Moreover, as noted above, Mr. Lowe allegedly forcibly administered alcohol to at least one lemur, in direct contravention of the most basic standards of animal care.

Proper nutritional protocols and their implementation are fundamental to the physical and psychological well-being of any captive animal. Denying lemurs a species appropriate diet plan creates a likelihood of injury to them by significantly disrupting their normal feeding behaviors, thus harassing them in violation of the ESA.

### H. GW Park takes a grizzly bear by denying the bear adequate space and enrichment.

Generally accepted animal husbandry practices dictate that brown bears be provided with large, complex, environments designed to meet their physical, social, behavioral, and psychological needs.[47] Despite this, GW Park harms and harasses a grizzly bear by depriving her of appropriate space and enrichment, leading to injury and significant interference with the bear's natural behaviors in a manner likely to lead to further injury.

The inadequacy of the grizzly bear enclosure at GW Park is patent. GW Park confines the bear to a small, virtually barren enclosure, with little to no variance, choice, or control. Such barren environments and lack of enrichment harass the bear by significantly disrupting her ability to engage in species-appropriate behaviors such as digging, climbing, bathing, foraging, hunting, denning, resting, and playing. Mud also accumulates in the static environment due to a lack of adequate drainage. Indeed, the enclosure is so deficient that it does not prevent members of the public from touching the bear. Public contact with a grizzly bear is extremely dangerous for the animals and the public, and contravenes the most basic standards of animal care and AWA regulations.[48] Such conduct puts the bear at risk of physical injury and interferes with her species-typical behaviors in a manner likely to cause further injury to her physical, behavioral, and psychological health.

---

[46] *See* Global Federation of Animal Sanctuaries, *Standards for Prosimian Sanctuaries* 20 (Dec. 2019).

[47] *See, e.g.*, Global Federation of Animal Sanctuaries, *Standards for Bear Sanctuaries* (June 2013).

[48] *See, e.g.*, 9 C.F.R. § 2.131(c)(1).

The deficiencies at GW Park are so egregious that the grizzly bear engages in harmful stereotypic behaviors, including biting the bars of her cage and frantic stereotypic pacing behavior. Pacing and bar biting are signs of compromised well-being and psychological distress, and can lead to physical injuries such as arthritis, ulcerated foot pads, broken teeth, and other associated health issues.

By confining a grizzly bear in an enclosure that lacks any essential environmental enrichment and that denies the animal any meaningful opportunity to exercise choice or express natural behaviors, GW Park fails to satisfy generally accepted standards of care, physically and psychologically injures the bear, and significantly disrupts her normal behavioral patterns in a manner likely to cause further injury. GW Park thereby takes the grizzly bear by harming and harassing her in violation of the ESA.[49]

## I.  GW Park takes a grizzly bear by denying the bear basic necessities, including adequate nutrition and timely veterinary care.

GW Park harms and harasses the grizzly bear by denying her appropriate care, including adequate nutrition and veterinary care, causing actual injury and creating a likelihood of further injury by significantly interfering with the bear's ability to engage in species-typical behaviors. Specifically, as noted in the USDA's June 2020 Inspection Report, the grizzly bear is emaciated. Her coat is also chronically patchy and unkempt—signs of inadequate diet, environment, and/or an underlying health condition that has not been properly diagnosed or treated.

Even the AWA, which sets forth the bare minimum standards of care, mandates that captive animals be provided with appropriate veterinary care, including appropriate facilities and personnel, appropriate methods to prevent, control, diagnose, and treat disease, and daily observation of animals.[50] The AWA's minimum standards also require that captive animals be provided with food that is "wholesome, palatable, . . . free from contamination[,] . . . of sufficient quantity and nutritive value to maintain all animals in good health," and "prepared with consideration for the age, species, condition, size, and type of animal."[51] Meeting a bear's nutritional needs requires properly addressing the bear's seasonal physiological and nutritional cycles, by, for example, working with a veterinarian or nutritionist to formulate and provide seasonally appropriate diets. On information and belief, GW Park does not provide for seasonality, which is critical to maintain the bear's health.

---

[49] *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.11(h), 17.40(b).

[50] 9 C.F.R. § 2.40.

[51] 9 C.F.R. § 3.129(a).



GW Park's failure to provide adequate nutrition and veterinary care to the grizzly bear in its possession does not comply with generally accepted husbandry standards or the minimum standards of care set forth in the AWA, and harms and harasses the bear in violation of the ESA.[52]

**J.  GW Park lacks the funds to provide adequate care to Listed Species.**

Greater Wynnewood Exotic Animal Park, LLC and Mr. Lowe were sued by the State of Oklahoma regarding their failure to pay at least $50,274.01 in taxes the parties are responsible for withholding, collecting, and remitting to the State.[53] On information and belief, GW Park's nonpayment of its delinquent taxes reflect a lack of funds to correct the above deficiencies—including, but not limited to, providing adequate nutrition, veterinary care, staffing, or facilities for Listed Species. For example, in addition to the deficiencies identified above, visitors to the Wynnewood Facility report that the premises are "empty," without staff to ensure safety.[54] It is also anticipated that enforcement proceedings by the State of Oklahoma and other counterparties will further drain GW Park's available funds to provide adequate care to Listed Species by, for example, increasing GW Park's ongoing and expected liability for costs, penalties, and fees.

**III.  GW Park Has Trafficked in ESA-Protected Species in Violation of the ESA.**

GW Park and Mr. Lowe have a long history of trafficking in ESA-protected species in violation of the ESA, including neonatal Big Cat cubs who, as detailed below, were unlawfully "taken" and subsequently transported out of state.

Removing cubs from their mothers prematurely and subjecting them to the stresses and excessive handling inherent in animal transport violates generally accepted husbandry practices, and harms and harasses them in violation of the ESA.[55] This is particularly true for neonatal Big Cat cubs four weeks old or younger, who "have special handling and husbandry needs" because Big Cat cubs of this age "are not able

---

[52] *See, e.g., People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 424 F. Supp. 3d 404 (D. Md. 2019) (holding, in part, that failure to provide adequate veterinary care to captive animals violates the ESA).

[53] The King and the Court at Odds Over Taxes: GW Zoo Taking Heat from PETA and OK Courts, Wynnewood Gazette (June 17, 2020).

[54] R. Clark, 'Big Brother': Cody Nickson and Jessica Graf Visit 'Tiger King' Zoo, Soap Dirt (May 9, 2020). *Available at* https://soapdirt.com/big-brother-cody-nickson-jessica-graf-visit-tiger-king-zoo/.

[55] *See, e.g.*, Section II.B, *supra*.

to thermoregulate and lack a fully functioning immune system to fight off disease and infection."[56] As the USDA has explained, neonatal Big Cat cubs "should be housed with their mother for as long as possible after birth to promote good health," and "[u]ntil these animals can thermoregulate and are immunocompetent, they should be housed in the controlled environment."[57] Individuals who ignore these guidelines and allow neonatal Big Cat cubs to be exposed "to *any* form of public contact, including public feeding and handling, are considered noncompliant with the veterinary care and handling requirements of the Animal Welfare Act regulations."[58] Despite the injurious effects pulling neonates from their mothers has on Big Cat cubs, GW Park has a pattern and practice of pulling these infants from their mothers, in violation of the ESA.

Moreover, on information and belief, GW Park has sold, delivered, carried, transported, or shipped, or induced, aided, or abetted the sale, delivery, carrying, transportation, or shipment of, Big Cat cubs and a lemur taken in violation of the ESA and sold, delivered, received, carried, transported, or shipped, or induced, aided, or abetted the sale, delivery, carrying, transportation, or shipment of, at least two Big Cats in interstate commerce in the course of a commercial activity. For example, on information and belief, Mr. Lowe reportedly sold seven cubs, including at least one lion cub, to Scotty Brown of Zootastic Park in Troutman, North Carolina, transported, delivered and/or sold at least one tiger cub to Kayla and Karl Mitchel in Pahrump, Nevada, and transported a solitary, unlawfully "taken" lemur from the Wynnewood Facility to Las Vegas, Nevada.[59] GW Park has also shipped at least one neonatal Big Cat cub to Special Memories Zoo in Greenville, Wisconsin, and a neonatal Big Cat cub to Robert Engesser in Trenton, Florida. Mr. Lowe's apparent sale, delivery, and/or transfer of at least one lion cub and one tiger cub in interstate commerce unequivocally violates the ESA.[60] Additionally, by pulling at least two neonatal Big Cat cubs from their mothers and subsequently shipping them, and by transporting a solitary lemur from the Wynnewood Facility to Las Vegas, Nevada, GW Park has violated the ESA by unlawfully shipping and transporting Listed Species who have been taken in violation of the ESA.[61]

---

[56] *See* U.S. Dep't of Agriculture, Tech Note, *Handling and Husbandry of Neonatal Nondomestic Cats* (March 2016), https://www.aphis.usda.gov/publications/animal_welfare/2016/tech-neonatal-nondomestic-cats.pdf.

[57] *Id*.

[58] *Id*. (emphasis added).

[59] *See* Section II.E, *supra*.

[60] *See* 16 U.S.C. § 1538(a)(1)(E)-(G); 50 C.F.R. §§ 17.21(e), (f), 17.31, 17.40(r).

[61] *See* 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d), 17.31, 17.40(r).

GW Park also induced a potential business partner in the Thackerville Facility to transport more than 100 animals—including, based on information and belief, Listed Species—more than 800 miles from southern Indiana to Oklahoma in February and July of 2019. By Mr. Lowe's admission, a number of these animals died during transport.[62] Mr. Lowe further admits that the surviving animals arrived in "horrible conditions," including, but not limited to, "[s]ome animals [who] started chewing their tails off their bodies[.]"[63]

Concerns regarding GW Park's history of trafficking in Listed Species are underscored by a July 2020 USDA Inspection Report, which cited Mr. Lowe for missing or unavailable acquisition and disposition records for thirty-four animals, including five Big Cats who were dropped from the facility's most recent inventory and two Big Cats who were transferred without record of acquisition. Acquisition and disposition records are necessary to accurately track animals to ensure their legal transfer.

## IV. The Parties' Operation of the Thackerville Facility is Reasonably Certain to Harm and Harass Federally Protected Animals.

As noted above, the Lowes have announced their intention to close the Wynnewood Facility and relocate the animals to the Thackerville Facility in 2020. Based on Mr. Lowe's current and historic business practices, G.W. Park's lack of financial wherewithal, as well as numerous representations on the Thackerville Facility's social media accounts, the majority of the ESA violations described above—including, but not limited to, the unlawful takings related to premature maternal separation, public-handling sessions, lack of enrichment, and failure to provide timely, appropriate veterinary care—are reasonably certain to continue to occur or worsen once the Listed Species are relocated to the Thackerville Facility. Thus, after the expiration of the sixty-day notice period, PETA will seek to enjoin the Parties' imminent harm and harassment of the Listed Species at the Thackerville Facility.[64]

\* \* \*

The conditions set forth herein violate the ESA's prohibition on the "take" of the lemurs, a grizzly bear, a jaguar, and Big Cats. Unless the violations described herein cease immediately, PETA intends to file suit against Greater Wynnewood Exotic

---

[62] Jeff Negan Lowe, Facebook (Sept. 8, 2019).

[63] *Id.*

[64] *See Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995) ("[T]he *future threat of even a single taking is sufficient to invoke the authority of the Act.*" (internal citation omitted; emphasis added)).

Notice of Intent
September 21, 2020
Page 20 of 20

Animal Park, LLC, Big Cat Institute, Tiger King, LLC, Jeffrey Lowe, Lauren Lowe, Erik Cowie, Eric Yano, and Cheryl Scott under the ESA after the expiration of sixty days. Pursuant to the ESA, PETA will seek declaratory relief and an injunction against continued violations, including, but not limited to, requesting that the court order the transfer of the Listed Species to reputable facilities, as well as attorney's fees and litigation costs.

In the interim, all Parties are hereby on notice of their obligation to preserve and not destroy any and all evidence, documents, tangible items, and electronic data that are the subject of or relevant to the violations addressed in this letter. The Parties' preservation obligation also prohibits the Parties from transferring physical or legal custody of the Listed Species, unless otherwise ordered by a court or government agency. If the Parties fail to preserve and maintain such evidence, PETA will seek sanctions and appropriate remedies.

During the sixty-day notice period, PETA is willing to discuss a mutually agreeable remedy for the violations addressed in this letter. Specifically, PETA is willing to arrange for the relocation of the Listed Species to reputable facilities, in exchange for an agreement that the Parties shall not own, exhibit, possess, buy, sell, transfer, transport, or in any way handle or have contact with endangered or threatened animals in perpetuity. If the parties wish to pursue this remedy and avoid litigation, please contact me directly. You can reach me by phone at (405) 235-4100 or by e-mail at hlhintz@phillipsmurrah.com in order to facilitate placement.

Very truly yours,

Heather L. Hintz
For the Firm

P|M