1    **IN THE UNITED STATES DISTRICT COURT FOR THE**
     **EASTERN DISTRICT OF OKLAHOMA**
2

3

4    UNITED STATES OF AMERICA,    )
                                  )
5                                 )
              Plaintiff,          )
6                                 )
     -v-                          )
7                                 )
     JEFFREY LOWE, LAUREN LOWE,   ) Case No.
8    GREATER WYNNEWOOD EXOTIC     ) 20-CV-0423-JFH
     ANIMAL PARK, LLC., and       )
9    TIGER KING, LLC.,            )
                                  )
10                                )
              Defendants.         )
11                                )

12

13

14

      PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
15                       and
      PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
16                      ORDER
        BEFORE THE HONORABLE JOHN F. HEIL, III
17           UNITED STATES DISTRICT JUDGE

18            JANUARY 12, 2021

19

20

21

22

23

24            SHELLEY OTTWELL, RPR, CSR
             United States Stenographer
                  P.O. BOX 607
25          Muskogee, Oklahoma 74402

1                    **A P P E A R A N C E S**

2

                  *ON BEHALF OF THE GOVERNMENT*
3                    APPEARING VIA ZOOM
                  Jonathan Brightbill, Esq.
4                   Winston & Strawn, LLP
                     1901 L Street NW
5                  Washington, DC 20036

6                    APPEARING VIA ZOOM
                    Mary Hollingsworth,
7                United States Attorney's Office
          999 18th Street S. Terrace, Suite 370
8                  Denver, Colorado 80202

9                    APPEARING VIA ZOOM
                    Briena Strippoli, Esq.
10      United States Department of Justice - Environment
                 and Natural Resources Division
11           950 Pennsylvania Ave. NW, Suite 2133
                    Washington, DC 20530

12
                     APPEARING VIA ZOOM
13               Michael J. O'Malley, Esq.
               United States Attorney's Office
14                    520 Denison Ave.
                 Muskogee, Oklahoma 74401

15

16               *ON BEHALF OF THE DEFENDANT*
                    APPEARING VIA ZOOM
17                  Daniel J. Card, Esq.
                    Attorney at Law
18                  512 NW 12th Street
                Oklahoma City, Oklahoma 73103

19

20                      **I N D E X**

21   Argument on behalf of the government        10

22   Argument on behalf of the defense           48

23   Rebuttal argument on behalf of the government  66

24   Rebuttal argument on behalf of the defense   73

25   Stenographer's certification                83

                *UNITED STATES DISTRICT COURT*

1     **COURT IN SESSION**

2          (On the record at 10:01 a.m.)

3          THE COURT:  Call Case 20-CIV-423-JFH,

4     *United States of America v Jeffrey Lowe, Lauren*

5     *Lowe, Greater Wynnewood Exotic Animal Park, LLC,*

6     *and Tiger King, LLC.*

7          If counsel would please make your appearances

8     for the record.

9          MR. BRIGHTBILL:  Jonathan Brightbill for

10    the United States of America.

11         I also have Mary Hollingsworth and Briena

12    Strippoli from the Environment and Natural

13    Resources Division, and then Susan Brandon

14    and . . .

15         MR. O'MALLEY:  Michael O'Malley.

16         MR. BRIGHTBILL:  Michael O'Malley from

17    the Eastern District of Oklahoma U.S. Attorney's

18    office, Your Honor.

19         Just a point of personal privilege here, Your

20    Honor, we are having a very difficult time

21    hearing at least the courtroom deputy.  I don't

22    know when Your Honor speaks if we're going to be

23    able to hear that.

24         THE COURT:  Okay.  Let's see.  Can you

25    hear me okay?

1            MR. BRIGHTBILL:  No, not at all.

2            THE COURT:  So they can't hear me.

3    Let's see.  How about now?

4            MR. CARD:  Your Honor, this is Daniel

5    Card on behalf Jeffrey Lowe and Lauren Lowe, the

6    defendants.  I can't hear you all that well

7    either, Your Honor.

8            THE COURT:  Okay.  Let's see what we can

9    do here.  Okay.  Let's see if this works any

10   better now.

11           COURTROOM DEPUTY:  Try that again,

12   Judge.

13           THE COURT:  Okay.  Let's see this if

14   this works any better now.  Is that better?

15           MR. BRIGHTBILL:  Unfortunately no, Your

16   Honor.

17               (Pause in proceedings.)

18           THE COURT:  Does this help at all?

19           MR. BRIGHTBILL:  A little bit, Your

20   Honor, yes.  I mean, another possible solution is

21   to mute the microphone on the one far away with

22   the camera with the panoramic shot and if there

23   is a phone at your Honor's bench, to dial in to

24   do the audio so that you are right up next to the

25   microphone.  That's another thing that sometimes

```
 1   works.
 2           THE COURT:  Is that an option, Nick?
 3           NICK NEIBLING:  Are you able to hear us?
 4           MR. BRIGHTBILL:  Your Honor, that's much
 5   better.
 6           MR. CARD:  That's much better.
 7           THE COURT:  Well, unfortunately that was
 8   our IT person that you were hearing, so I could
 9   just leave and let him take over.  Probably
10   wouldn't work very well, would it?
11       How are you dialed in, Nick?  Are you just on
12   your computer?
13           NICK NEIBLING:  My computer, yes.
14           THE COURT:  Well, what if we brought the
15   computer up here with the microphone?  Would that
16   work?
17           COURTROOM DEPUTY:  It sounds like you're
18   not even going over the courtroom.
19           THE COURT:  It sounds like it is.  Can
20   you hear me in the back?
21       Yeah, they can hear.
22       So we need a different microphone.
23       Okay.  Is it coming through that speaker now?
24       Can counsel on the line hear me better now?
25           MR. BRIGHTBILL:  Candidly, no, Your
```

1    Honor.  There was a moment just a little bit ago
2    where you were very intelligible but now you're
3    harder to hear now.
4            THE COURT:  Okay.  Let's try this again.
5    We're speaking pretty loud in the microphone, but
6    is there away to get that speaker up closer to
7    the other one, Nick?
8        It sounds like the audio has not improved
9    from moving the device in the camera.
10       Counsel, can you hear me better now?
11       It doesn't sound like it.
12           MR. BRIGHTBILL:  Unfortunately no, Your
13   Honor.  Is the different microphone still on?
14               (Pause in proceedings.)
15           THE COURT:  Sorry, counsel.  We're
16   diagnosing the problem.  We'll see if we can get
17   it remedied and start as soon as we can.
18           MR. BRIGHTBILL:  Your Honor, it sounds
19   like the microphone is still across the
20   courtroom.  The audio has not improved from
21   moving the device that the camera --
22           THE COURT:  Yeah, I think it's a problem
23   with the camera device.  It's not picking us up,
24   so we'll see if we can exchange it for another
25   one.

1          MR. BRIGHTBILL:  Right there is better,

2     Your Honor, whatever just happened.

3          NICK NEIBLING:  I changed the settings.

4          THE COURT:  Oh, changed the setting.

5     Can you all hear me better now?

6          MR. BRIGHTBILL:  Yes.  Yes.  We can,

7     Your Honor.

8          THE COURT:  Okay.  That's good.  Okay.

9       All right.  Any time that you all can't hear

10    me, just speak up and I'll try to remedy it.

11    I'll try to speak as loud as I can.  Is this

12    better right now?

13          MR. BRIGHTBILL:  Yes, it is.

14          MR. CARD:  Yes, Your Honor.

15          THE COURT:  Okay.  Very good.  We got

16    introductions for counsel for the plaintiff.

17      Good morning to you all; and then counsel for

18    defendant if you would make your appearance.

19          MR. CARD:  Yes, sir.  This is Daniel

20    Card on behalf of the defendants; Jeff and Lauren

21    Lowe are also joining just to observe.

22          THE COURT:  Okay.  Good morning,

23    Counsel.

24      All right.  We're here on the Plaintiff's

25    Motion for Preliminary Injunction and Motion for

1    Temporary Restraining Order, and I appreciate the

2    parties conferring.

3         It sounds like, from what I've seen over the

4    last couple of days, the parties have done a

5    better job of conferring.  Looking at your

6    responses that you filed, and I looked at those

7    this morning, Mr. Card, there is a couple of

8    things that I note.  There's a couple of

9    statements in response to the Motion for

10   Preliminary Injunction that defendants would have

11   agreed to certain things had they been consulted

12   with initially, and then there are some, some

13   counter -- what seems to be counter-proposals to

14   the relief that the government seeks by way of a

15   temporary restraining order.

16        Have those matters been discussed with the

17   government over the last few days as far as any

18   issues that the defendants would agree to?

19             MR. CARD:  Your Honor, the email I did

20   offer for the government if or, excuse me,

21   Mr. Lowe offered that the government could have a

22   vet of their choosing come to his facility on his

23   dime and look at every cub in the facility, take

24   an x-ray if they see fit, and look at the mothers

25   who are nursing cubs in order to assess whether

1    they are in any danger of metabolic bone disease,

2    or anything else for that matter.  I never got a

3    response to that offer.

4           THE COURT:  All right.  Let me hear from

5    Mr. Brightbill on that because this is the first

6    time that I've obviously had a chance to see that

7    or be a part of any of these communications.

8       Mr. Brightbill, did you see that proposal in

9    defendants' response to the Motion for Temporary

10   Restraining Order and, if so, what is your

11   response to that?

12          MR. BRIGHTBILL:  Yes, we did, Your

13   Honor.  And our response is that it does not

14   appear sufficient.  We have consulted with USDA

15   and the experts there, and as to whether there

16   might be some eventual workable solution but the

17   problem is, Your Honor, that we're not dealing

18   with a moment in time, just a mere snapshot.

19      There is a continuing course of conduct of

20   insufficient handling of these animals.  So

21   having a veterinarian come in and take x-rays

22   under certain conditions for a snapshot in time

23   is not sufficient, Your Honor.

24      This is an individual with a history, as we

25   will discuss, doing what they need to do to get

1  past legal trouble at the moment, if they can;

2  hasn't always kept them out legal trouble, Your

3  Honor.  And the solution that's been offered is,

4  frankly, is insufficient as we now understand it

5  from our clients at USDA.

6          THE COURT:  Very good, okay.  That's

7  enough of that.  We've explored our options and,

8  of course, I can't make you all come to some

9  agreement and that's why I'm here to resolve the

10 dispute.

11     So if there's nothing else on an

12 administrative basis, let's proceed with the

13 plaintiffs.

14          MR. BRIGHTBILL:  Thank you, Your Honor.

15 Jonathan Brightbill for the United States.

16     First of all, I want to thank you, Your

17 Honor, on behalf of the United States and the

18 USDA for making this case a priority and setting

19 it for hearing on an expedited basis.  We're very

20 aware of the heavy case load that this court now

21 carries.  And as I said, with me today are my

22 colleagues from the Environment and Natural

23 Resources Division here in Washington, as well

24 from the Eastern District of Oklahoma.

25     Your Honor, given the Zoom format, we have

1   prepared a presentation for you that summarizes

2   the evidence that has been presented and allows

3   us to walk through the arguments.  There should

4   also be a binder of the exhibits that you have in

5   case you want to pull out and look at any of

6   those in whole.  It's a witness binder that we

7   would use if we were having live testimony.  It's

8   just limited to those exhibits that are

9   specifically relevant to the presentation.

10        Also, Your Honor, I'd like to note defendants

11   filed their response to our preliminary

12   injunction as what was at 1:00 a.m. our time, and

13   their TRO response nearly two hours later at

14   approximately 1:54 in the morning in central

15   district time.  Therefore, one of the things that

16   we would ask, Your Honor, is to the extent that

17   it is necessary, and we don't think it's

18   necessary--and I fully intend to try to address

19   any open legal issues, or any open issues

20   whatsoever that are necessary to justify and

21   support the entry of a temporary restraining

22   order and preliminary injunction today, Your

23   Honor--if any open questions do remain, Your

24   Honor, we would request an opportunity to file a

25   legal reply brief on Friday to address any open

1  issues that may remain.  I know that's atypical

2  of many courts, actually in the Western District

3  of Virginia closer to home, it's actually

4  standard operating procedure.  They often have

5  hearings before replies are filed.

6     Regardless, Your Honor, we can take that up

7  perhaps at the end of the hearing if Your Honor

8  deems it to be appropriate.

9        THE COURT:  All right.  We'll take that

10  up at the end of the hearing.

11        MR. BRIGHTBILL:  Thank you, Your Honor.

12     So one of the things that you're going to

13  hear throughout the presentation today is that

14  smoke and mirrors are really a theme of what you

15  will see, because that's all we've gotten this

16  morning from the defendants and that is all that

17  they have repeatedly offered up in an attempted

18  defense of their conduct.

19     Before moving their animals to Tiger King

20  Park, the defendants in this case, Jeff and

21  Lauren Lowe, as well as their entities, claimed

22  to operate the largest private zoo in the

23  country.  But from June of 2018 forward to today,

24  they have violated many of the most critical

25  regulations for protecting the health and the

1    safety of the many, many animals including

2    ESA-protected species that are in their

3    possession, custody, and control.

4         Nearly two years ago, more than two years ago

5    now, Dr. JoAnne Green, who was the veterinarian,

6    and is now a witness for the government, for the

7    Greater Wynnewood Exotic Animal Park for nearly

8    21 years resigned after an incident of verbal

9    abuse by the Lowes.  Notwithstanding that, the

10   law requires an attending vet to be in place and

11   a plan to ensure the proper care and health and

12   treatment of the animals.  Since then, the

13   facilities operated with the Lowes have been

14   violating this critical requirement.  And this is

15   a critical requirement not only because of the

16   physical nature of ensuring the health and the

17   safety of these animals and, that is, providing

18   tailored guidance on proper ways to treat sick

19   animals, providing tailored guidance to ensure

20   proper nutrition for their diet.  It provides an

21   independent professional under the broader scheme

22   that USDA has established for ensuring the health

23   and safety of animals at all facilities.

24        USDA can't be at every facility all at once,

25   but by requiring the presence of an attending vet

1   and plan, who's periodically checking it,

2   regulated by the government, it provides yet

3   another independent check to ensure proper

4   treatment, health, and handling of the animals.

5   That hasn't been the case now for two and a half

6   years, and the consequence has been very serious.

7          Now, as the court is aware, the United States

8   filed a preliminary injunction, which seeks to

9   remedy and address unsafe harmful conditions at

10  the park, including, specifically by ordering a

11  cessation of all further exhibition without a

12  license and to come into compliance with critical

13  regulations, but we also requested a temporary

14  restraining order, which relates to the

15  defendants' disregard of court orders and callous

16  treatment of certain animals in their care.

17         Now I want to pull up, Your Honor -- my

18  apologizes here for the transition.  And just to

19  make sure, can you see the dec, Your Honor?

20             THE COURT:  I can, thank you.

21             MR. BRIGHTBILL:  Okay.  Great.

22         Now as, Your Honor, knows the government

23  initially moved for a temporary restraining order

24  on December 30th regarding defendants' unlawful

25  disposition of a tiger cub.  This was in

1   violation of the stipulation and, because it was

2   entered by this court, a court order.  Now, the

3   government sought a temporary restraining order

4   at that time, which under Rule 65(b) can be

5   granted on an ex parte basis, but then would only

6   last for 14 days and need a hearing.

7        Now, at this point, the defendants have

8   responded; we're having this hearing.  This

9   satisfies the procedures for a preliminary

10  injunction.  And so, while the United States

11  initially moved for a temporary restraining

12  order, we're past that point, Your Honor, now.

13       At this point the United States would orally

14  move for a request that if an order is entered by

15  the court, the TRO request should actually be

16  converted to a preliminary injunction request,

17  that the injunction should not expire but should

18  last until trial.

19       The difference between a temporary

20  restraining order and a preliminary injunction,

21  in terms of the standards, are immaterial under

22  the various case law and under the standards,

23  Your Honor.

24            THE COURT:  Counsel, let me maybe save

25  you some time.  I understand the difference

 1    between a TRO and a preliminary injunction, and

 2    the Court will hear the requested relief in your

 3    TRO as a preliminary injunctive matter based upon

 4    the fact that the Court has taken a response as

 5    well as having this hearing.  It would not be my

 6    intent to hear the matter as a TRO and then 14

 7    days later have another motion on the preliminary

 8    injunction.  So I understand the point.

 9              MR. BRIGHTBILL:  Thank you, Your Honor.

10    We appreciate that.

11         So now the United States is here because of

12    widespread violations of both federal Animal

13    Welfare Act and the Endangered Species Act.  The

14    defendants are putting the health and the safety

15    of the animals in serious danger.  They are

16    harming and harassing Endangered Species Act

17    protected-species, including lions and tigers,

18    but not just lions and tigers, and to the extent

19    that they are exhibiting with people on the

20    property and permitting people, who are not their

21    employees, access to the property.  They're

22    endangering those members of the public with

23    these violations.

24         The violations, as this court is aware from

25    the legal briefing, are many.  There is the issue

 1   of Daniel the tiger, who was euthanized in

 2   violation of the court order.  There is the issue

 3   of the insufficient food and nutrition, which has

 4   been recklessly handled, allowed to either

 5   swelter and rot in summer sun, or lie frozen,

 6   exposed to pests on the ground, to thaw in the

 7   wintertime.

 8        You read in the briefs about Nala, the lion,

 9   who was found so sick and unable to rise, that an

10   initial inspection in June of 2020 had been to

11   called off.  You heard of the monkeys acclimated

12   to cold weather, left out in the freezing during

13   the day, during the time of the inspection.

14        The lack of interior fencing, protecting

15   members of the public or other visitors of the

16   property, the lack of proper exterior fencing to

17   secure the property, both externally and

18   internally, Your Honor.  We will walk through

19   each of those issues and the evidence that

20   supports them is before this court in a few

21   moments, Your Honor.  But before we do so we want

22   to talk about the defendants in this case.

23        Now, the United States has brought this case

24   against four defendants, Jeffrey Lowe; Lauren

25   Lowe, his wife; the Greater Wynnewood Exotic

1    Animal Park, LLC; and the Tiger King Park, LLC.
2    But the central actor in all of this was
3    Mr. Jeffrey Lowe.
4        Mr. Jeffrey Lowe has variously profited by
5    the exploitation of animals for many years.  I
6    say "exploit" not because there's anything
7    improper about the lawful exhibition or use of
8    animals in various forms.  Congress has provided
9    for that, and the United States is fully
10   supportive of the policies that Congress has
11   articulated.  That's our job to defend those.
12   But I say "exploit" because Mr. Lowe has a long
13   history of operating on the edge of, if not all
14   across of, and in violation of the law and of
15   animals in his care long-suffering.
16       Now, Mr. Lowe makes no secret about his
17   contempt for the law.  He has bragged of it.
18   Mr. Lowe sent this email to the government
19   witness Brittany Peet where he rants, quote,
20   "I've learned a lot about distracting, diverting
21   attention and using smoke and mirrors in the last
22   few years.  I'm perfectly content to play chess
23   with you guys until the day I die."  He goes on,
24   "if we lose in lawsuit, we simply change the name
25   and open another animal business some place else.

1   We all have multiple USDA licenses available."

2       Your Honor, this is not just braggadocio.

3   These were no mere negotiating tactics.  This is

4   Jeffrey Lowe's modus operandi.  This is what he

5   does and has long done.

6       In 2015, he opened a tiger display, a petting

7   pen, in the back of a flea market in South

8   Carolina.  USDA cited him for various violations

9   of the Animal Welfare Act while he was there and

10  he got into a legal dispute with the local

11  community.  Ultimately, a local ordinance was

12  passed limiting him to a small number of animals

13  on the property.  Thereafter, he then absconded

14  to Oklahoma where he joined up with Joe

15  Maldonado, and the Joe Exotic from the *Tiger King*

16  series, Your Honor, and the Greater Wynnewood

17  Exotic Animal Park.

18      Now, in 2017, prior to the legal troubles of

19  Joe Exotic, Mr. Lowe himself then opened a Tiger

20  Cub petting operation in a local mall.  Local law

21  enforcement and officials began to take interest

22  and notice, become concerned.  Before anyone

23  could come in and shut him down, Lowe moved off

24  and bragged of going to Las Vegas where he could

25  make far more money.  Then in Las Vegas, Mr. Lowe

1  operated an unlawful tiger cub petting bus

2  operation where he would cruise around with tiger

3  cubs in the back, shuttling people from casino to

4  casino.  Ultimately, he was arrested.  The

5  animals were found to have diarrhea,

6  malnutrition, and other illnesses, and he

7  ultimately pled guilty to the unlicensed

8  exhibition of animals before coming back to

9  Oklahoma.

10      More recently, riding the newfound fame of

11  the *Tiger King* show, he's been back at the

12  Greater Wynnewood Exotic Animal Park, or was,

13  trying to profit.  Meanwhile, with the 21-year

14  veterinarian chased from the operation; Mr. Joe

15  Exotic, as he called, arrested and imprisoned;

16  the operations deteriorated over the next two

17  years.

18      USDA inspections in June and July found gross

19  and distributing instances of violations of the

20  Animal Welfare Act and many animals in peril as

21  set forth in the various exhibits and submissions

22  of the United States.  The USDA then moved to

23  revoke Mr. Lowe's license before he engaged in

24  his acts of smoke and mirrors again by

25  unilaterally surrendering his license and moving

off to Thackerville, where his new Tiger King

Park was under construction.  Now, here we are in

2021.

Now, during the status conference on Friday,

Mr. Lowe's counsel represented that he's not

making any money.  The record is to the contrary

based on the various admissions and statements of

Mr. Lowe.  He claims to be making millions upon

millions of dollars.  One must ask, premised on

what?  Premised on exhibiting animals at the new

zoo.  He's selling T-shirts premised on there

being a zoo that people will be able to open.  He

has a made repeated statements of opening and

resuming operations at a new zoo.  He's

soliciting promotions from the public, Help Build

the New Tiger King Park, premised at exhibiting

at a zoo.

Your Honor, under the Animal Welfare Act,

exhibitors need to be licensed.  In order to be

licensed, they must demonstrate that they meet

the qualifications of the law.  Now, the

definition of "exhibitor" under the Animal

Welfare Act is quite broad.  It includes the term

"effects commerce," which is a phrase that

Congress famously uses when it is attempting to

1  stretch and/or broaden the reach of its

2  regulatory authority to, or at the limits of, the

3  commerce power.  Textually, there is also nothing

4  in this statute that limits exhibiting by an

5  exhibitor to in-person exhibition.  If you

6  possess an animal, if you display them to the

7  public in person or if you display them remotely

8  somehow for compensation, you are covered as an

9  exhibitor.  Moreover, all zoos are covered for

10  profit or not.  Now the Lowes, they deny they

11  have a zoo.  They are calling it a park.  Your

12  Honor, they can call it whatever they want but

13  the evidence demonstrates that what they have

14  meets the definition and the understanding of a

15  zoo.  They say the public is not present, and

16  hasn't been allowed on the facility.  The record

17  refutes that, but we'll deal with that in a

18  moment, Your Honor.

19       Under the statute, it doesn't matter if

20  they've paused their operations, if they've

21  surrendered their license, if they're engaged in

22  a scheme of smoke and mirrors to evade USDA and

23  federal regulation.  They have a zoo full of

24  animals and they had it before, they have it now,

25  Your Honor.  Many zoos right now are not open to

1    the public because of COVID-19.  The National Zoo

2    here in Washington is closed and has been for a

3    long time.  It's still a zoo, Your Honor.  It's

4    still filled with animals.  It's still a

5    structure that's been physically constructed for

6    that purpose and with the intent to resume that

7    purpose, and it's still subject to USDA

8    regulation.

9         The same here, Your Honor, there hasn't been

10   any evidence and there is no evidence that these

11   defendants are ceasing exhibition for all time,

12   that they are stopping to be a zoo.  As a factual

13   matter, they have a zoo.  Their operations may be

14   paused, but they still in terms of what -- of

15   actually having a concessions with tickets at a

16   gate, but they still meet the definition

17   regardless.

18        Now, moreover, they don't even deny, though,

19   that they've been allowing Netflix film crews on

20   to the property, and that's enough under

21   long-standing Animal Welfare Act law.

22        Basic premise of administrative law is

23   under -- going all the way back to the Supreme

24   Court's January 2 decision in 1947, is that

25   agencies can make law and interpret statutes

1    under their authority by either regulation or

2    adjudication.

3        USDA has long broadly interpreted exhibitor

4    to include the television and visual display of

5    animals by those who possess or control those.

6        The *In re Lloyd A. Good* decision from the

7    Department of Agriculture back in 1990 expressed

8    this, and this has now been carried forward and

9    recognized in federal law.  The Tenth Circuit has

10   never candidly reached this issue, Your Honor,

11   but the Eleventh Circuit has in the *907 Whitehead*

12   *Street, Incorporated* decision of 2012.  They --

13   the museum argued that it is not an exhibitor of

14   animals as defined in the Animal Welfare Act,

15   because they were merely displaying images over

16   the Internet.  The Secretary reasoned, however,

17   earlier in the 1990 *Good* decision that the word

18   "distribution" relates only to the manner in

19   which the animals are displayed to the public,

20   and thus an exhibitor becomes subject to the AWA

21   if he distributes animals by television

22   or--so it's disjunctive, Your Honor--simply by

23   making them available to the public.  The

24   Secretary's reasonable and consistent

25   interpretation of exhibitor as articulated in

1  *Good* is entitled to Chevron deference, and

2  ultimately the Eleventh Circuit went on to affirm

3  that the museum at issue there, Your Honor, was

4  subject to the Animal Welfare Act.

5      Now, there is, of course, widespread evidence

6  of Internet exhibition.  They've been charging

7  the public for videos on sites like Cameo, just

8  like -- Just Fans.  As you can see, Your Honor,

9  for $125, you can go online and request as,

10 quote, "As seen on Netflix, Tiger King, Jeff and

11 Lauren Lowe.  All the money goes back towards the

12 animals' care.  We want to make sure they live

13 long, healthy lives," Your Honor.  You can buy a

14 custom message that they'll film on Internet.  A

15 number of those are included in the record, Your

16 Honor.

17     But exhibition is not just limited to over

18 the Internet.  They always acknowledge that

19 television exhibition is being engaged in.  "We

20 just started filming."  You can see in the

21 transcript of this video by Lauren Lowe in

22 Exhibit E, Your Honor.

23     And the record reflects that that's entirely

24 true.  The videos that have been found on the

25 Internet reflect current exhibition, using

television film crews who have come on to the
property as well as planned exhibition.  It
includes their claim of -- to open a bed and
breakfast.  Here's Lauren Lowe with film crews
observable in the video explaining their plans
for exhibition.

(Video played.)

So can you see, along with the woman and the
camera person in the frame, Your Honor, whom --
according to the notes on the Internet by the
person who posted it, represents the filming of
*Tiger King Season 2*, "my six-year old holding my
camera."  And you can see from the low-angle shot
that that seems to be entirely accurate.

(Video played.)

There is a member of the public.  They say
it's a friend, Your Honor.  It's not an employee.
It's with -- it's someone with a broader group of
camera individuals, simply reaching through the
bars related to the enclosure and touching an
animal, Your Honor.

(Video played.)

Now, it's not just Netflix exhibition.  It's
just other people from outside of the operational
staff at the facility, Your Honor.  There is also

 1  evidence that reporters have been allowed onto
 2  the property.  The Daily Mail reported Lowe
 3  granted DailyMail.com exclusive access to its
 4  55-acre Tiger King Park in Thackerville,
 5  Oklahoma, to show the world that the USDA is
 6  wrong.
 7       Now to be clear, Your Honor, this issue,
 8  though, of an exhibitor is only relevant to the
 9  Animal Welfare Act claim.  It's important that
10  there are two claims that are made.  One of them
11  is the Animal Welfare Act, both of which justify
12  preliminary injunctions here, the other is under
13  the Endangered Species Act.  Now, where the Lowes
14  are acting as exhibitors, then the Animal Welfare
15  Act applies.  Its standards apply for all the
16  animals, but under the Endangered Species Act, it
17  doesn't matter if the Lowes are exhibitors or
18  not.  If they possess ESA covered species, they
19  are covered by the Act and liable if they harm or
20  harass and tape animals that they possess.  And
21  the evidence, including inventories from the
22  defendants, reflect numerous tigers, lions,
23  first-generation hybrids, all of which are
24  covered.
25       Now, defendants are trying to argue hybrids

1    aren't covered.  Your Honor, that's been rejected

2    by prior courts, including the *PETA v Stark*

3    decision in the Southern District of Indiana,

4    which I believe has been cited in our brief.

5    It's also contrary to the plain text of the

6    statute, which talk about not only the species,

7    but then their offspring.  There's also a

8    grandfathering provision which, Your Honor, again

9    we can set forth in our reply brief, whereby

10   endangered species that were already within the

11   possession of individuals at the time of the

12   passage of the Endangered Species Act, would be

13   grandfathered and therefore not subject to the

14   Endangered Species Act, Your Honor.  With the

15   structure of those provisions obviously

16   implicating that the -- that going forward the

17   species would be per se covered; otherwise, there

18   would be no need for a grandfathering.

19        Now, with the preliminary elements for the

20   ESA and AWA established, the evidence reflects

21   that the Lowes are exhibitors and the evidence

22   reflects by party admissions of the Lowes that

23   they have ESA-covered species on the property,

24   notwithstanding their attempt to say these are

25   hybrids.  That's all by the way a recent

1  invention, Your Honor.

2      If you go back to the actual inventories that

3  were provided prior to these legal proceedings

4  you can see tiger, tiger, tiger, tiger, and it

5  goes on and on and on.  It's only after the

6  United States brought their claims that, in

7  December we started seeing inventories that

8  started to call things "hybrid tiger" or "hybrid

9  lions."  Your Honor, all of that is self-serving

10  smoke and mirrors and insufficient to rebut the

11  clear conduct and history of evidence here

12  reflecting that these are fully ESA-protected

13  species that are in their possession.

14      So, with the preliminary elements covered,

15  let's start going through the abundant evidence

16  that these animals continue to be in, or are now

17  in, serious danger, are being harmed and are

18  being harassed by being within the possession,

19  and custody, and control of the Lowes and their

20  current operations, Your Honor.

21      First, we'd like to start with the violation

22  of this Court's order.  Now, as this court is

23  aware, defendants largely stipulated to the

24  United States first preliminary injunction

25  relief.  Not everything, but many.  But the

1   primary objective of that first preliminary

2   injunction was for the United States and the USDA

3   and its inspectors to get access to this new

4   facility that the United States had been shut out

5   of, and to determine what was going on there and

6   had things materially changed.  When the Lowes

7   agreed to that, a stipulation was filed on

8   December 14th and it was entered on December

9   15th.  It included numerous provisions, Your

10  Honor, but in response to the brief that we saw

11  from last night, Your Honor, midnight your time,

12  Your Honor, was that the stipulation was,

13  expressly in paragraph seven, subject to a

14  non-waiver of any and all rights because the

15  United States and USDA knew full well that once

16  we got access to the facility, we may very well

17  find additional violations and issues, as we did.

18       Now, within this stipulation, as this Court

19  is aware, defendants agree that, quote,

20  "defendants will not acquire or dispose of any

21  animal absent leave of court sought by duly

22  noticed motion," and there was an agreement to

23  provide the United States notice before that

24  would happen.  Now, there is no dispute that

25  disposal includes and applies to euthanization,

1   and there is a good reason.  Acquisition or

2   disposition in the context of the Animal Welfare

3   Act is a well-known term of art.  9 C.F.R.,

4   Section 2.75(d)(1) includes euthanize among terms

5   that are ultimately summed as "otherwise disposed

6   of," Your Honor.  In fact, USDA has repeatedly

7   cited the Lowes, or Mr. Lowe, who is the licensed

8   exhibitor, for violations of 2.75(d)(1) over the

9   years.  Here's from the July 8, 2020, report

10   Exhibit P, quote "animals transferred to or

11   acquired from other licensees must have

12   disposition and acquisition records."  Goes on to

13   explain the requirement and that all regulated

14   animals, transported, sold, euthanized or

15   otherwise disposed of are included in the scope

16   of that.

17       So there's no dispute here that the

18   stipulation applied to what occurred, Your Honor.

19   In fact, you heard no dispute of that during the

20   status conference on Friday.

21       And so what happened was, on December 21st or

22   22nd, as it's now based on the stipulation that

23   was filed or declarations that were filed today,

24   Your Honor, a mere week after the stipulation was

25   entered, defendant sent an agent, a partner,

whatever you want to call him, an individual Eric
Yanno, to a veterinarian who was not previously
known to the government.  Dr. Ash Durham is now a
witness for the government, and she documented
real time what she was observing and some of the
conversation.  And she recorded, quote, "due to
poor prognosis, Mr. Yanno elected to euthanize.
I also felt it was the most humane decision due
to the condition of the cub on presentation.
Also, compliance for correction of the
nutritional deficiency might have been an issue."
The animal was then sent for an independent
necropsy--essentially an autopsy for animals,
Your Honor--by the Oklahoma Animal Disease
Diagnostics Lab.  What they found was a stomach
that was markedly distended with large amounts of
ingesta, which is reflected in Exhibit KK, which
was white meat, Your Honor.  Not evidence of
mother's milk or appropriate supplement.  The
necropsy went on to explain "gross examination is
consistent with the clinically diagnosed
metabolic bone disease with secondary
hypoparathyroidism."  The most common cause of
metabolic bone disease in young, growing animals
is due to improper dietary ratios, calcium

 1    phosphorous, and Vitamin D.  This is further

 2    supported by the subjectively enlarged

 3    parathyroid gland, another indication that this

 4    was metabolic and not genetic, Your Honor.

 5         Now, Mr. Lowe's excuse for not complying with

 6    the court order and not providing notice is "It

 7    had to be done."

 8         At midnight, Your Honor, we got a declaration

 9    from a Dr. Danner who claims that this was all

10    okay because this was genetic metabolic bone

11    disease.

12         Well, first of all, Your Honor, in response

13    to that, that is irrelevant and no defense to the

14    violation that has occurred and the conduct and

15    the contempt that this represents.  It was not

16    Mr. Lowe's, Mr. Yanno's or anyone else's decision

17    to make as to euthanize this animal in light of

18    that court order.

19         By stipulation they ceded to the government

20    and to this court the participation in that

21    decision.  That's what that meant, without leave

22    of court, Your Honor.  So prior to anyone making

23    a decision to euthanize this animal or any other

24    animal, it was incumbent upon them to provide

25    notice of this to the United States.  If we did

1   not stipulate, to file duly noticed motion with

2   this court and for there to be an adjudication as

3   to whether or not this was truly necessary.

4        Now, second, you see in their response is

5   they tried to hide behind Dr. Durham and say that

6   she agreed to euthanize as if to wash their hands

7   of the responsibility of all this.  Now, of

8   course, Dr. Durham didn't know that the Lowes was

9   involved in this.  Mr. Yanno gave the address of

10  the facility, but didn't identify who he was

11  working for.  The government was -- she didn't

12  know.  Dr. Durham didn't know the government was

13  concerned about the Lowes and their conduct, but

14  she nevertheless independently became concerned

15  based on the conversation that if the animal

16  wasn't euthanized, it could not be properly cared

17  for and would not be given the opportunity to

18  recover.  That's what she what meant by

19  "compliance for correction of the nutrition

20  deficiency might have been an issue."  She

21  nevertheless told Mr. Yanno that other cubs

22  needed to be evaluated and nutritional changes

23  needed to be implemented immediately.

24        Now, the government's expert witness,

25  Dr. Gage, has reviewed the file.  She thinks

1   Daniel could have recovered and certainly there

2   was no evidence that Daniel was about to die.

3   Nevertheless, at midnight, again the defendants

4   filed a declaration of Dr. Danner.  Dr. Gage has

5   identified in a supplemental declaration, which

6   by stipulation we are either in the process of

7   filing or have already filed, Your Honor, many

8   holes in Dr. Danner's midnight declaration.  For

9   example, Dr. Danner seems to be proceeding under

10  the belief that the tiger cub has been fed by the

11  mother's milk, but the stomach was found to

12  contain white meat.  It was photographed just a

13  week before in a cage with other random liter

14  mates, not with its mother, Your Honor.  There

15  are other issues that Dr. Gage has identified,

16  including that this notation of a genetic

17  metabolic bone disease is based on very, very

18  thin and very old and largely discredited

19  scientific studies.

20       It was instead, and is Dr. Gage's testimony

21  that in her experience and professional opinion

22  that this young tiger's metabolic bone disease

23  was diagnosed in a timely manner.  It is highly

24  likely that the tiger would have recovered with

25  the appropriate care, exercise and diet, Your

1    Honor, and that's what having a veterinarian

2    on-site consistent with USDA regulations would

3    have ensured, Your Honor.  Regardless, this is

4    all irrelevant.  We'll never know if Daniel the

5    tiger might have recovered.  And in some level

6    this is all academic because what this really

7    just simply just demonstrates is Mr. Lowe's

8    contempt for legal process and that this is more

9    of his smoke and mirrors and effort to evade the

10   law.

11        Now, piling on and making this all the worse,

12   it appears that Daniel's death is just the tip of

13   the iceberg.  We found out just yesterday, Your

14   Honor, about Bubbles another cub tiger, under the

15   age of one, who died a -- this is from the

16   declaration of Mr. Lowe filed around midnight

17   last night, Your Honor, the day of the

18   inspection.  Bubbles, a hybrid tiger cub, died

19   because she had choked on a chicken bone it was

20   fed.  Unfortunately, we were unable to save her

21   and buried her, Your Honor.  So that's two dead

22   tiger cubs under the age of one within a one-week

23   period of time, Your Honor.

24        Moreover, it seems highly improbable when you

25   look at Bubbles and the age of this tiger as

1    Dr. Gage voiced, that the tiger would have died

2    the day after the inspection from a chicken bone,

3    first and foremost, because of its age and size.

4    But, second of all, Your Honor, just the day

5    before the inspectors were on the property and

6    there wasn't a chicken bone to be found anywhere.

7    That's one of the things that they cited the

8    Lowes for is that they were feeding them frozen

9    white chicken breasts without the bone necessary

10   to provide them calcium, Your Honor.

11       And that's probably not all, Your Honor.  The

12   last inventory that the government received from

13   the Lowes prior to the Thackerville facility was

14   dated August 21, 2020, approximately four months

15   past the next inspection.  And then what did USDA

16   find on December 15, 2020?  Acquisition and

17   disposition records were missing or unavailable

18   at times of inspection, and at least 60 animals

19   could not be accounted for when comparing

20   animals.  Where did those animals go, Your Honor?

21   We don't know.  We're being made to guess as to

22   their condition.  This court is being left to

23   guess as to their condition.  But there is

24   certainly abundant evidence based on the Lowes'

25   terrible track record about where -- what is the

1   likely status and condition of those many, many

2   missing animals?

3        So the government is beyond the relief

4   relating to the tiger cubs and their mothers that

5   was sought through what was initially a temporary

6   restraining order.  It had previously requested a

7   preliminary injunction to prohibit further

8   exhibition and compliance with the AWA.

9        Now, as we discussed, the predicate elements

10   of the AWA is that they are exhibitors; but the

11   Endangered Species Act is that they are

12   ESA-covered species.  And the legal standards

13   shows then thereafter to establish the violation,

14   the legal standards that must be shown are

15   substantially serious or, excuse me, Your Honor,

16   substantially similar.

17        Under the AWA, the government must show that

18   the animals are in serious danger.  Under the

19   ESA, the government must show there has been

20   take, meaning that animals are being harmed,

21   animals are being harassed.  And there is an

22   abundance of evidence of this serious danger,

23   harm, and that there is harassment and it

24   includes defendants long-standing habit of

25   providing cheap and inadequate food and nutrition

1    and lack of appropriate supplements for exotic
2    animals.
3         Now, the government's witnesses have cited
4    many, many examples of this, of this long course
5    of conduct on behalf of defendants, both stemming
6    from the earlier Greater Wynnewood Exotic Animal
7    Park and now carried on to the Tiger King Park
8    they're in, Your Honor.
9         There's the story of Dizzy, the emaciated
10   bear.  There's the story of the geriatric wolf
11   sleeping on the concrete with a massive sore on
12   the side.  There is the story of Nala wallowing
13   in mud, unable to stand and with a condition so
14   dire that the initial inspection had to be
15   cancelled.  Government witnesses also referred to
16   the rotting chicken in the summer heat.  The
17   frozen meat open to winter cold and pests, horse
18   supplements not tailored to the nutritional needs
19   of exotic animals.
20        Now, the Lowes' response to all of this
21   pretty consistently has been genetic conditions.
22   We have hybrids.  None of this is our fault.
23        Your Honor, the evidence is to the contrary.
24   For example, there is the continued story of
25   Nala.  After Nala was taken from the defendants'

1    care, she was brought to a Colorado sanctuary and

2    was filmed.  The present condition of Nala, Your

3    Honor.

4                        (Video played.)

5         This is Nala here, Your Honor, dragging her

6    hind legs.  Without much reason, she stumbles and

7    has trouble getting up.  Now, note that she was

8    unable to stand at all in June of 2020, Your

9    Honor.  But after just two months of appropriate

10   care at this sanctuary, Nala looks much better.

11                       (Video played.)

12        This is Nala, the small lion playing with the

13   larger one.  You can see Nala still has a limp.

14   She's not all the way there yet, Your Honor, but

15   she's doing a lot better.

16        Now, as the government's witness veterinarian

17   Dr. Gage summarized of all the abundant

18   evidence -- be sure I've got the right . . .

19   Sorry about that, Your Honor.  Dr. Gage has

20   testified, quote, "These sources demonstrate that

21   the Lowes consistently failed to provide their

22   big cats with a diet containing the necessary

23   nutrients to allow them to grow properly and

24   thrive."  She continues, "Because the Lowes are

25   not using appropriate dietary supplements, it is

1  my opinion that they not feeding their big cats a

2  nutritionally balanced diet and thereby placing

3  the animals at risk developing metabolic bone

4  disease and other nutritional disorders."  The

5  Lowes have a history of providing a nutritional

6  deficient diet to the big cats at their

7  facilities, Your Honor.

8      Now, the Lowes are also placing their animals

9  in serious danger, harming them, and harassing

10  them through the insufficient housing facilities

11  at the new Tiger King Park.  As the court is

12  aware and can freely take judicial notice of, the

13  temperatures frequently drop below freezing at

14  night in Thackerville, Oklahoma, with chances of

15  rain, snow, and sleet, and actually remain below

16  freezing certainly many days in January, Your

17  Honor.  Yet the Tiger King Park consists of many

18  small cages insufficiently prepared for winter

19  and adverse weather generally.

20      Macaques, monkeys native to tropical

21  conditions, were found shivering in freezing cold

22  during the December inspection, Your Honor.  As

23  the report reads, and cited them, quote, "failure

24  to have correctly acclimated non-human primates

25  housed in outdoor housing conditions, can lead to

1    hypothermia or hyperthermia."  In fact, it wasn't
2    just the monkeys, Your Honor.  The USDA went on
3    to cite them for inadequate facilities and the
4    witnesses, Ms. Cunningham, her declaration
5    testifies to this more generally, for the animals
6    around the new Tiger King Park.  Quote, "Most of
7    the enclosures" -- excuse me.  "Most of the
8    enclosures housing the big cats do not provide
9    shelter for inclement weather.  Some of the
10   larger enclosures have roof space that would
11   allow the animals to remain dry in case of wind,
12   rain, and snow, but most of the enclosures would
13   not.  Even animals that are cold-weather tolerant
14   may be adversely effected," Your Honor.
15        You can see many of these same in various
16   cages and many places around the park.  Large
17   tigers in small holding cages, Your Honor, and
18   you even have the issue of the young cubs, some
19   of Daniel's litter mates, other small cubs all
20   presumably to some level deficient in their
21   nutrition, prone to fracture and crowded in small
22   cages.  Perfect conditions for an accident.
23        Now, beyond these issues for the animals in
24   supporting the injunction, vis-a-vis the Animal
25   Welfare Act, for the public as a whole, Your

1  Honor, are the missing barriers for public
2  safety.
3      USDA regs require secondary barriers to
4  protect the public and prevent contact with the
5  animals.  That is for the safety of both the
6  animals themselves as well as the public.  And
7  the Internet reflects, from the various pictures
8  that have been gathered, that people can readily
9  stick their hands in and through the bars of the
10  cages and have done so.  It is also a violation
11  of USDA regs to have insufficient exterior
12  fencing.  Individuals or wild animals can enter
13  under or through insufficient fences, nor is this
14  secondary fence capable in any way of containing
15  fugitive escapees.  The Tiger King Park is in the
16  midst of a rural residential area.  One of the
17  photos submitted with the government's briefs
18  shows the Park with neighbors all around them in
19  every direction. In fact, as can be seen in this
20  posed promotional shot, there are essentially no
21  secondary barriers.
22      Now, in the December 14th stipulation the
23  government said it would not cite the Lowes for
24  such a violation but this stipulation, when the
25  Court is able to -- has the time to go and review

1    it, you will see it was premised on the

2    defendants' factual representation that the

3    public is not allowed on the property and will

4    not be on the property.  It was also subject to

5    the government's reservation of rights once they

6    were on the property and were able to assess the

7    condition of the property and the events as

8    relative to new information -- other information

9    obtained, and the videos and the pictures on the

10   Internet ultimately reflect that this is simply

11   not true.  Members of the public have been

12   allowed onto the property and absent a court

13   order, one must presume and can presume, the

14   evidence reflects that that will continue.

15        Now finally, Your Honor, with respect to the

16   five major issues of serious danger, harm, and

17   harassment.  All the violations here are

18   partially attributable to one, a final issue,

19   that we focus on.  That is that USDA regulations

20   require an attending veterinarian and plan of

21   treatment.  As I indicated at the beginning, this

22   is a critical requirement because it provides an

23   independent professional, who has responsibility

24   to other regulatory authorities, who can provide

25   and do provide an independent check beyond the

USDA that exhibitors are exercising due care in
the possession and nourishment and feeding and
health of their animals.

As I indicated, the veterinarian of 21 years
resigned her position in June of 2018, quote,
"Following an episode following an abusive,
verbal attack toward me by Jeff and Lauren Lowe."

There have been other veterinarians called on
an ad hoc basis.  All of them have confirmed that
they are not attending veterinarians of the
Lowes, and have not been.  That includes
Dr. Devine, that includes Dr. Gilmore, and that
also includes Dr. Danner, who in his midnight
declaration similarly stated that he was not the
attending veterinarian of the Lowes.

In the past year alone, defendants' callous
handling have racked up a gruesome list of
causalities as, Your Honor, sees partially
summarized here.  From dead, malnourished and
abused animals.  These are just some of the
stories that have been related, but the evidence,
of course, indicates that many of the animals on
the property are malnourished, suffering in
serious danger, have been harmed, have been
harassed.

1    You've heard about Nala; Ayeesa, in the

2    briefs; Promise; Dizzy; Dot; Mama; Young Yi;

3    Petunia; the macaques, the monkeys; the Lizzie;

4    Bubbles; an unnamed hybrid; Daniel.  The list

5    goes on, Your Honor.

6        The United States has demonstrated a very

7    strong likelihood of success.  The same evidence

8    shows irreparable harm.  Young Yi is dead.

9    Daniel is dead.  Bubbles is dead.  Their brothers

10   and sisters and fellow animals in the possession,

11   custody, and control of the Lowes need not

12   similarly die.  It is also in the public interest

13   to grant an injunction to protect endangered

14   species so that endangered species, whether

15   captive or wild, are being preserved.  It's

16   important and in the public interest to grant an

17   injunction so that similar bad actors are

18   deterred, and there is no real harm to the

19   defendants as was revealed in the status

20   conference.

21       The Court no doubt recalls its colloquy with

22   counsel:  "Would any of the defendants lose any

23   revenue and I believe your answer was, no, they

24   would not?"

25       "MR. CARD:  Correct.  That is correct.  They

1    will not lose any revenue because they're not

2    making any revenue on them anyway.

3        "THE COURT:  Second question is if I granted

4    the government's request in terms of the

5    preliminary injunction or the temporary

6    restraining order would your clients suffer any

7    harm; and, if so, what do you contend that would

8    be?"

9        "The harm is that the cats are Mr. Lowe's

10   property and he has raised them and it would just

11   be like taking any other property from a private

12   citizen.  I mean, obviously he wants the cats

13   that he cares for in his care.  So, I mean,

14   there's no financial harm, but there's certainly,

15   you know, he's got a right to his property."

16       "THE COURT:  So your clients' interest would

17   be that the animals would be cared for and

18   preserved and kept healthy?  That's your clients'

19   interest; right?"

20       "MR. CARD:  Correct.  And they are perfectly

21   capable of doing that."

22       So says Mr. Card, Your Honor, the government

23   thinks the evidence is to the contrary.

24       The colloquy shows, when engaging in the

25   balance of equities, there is no material harm to

1    the Lowes; certainly nothing outweighing the

2    very, very strong need to protect the health and

3    the safety of these animals.

4        Your Honor, it is time to look past Jeffrey

5    Lowe's smoke and mirrors.  His callous

6    exploitation of animals, using them and

7    discarding the animals, letting them die, as long

8    as he has a new round of cubs to continue to

9    generate income just like the facilities that

10   he's left behind along the way.  All of this must

11   end, and that's what our case ultimately will

12   culminate in, Your Honor.

13       For the moment, though, all we are requesting

14   is a preliminary injunction with various forms of

15   relief to protect the animals pending trial, Your

16   Honor.  For these reasons, the United States

17   respectfully requests that the Court grant the

18   relief sought by the TRO, converted, obviously,

19   to a preliminary injunction pending trial, and

20   grant its broader preliminary injunctive relief

21   granting -- pending trial as well.

22       Thank you, Your Honor.

23           THE COURT:  Thank you, Mr. Brightbill.

24   Mr. Card, you may proceed.

25           MR. CARD:  Thank you, Your Honor.  Can

1    you hear me okay?

2              THE COURT:  Yes.

3              MR. CARD:  Okay.  Your Honor, it seems

4    abundantly clear from both the government's brief

5    and the presentation today that when the

6    government entered into the December 14, 2020,

7    stipulation it had no intention of sticking to

8    it.

9         When we entered into the agreement on

10   December 14th, the government knew well that the

11   facility in Thackerville is under construction.

12   It is not a complete structure.  They knew full

13   well that there were no public barriers because

14   the public doesn't go on the property.

15        When they get in the property the next day,

16   they seem surprised to learn that there are, in

17   fact, no public barriers.  The government

18   conceded, in fact, dropped the request in the

19   stipulation that the Lowes have an attending

20   veterinarian.  When they get in the next day,

21   they seemed surprised that there is no attending

22   veterinarian.

23        I say this to say, Your Honor, they agreed to

24   something and then used the knowledge that they

25   already had in order to file a new motion.

 1          Now, a lot of their motion, Your Honor, is
 2     based on the Lowes allegedly exhibiting over the
 3     Internet or on TV.  And by the time that the
 4     stipulation was entered into on December 14th,
 5     every one of those videos and every one of those
 6     shots and all the filming was already known to
 7     the government.  None of this is new information.
 8     Yet they alleged that the Lowes, quote,
 9     "continued to exhibit."  There is not a single
10     piece of evidence that they put within their
11     motion that would substantiate that they are
12     continuing exhibit.  There has not been a film
13     crew on the property since the stipulation has
14     been entered into.  There has not been -- to my
15     knowledge, there's not been any Cameos.
16     Actually, I know there's been no Cameos that
17     exhibit animals since this stipulation.
18          And speaking of that, Your Honor, the
19     government's definition of exhibitor and the
20     government's definition of public is so broad
21     it's scary, frankly.  The Lowes have been -- I
22     mean, ever since the -- particularly ever since
23     the airing of *Tiger King* in March of 2020, which
24     was seen by 34 million people, they're all over
25     the Internet and there's no way that they're

1  going to be able to scrub themselves from the

2  Internet.

3      According to the government's definition of

4  exhibiting, they're going to be exhibiting

5  forever because they are, in fact, on the

6  Internet.  Moreover, the government is actually

7  claiming they are exhibiting by selling T-shirts.

8  Selling T-shirts on a website, according to the

9  government, is exhibiting regardless of whether

10  it has anything to do with an animal whatsoever.

11  These Cameos, in particular, they are not based

12  on seeing the animals.  Although, in some of

13  them, in some of the older ones, an animal can be

14  seen in the background.  The customers ask for

15  these Cameos because of the fame or notoriety, or

16  whatever you want to ask, of the Lowes at this

17  point.  And when their zoo had to be shut down

18  during COVID, that was a way to make money.  The

19  same thing goes for OnlyFans.  There has been no

20  OnlyFans video, which has shown an animal, since

21  the stipulation and indeed since this summer.

22  But the Lowes can't scrub that from the Internet,

23  and the government already knew about these

24  videos before they entered into the stipulation.

25  So why they're complaining about it now, I'm

1    unsure.

2        Your Honor, there's some significant legal

3    questions that need to be answered in this case

4    before any preliminary injunction should be

5    entered.  Because once it's time for the

6    defendants to file their answer, it's going to

7    come in the form of a motion to dismiss.  As

8    we've already said, the Lowes' animals are not

9    subject to the ESA because they're hybrids.

10   There's scientific articles regarding that fact

11   and the history of the legislation would tend to

12   agree with that.

13       These are all legal questions that need to be

14   born out in more thorough briefing and not just

15   relying on an expedited briefing for a

16   preliminary injunction that shouldn't have been

17   filed in the first place, because there was

18   already agreement to it on December 14th.

19       More concerning is their definition of

20   "public" and "exhibition."  As I've already said,

21   according to the government, selling T-shirts on

22   a website is apparently exhibition to the

23   government.  Keep in mind, Your Honor, the Lowes

24   live on this property with these animals.  That's

25   their life; that's how they live.  According to

1    the government's definition of exhibition, they

2    can never have a friend over.  Ever.  Otherwise,

3    that's exhibition against the USDA rules.  They

4    can't ever film themselves at their own house and

5    post it, otherwise that's exhibition according to

6    the USDA's or, excuse me, the government's

7    definition of exhibition.

8         Now, obviously this raises significant First

9    Amendment issues which, again, needs to be born

10   out by thorough briefing with the court.

11        By the way, Your Honor, it's not illegal to

12   own these animals.  So if the Lowes want to post

13   a selfie with their own animals, they should be

14   allowed to do that.  Moreover, according to the

15   government's definition of exhibition, Netflix is

16   an exhibitor.  They, for-profit, are showing

17   lions and tigers on the Internet and according to

18   the government's definition that's exhibition.

19        Now, perhaps Netflix has an exhibition

20   license; I sincerely doubt it.  PETA, for

21   instance, has pictures of wild animals, lions,

22   tigers on their Facebook page.  According to the

23   government's definition, PETA is actually

24   exhibiting wild animals.  I sincerely doubt PETA

25   has an exhibition license because that's their

```
 1    point of existing is to rid the world of
 2    exhibiting animals.
 3         Excuse me, Your Honor.
 4         The point is, Your Honor, that the
 5    government's definition of the public and
 6    exhibition is so broad that it cannot possibly
 7    withstand constitutional scrutiny under the First
 8    Amendment, and it cuts against the point of the
 9    law in the first place.
10         Now, these regulations were written, I
11    believe, in the 1970s if I'm remembering
12    correctly, at a time when Netflix and the
13    Internet and streaming services just didn't
14    exist.  I find it hard to believe that Congress
15    intended for pictures of wild animals with their
16    owners to include -- to be included in
17    exhibiting.
18         Again, with public, the definition of public
19    is of or concerning people as a whole.  Are the
20    Lowes -- one of the Lowes closest friends, who is
21    their former nanny and who they named their
22    daughter after, is that people as a whole?
23    Surely not.  But it is according to the
24    government.
25         There are some things that I would like to
```

1  directly address, with regard to particularly

2  Dr. Durham, one of which was that it was claimed

3  that on the day that the animal was put down that

4  Dr. Durham didn't know who Mr. Yanno was working

5  for.  That's absolute nonsense.  She had been to

6  the park two weeks earlier.  She knew exactly who

7  she was working for.  She met the Lowes.  She

8  toured the entire facility.  She looked at every

9  animal and said they all looked great.  Why she

10  has changed her tune at this point one can only

11  guess.  I assume that she had spoken to --

12  actually, I know that she had spoken to

13  Dr. Devine, who had been a previous vet with the

14  Lowes, and poisoned him -- perhaps Dr. Devine had

15  poisoned the well a bit.  But regardless, she

16  knew exactly who she was dealing with.  She said

17  the animals looked great on that day.

18      Eric Yanno was on a course to get this animal

19  treatment as soon as possible.  He cared about

20  the animal and despite the government's rhetoric

21  that, well, they were just looking for a vet to

22  euthanize a cat that day, he was trying to find a

23  vet that would -- that could possibly help this

24  cat and could potentially safe its life.

25  Mr. Yanno had forged an excellent relationship

1   with Dr. Danner, who has been in this business

2   for 42 years.  He was the president of Oklahoma

3   Veterinary Board Association for two terms,

4   appointed by Governor Henry, and Mr. Yanno came

5   to trust his judgment.

6        So when he got there that day, Mr. Yanno was

7   told by Dr. Durham, this cat isn't saveable.

8   There's nothing we can do for it.  But before

9   Mr. Yanno decided to go ahead and put the cat

10  down as Dr. Durham had suggested, he wanted her

11  to call Dr. Danner so he could get a second

12  opinion.  So this idea that the defendants are so

13  callous about their cats is, in and of itself,

14  smoke and mirrors.  They're trying to save this

15  cat.

16       Now, I realize there's going to be expert

17  disagreements, just like there could be in

18  medical malpractice cases, but the government's

19  experts are not the end-all be-all.  They're not

20  the sole arbiter of what proper vet care is and

21  what proper diagnosis is.

22       The fact that is that Dr. Danner was, I say,

23  quote, "put boots on the ground," but it was over

24  the telephone.  He read the x-rays in real time.

25  He spoke to Dr. Durham in real time.  He looked

1   at the blood work in real time, and based on his

2   knowledge of the situation he also agreed this

3   animal was suffering.  It was going to continue

4   to suffer.  There was no bringing this animal

5   back, and the best thing to do was to put this

6   animal down, unfortunately.  However, he did call

7   the USDA and he told Eric Yanno that I'm going to

8   call the USDA for you.  So he called Bob Styles,

9   who was a USDA investigator, and told him what

10  was going on.

11       So I distinctly recall that in the status

12  conference last Friday it was alleged that, well,

13  we had a cat put down in a clandestine manner.

14  Again, this is more rhetoric from the government

15  that bears no truth whatsoever.

16       Eric Yanno tried to do everything that he

17  could to save that cat.  Two vets with boots on

18  the ground decided this cat could not be saved

19  and that this cat was suffering.  One of the vets

20  called the USDA.  Now, granted, that is not how

21  the process should have gone.  Mr. Yanno did not

22  know about the stipulation.  And I suppose

23  there's -- well, there must have been a

24  miscommunication among us.

25       Had we known, had I known, I would have

1  called the government and said this is what's

2  going on.  This cat needs to be put down

3  immediately because it's suffering.  That doesn't

4  change the circumstances that this cat was

5  suffering and the suggestion that Eric Yanno was

6  flippant about the idea is just nonsense.

7       And one final thing, Your Honor, the

8  government went into a great deal about Jeff

9  Lowe's past and the allegations that we still, to

10 this day, have not had a chance to refute because

11 we have not been able to answer a complaint as of

12 yet.  Discovery should be born out.  I should be

13 able to cross-examine these witnesses.  I should

14 be able to cross-examine Dr. Gage or, I mean,

15 Peet and among the many, many, many other

16 witnesses that the government has brought forth

17 in affidavits without the benefit of

18 cross-examining them.  The previous vet,

19 Dr. Devine.

20       The point is this is all premature.  These

21 are simply allegations, which the Lowes

22 categorically deny.  At this point, the Court

23 should not be swayed by simple allegations

24 anymore that it can rule on a simple filing of a

25 complaint.  The Lowes and the defendants should

 1   be able to have their day in court in which they

 2   can answer the complaint, file appropriate

 3   motions to dismiss the complaint, and why it

 4   needs to be dismissed, have the court analyze

 5   those very important legal questions before any

 6   tigers or the property of Jeff Lowe are taken

 7   from him based solely on affidavits that yet have

 8   been substantiated.

 9        Your Honor, and I apologize for backtracking

10   as well--I was just going over my notes--but

11   according to the government as well, the very

12   prospect that they want to open a zoo, by the

13   mere fact that they are saying we are building

14   cabins, we would like to rent them out as a bed

15   and breakfast.  We're building a zoo.  Eventually

16   we'll open it.  According to the government, that

17   in and of itself is exhibition.  That just

18   doesn't make common sense, Your Honor.  It

19   doesn't make sense under the statute; it doesn't

20   make sense under the First Amendment, and these

21   things need to be born out in briefs and in

22   discovery.

23        Thank you, Your Honor.

24            THE COURT:  Thank you, Mr. Card.

25        Mr. Card, you said that the defendants'

 1    position is that they are not subject to the ESA

 2    because some of the animals they have are

 3    hybrids.  Do you have any authority to cite to me

 4    for that position?

 5              MR. CARD:  That -- well, I have

 6    scientific.  Well, I intend to get an expert on

 7    that one, Your Honor.  Mr. Lowe has sent

 8    scientific articles that I've read.  And frankly

 9    that was another reason I would like the chance

10    to actually brief this issue to determine whether

11    these hybrids are actually subject to the ESA.

12              THE COURT:  Well, I guess those are two

13    different issues.  I'm not asking you to

14    demonstrate to me that they are, in fact,

15    hybrids.

16        The question is more of a -- a legal question

17    is:  Do you have any authority that would say

18    that hybrids are not subject to the ESA versus,

19    you know, purebred tigers or lions?  Is there any

20    legal authority that I should be reading?

21              MR. CARD:  Excuse me, I'm sorry, Your

22    Honor.  I don't have any legal authority offhand,

23    but that was part of the request.  There's no way

24    I could have made that thorough argument and done

25    all the research within the small time that we

1  had to respond to this.  It wasn't physically
2  possible.
3          THE COURT:  Okay.
4          MR. CARD:  But I would like the chance
5  to do so, Your Honor.
6          THE COURT:  Okay.  Mr. Card, when was
7  last time that a Cameo video was taken showing
8  any of the animals on the defendants' property?
9          MR. CARD:  Early September, I believe.
10 I believe we determined it was September 9th.
11 That's our best guess is September 9th.
12         THE COURT:  Was that at the new
13 Thackerville location?
14         MR. CARD:  No, that was in -- well, I
15 don't want to.  I believe it was in Wynnewood,
16 but I don't want to swear under oath to that.
17 But I believe it was in Wynnewood.
18         THE COURT:  Have there been any Cameo
19 videos taken showing any of the animals at the
20 new Thackerville location?
21         MR. CARD:  Cameo videos, new
22 Thackerville.  Let me think real quick.  I don't
23 believe there have.
24         THE COURT:  When was the last time that
25 a video was taken or sent through OnlyFans

1    showing any of the animals?

2         MR. CARD:  It was the same time period.

3    It was August or September.

4         THE COURT:  Were there any OnlyFans

5    videos taken or sent showing any of the animals

6    on the Thackerville property?

7         MR. CARD:  There have been instances

8    where there have been showing animals on the

9    Thackerville property, but they were in -- I

10   suppose they had to have been in September or

11   early October.  It was before the complaint was

12   filed.

13        THE COURT:  Okay.  When was the last

14   time that a film crew was on the defendants'

15   Thackerville property?

16        MR. CARD:  The first week of November.

17        THE COURT:  Are there plans for a film

18   crew to return to that location for filming?

19        MR. CARD:  No.

20        THE COURT:  Is it because the filming is

21   completed?

22        MR. CARD:  I'm not sure, but I also --

23   I'm not really sure on the status of how

24   quickly -- if their filming is completed yet.

25   But I know there are no plans for Netflix to come

1    back to the facility.

2            THE COURT:  Is it defendants' position

3    that they are not subject to the Animal Welfare

4    Act because they have relinquished Mr. Lowe's

5    USDA license?

6            MR. CARD:  Not at all.  Their objection

7    is that they're not subject to the USDA because

8    they're not exhibitors.  Again, it's not illegal

9    to own these animals.  And if they're not

10   exhibitors, the USDA -- they don't fall under the

11   USDA guidelines.

12       So when the, if I may, Your Honor, when the

13   USDA suspended his license--I believe it was

14   August 21st of 2020--he shut down the zoo, which

15   was in Wynnewood at the time, and at that point

16   he quit exhibiting.  Of course, since then,

17   within the next month or so, there had been a

18   couple of times such as on Cameo where an animal

19   was featured in the background, but they weren't

20   the sole focus of the video, so . . .

21           THE COURT:  Do the defendants intend to

22   exhibit the animals at the Thackerville location

23   called the Tiger King Park in the future?

24           MR. CARD:  When they get a license to do

25   so, yes.

1          THE COURT:  What is the expectation of

2    their timing of when they would be exhibiting any

3    of these animals?

4          MR. CARD:  The expectation would be as

5    soon as they -- as soon as the facility was built

6    to USDA standards and they actually got an

7    exhibitors license.  They're not just going to,

8    you know, say, Hey, we're open, come on in.

9    That's just not going to happen.

10          THE COURT:  If the defendants recognize

11   that they need a USDA license to exhibit the

12   animals, they were previously exhibiting the

13   animals at the Wynnewood location, and they need

14   a license to exhibit the animals at the

15   Thackerville location, why did Mr. Lowe

16   relinquish his USDA license?

17          MR. CARD:  At the time he didn't want to

18   fight with the USDA and go through the

19   bureaucracy, which clearly we're doing that now

20   anyway, but . . .

21          THE COURT:  Well, at the time --

22          MR. CARD:  Also, Your Honor --

23          THE COURT:  Go ahead.

24          MR. CARD:  Also, Your Honor, as I

25   recall, they were required to get out of the

 1    Wynnewood facility by October 1st anyway.  So

 2    it's not the -- the Wynnewood facility was not

 3    going to be open but for another month.  So it

 4    didn't make -- and he would have to apply for

 5    another exhibit --

 6            THE COURT:  Mr. Card, we lost your

 7    sound.

 8            MR. CARD:  He would have to apply for a

 9    new license for a new facility anyway so instead

10    of fighting for a license that would only last a

11    month, he decided to relinquish it and he would

12    just apply for a new one at Thackerville.

13            THE COURT:  When the animals were moved

14    to the Thackerville location, was it the intent

15    at some point in the future to exhibit those

16    animals after a license was obtained?

17            MR. CARD:  Yes.

18            THE COURT:  Does Mr. Lowe intend to

19    apply for a USDA license to exhibit the animals?

20            MR. CARD:  At this point that is the

21    intent, correct.

22            THE COURT:  And was that his intent when

23    he moved the animals?

24            MR. CARD:  Yes.  His intent was to open

25    a park and a zoo when he got the license and when

1  the zoo was actually built.  Neither one of those

2  things has happened, so he has not exhibited any

3  animals.

4          THE COURT:  Okay.  Thank you, Mr. Card.

5      Mr. Brightbill, do you have anything in

6  response?

7          MR. BRIGHTBILL:  I do, Your Honor.  I

8  just have a couple points on rebuttal.

9      First of all, I just want to be clear about

10 this issue of the stipulation, Your Honor.  So

11 the preliminary injunctive relief that was sought

12 in the first motion was to get, primarily to get,

13 access to the facility.  Immediately before we

14 were first supposed to appear and they were

15 supposed to file with the court and they were

16 supposed to file something, they agreed to give

17 us that access and we negotiated the terms of

18 that.  But as you can see here under Section 7,

19 quote, "By entering into this stipulation and

20 agreement to address the issues presented in the

21 United States' Motion for Preliminary Injunction

22 neither plaintiff nor defendants are conceding or

23 waiving any arguments, positions, rights, and

24 defenses.  Both parties reserve the right to seek

25 further or modify this relief as further

information develops."  So this argument, this
pseudo estoppel argument that they -- defendants
are attempting to roll out is precluded by the
actual agreement of the parties and ultimately
this Court's order.

Second, the defendants suggest that they
haven't had sufficient time and opportunity to
make their case in defense, Your Honor.  We filed
this complaint, our initial complaint, back in
November of 2020.  As, Your Honor, knows and
heard during the status conference on Friday,
there hasn't been a motion to dismiss and there's
been issues with the waiver of service and other
things.  Defendants have simply been taking,
candidly, their sweet time in responding to that.
They could have acted more expeditiously to
present these arguments, to file a motion to
dismiss if they wanted to.  There's nothing in
the federal rules that requires them to wait for
waiver of service to file -- to actually be
served to file a motion to dismiss.

Next, as to the issue of the witnesses and
the cross-examination it is the law of this
circuit, Your Honor, *Heideman v South Salt Lake
City*, 348 F.3d, 1182 from the 10th Circuit

1    (2003), quote, "The federal rules of evidence do
2    not apply to preliminary injunction hearings,"
3    Your Honor, out quote, and that is because of the
4    expedited nature of them and the fact that this
5    is a bench trial situation.  It is not a jury.
6    And the courts and judges are sophisticated
7    enough to weed through the various issues that
8    are presented by putative hearsay and credibility
9    and the like and make their judgments as to what
10   to accept from a factual predicate in order to
11   grant or deny preliminary injunction.
12        Next, Mr. Card argued that the government is
13   saying that they're exhibitors forever.  That is
14   not correct, Your Honor.  The issue here was that
15   they were long-standing exhibitors.  They are
16   making no bones about the fact that they continue
17   to exhibit.  This was not a cessation of
18   exhibition.  This was simply a pause of their zoo
19   operations to evade government inspectors,
20   government oversight.  They continue to market
21   themselves as exhibitors on the public to raise
22   money on that basis.
23        They want to stop being exhibitors, they can
24   stop marketing themselves as exhibitors; they can
25   stop letting the public on the property,

1   including the press and television; they can stop

2   posting content on the Internet; they can stop

3   featuring themselves on television, allowing film

4   crews on the property.

5        The government's definition of exhibitor is

6   not limitless, Your Honor.  The statute itself

7   applies to the welfare of the animals, it applies

8   to those in the possession, custody, or control

9   of animals, Your Honor.  That's what all the

10  provisions go to.  It does not apply to third

11  parties, who do not actually participate in the

12  possession, custody, or control, like Netflix.

13  That is the long-standing position of the USDA

14  throughout many, many adjudications and

15  regulations over the years.

16       There is no First Amendment issue here

17  whatsoever, Your Honor.  I mean, *Golan v. Holder*,

18  609 F.3d, 1067, from the 10th Circuit (2010),

19  sets forth the standard.  This is a classic

20  regulation of conduct in commerce.  The

21  regulations here regulate the possession,

22  custody, and control of the animals.  Any impact

23  on speech here is merely incidental to that

24  regulation, Your Honor, and most importantly the

25  impact on the speech is entirely content neutral.

1    There's no regulation that derives what they can

2    say or not say.  They're not subject to legal

3    process here on the basis of what they're saying,

4    as it is content-wise.  It is the fact that they

5    are seeking to advance a financial interest in

6    commerce that they are fighting.

7         Finally, Your Honor asked about hybrids.

8    Hybrids are a listed ESA species, and here's the

9    cite for you, Your Honor:  16 U.S.C. 1532(16).

10   That's the definition of species under the

11   Endangered Species Act, which includes all

12   subspecies.  Subspecies would include, therefore,

13   any offspring of tigers from the mixing of

14   genetics with and subspecies that are created,

15   Your Honor.  That's a long-standing, at this

16   point, USDA position and ESA position.

17        Now, one further thing that Mr. Card had said

18   was there aren't anymore videos, there isn't

19   anymore public access, and nobody needs to come

20   on the property anymore, that's not happening.

21        Well, Your Honor, if that's the case, and we

22   candidly believe that the evidence is to the

23   contrary, but if it is the case, Your Honor, we

24   have a likelihood of success on the various forms

25   of exhibition that are at issue here.  Now mind

1    you again, irrelevant for the Endangered Species
2    Act.  All we need to show, and we have shown, is
3    harm and harass.  But as to the Animal Welfare
4    Act, all they've done is confirm candidly, Your
5    Honor, that there would be no equitable harm in
6    the four-factor test in terms of the balance of
7    harm to the defendants from being subjected to
8    this injunction.  They claim they're not doing it
9    anyway and they don't want to do it.  We don't
10   believe them, we think the evidence is in
11   contrary.  But that's an admission that's fatal
12   to the balance of harm's factor in the
13   preliminary injunction.
14       Unless the Court has further questions, Your
15   Honor, I think that will probably be it.
16           THE COURT:  Now, Mr. Brightbill, the
17   stipulation that was entered by the parties
18   approved by the court required the production of
19   certain records and inventory.
20       Have those documents now been provided to the
21   plaintiff?
22           MR. BRIGHTBILL:  I don't believe all
23   those of records at this time have been provided.
24   My colleague, Ms. Hollingsworth, is also here in
25   the hearing.  She wants to chime in on the

 1  specifics of that.

 2          MS. HOLLINGSWORTH:  Hello, Your Honor.

 3  Mary Hollingsworth here.  Which documents

 4  specifically?

 5          THE COURT:  Well, the stipulation

 6  entered by the parties that the court approved

 7  required that the production of certain

 8  documents.  One was, I think, the category of an

 9  inventory of animals, including the name, sex,

10  age, of each animal and then there was veterinary

11  records to be provided.  Have all of those

12  documents or any documents that were covered by

13  the stipulation been provided?

14          MS. HOLLINGSWORTH:  Yes, Your Honor.  We

15  did receive on December 16, 2020, an inventory;

16  however, we're finding some factual issues with

17  the inventory, which we need to address with

18  opposing counsel.

19      In terms of acquisition, disposition records,

20  veterinarian records, any of those business

21  records, anything that pertains to a routine

22  inspection, none of those documents have been

23  provided.

24          THE COURT:  Okay.  Well, you confer with

25  Mr. Card on that.  And, Ms. Hollingsworth, I

 1    think you're muted.

 2            MS. HOLLINGSWORTH:  It doesn't show me.

 3    Can you hear me now?

 4            THE COURT:  Yes.

 5            MS. HOLLINGSWORTH:  Okay.  Yes, I will

 6    confer with him on the inventory issue.  Thus far

 7    they have not been willing to provide us with the

 8    rest of that documentation.

 9            THE COURT:  Okay.  You confer with

10    Mr. Card on that.  If you can't come to a

11    solution, then you can bring it to my attention.

12       Mr. Card, let me give you, first of all, a

13    question and then a final opportunity to respond

14    to Mr. Brightbill's comments.

15       My first question for you is, you suggested

16    that there is a First Amendment issue with

17    respect to the claims.  Can you explain to me,

18    Mr. Card, the First Amendment issue that you

19    believe is present in this case?

20            MR. CARD:  Your Honor, according to the

21    government, they can't sell T-shirts online.

22    Regardless of whether it has to do with an animal

23    or not.  They can't talk about having animals.

24    They can't go online and show a picture of their

25    own -- let's assume for a second, that there was

1  only one animal, one tiger.  According to the
2  government, the Lowes cannot take a picture with
3  their one tiger and post it to the Internet,
4  otherwise that's exhibiting.

5      Oddly, it was said that we make no bones
6  about we continue to exhibit.  We make all the
7  bones.  That's the -- we deny whole heartily that
8  anything that we were doing right now is a
9  exhibiting under the USDA.  That is why, and that
10  is solely why, we are not subject to their
11  regulations.

12      According to the government, they can't have
13  friends over or otherwise that's exhibiting.
14  They can't have friends to their house.  They
15  can't take videos with their friends at their own
16  house, otherwise that's exhibiting.  That's the
17  First Amendment issue.  There's freedom of
18  association; there's freedom of speech,
19  there's -- the Supreme Court has recently, you
20  know, there's social media.  Supreme Court cases
21  on the First Amendment that have recently come
22  out that I would like to bear out in front of the
23  Court.

24      According to the government, I've been taking
25  my sweet time because I haven't answered before

1    the answering date.  That was the argument that I

2    just heard earlier, which I find interesting.  So

3    that's the First Amendment argument, Your Honor,

4    and I believe there was talk about other

5    documents that haven't been provided.  We

6    provided what was agreed to.

7        And I'm going through the stipulation yet

8    again, just to make sure I'm not missing

9    anything, but we've provided the inventory.

10       When we came to the agreement, we agreed

11   there would be no attending vet and they agreed

12   to that and then got mad when we didn't have one,

13   and that's just how this has gone.  This has been

14   a "gotcha" game for the government since the word

15   go.  Same with the perimeter fences.  Told them,

16   we didn't have them, they said great.  They come

17   in and they're surprised that we don't have

18   perimeter fences.  The whole thing has been a

19   "gotcha" game, and had I been actually conferred

20   and called --

21       And one thing I would like to bring up, Your

22   Honor, is this issue of we have adamantly refused

23   to show the government that we are taking care of

24   these macaques, these monkeys.  I showed the

25   court this email string, which shows the absolute

1   opposite.  What they wrote in their brief is

2   absolutely untrue, categorically.  They said we

3   believe that these macaques should be put inside

4   if it's 45 degrees or below.  I said, great.

5   We're going to do that.  They're brought inside

6   anyway at night, but we're going to do that.  No

7   questions asked.  We did that.  They said, Can

8   you show proof?  I said, Sure.  Sent them videos,

9   sent them two videos.  They acknowledged receipt.

10       Four hours later they file a motion saying we

11   refused to cooperate with the government and

12   protect these macaques.  And that's just how this

13   lawsuit has gone thus far.  This has been a

14   "gotcha" game.

15       We need a chance to actually put our defense

16   forward in the time that we are given under the

17   Federal Rules of Civil Procedure whether the

18   government thinks that's taking our sweet time or

19   not, that's what we're given under the federal

20   rules.

21       So, Your Honor, that's all I have.

22           THE COURT:  Okay.  Well, both sides will

23   have an opportunity to do whatever discovery they

24   need at the appropriate time.  We're not there

25   yet, but we're moving towards that.  Once an

1    answer or a motion is filed and we set a schedule

2    for the case, then both sides will have their

3    fair opportunity to do whatever appropriate

4    discovery needs to be done.  So we'll be getting

5    there at some point.  But right now we're just

6    addressing the issues preliminarily.

7        And, Mr. Brightbill, are you requesting to

8    file a reply brief?

9            MR. BRIGHTBILL:  Your Honor, we would be

10    happy to file a reply brief.  We do think it

11    would be very appropriate to file a reply brief

12    if the Court thinks it's necessary and helpful.

13        At the same time, we obviously filed a

14    request for a Temporary Restraining Order.  We

15    would -- that could have been granted ex parte.

16    We do believe that the circumstances here provide

17    for expedited relief.  We don't want to candidly

18    file a reply brief if it's going to slow down the

19    process and slow down the time that is going to

20    be required for us to get a decision.

21        We would, nevertheless, if the Court believes

22    that it would be helpful to have that additional

23    brief, given some of the issues that were raised

24    at midnight last night and discussed during the

25    hearing today.  I feel I tried to pivot as

1  quickly as I could and provide the court some

2  cites to respond to all of these issues, which

3  are really unfounded, Your Honor.

4      But if the Court would like a full, legal

5  brief from us on reply to address those issues in

6  writing and believes that's appropriate, we would

7  be pleased to do it, Your Honor.

8          THE COURT:  Well, Mr. Brightbill, I'm

9  not asking or requesting the government to do

10  that.  And I agree that the Court's not going to

11  wait to issue its decision in this case for a

12  brief.  If the government would like to submit a

13  reply brief, you can do so at your option, but it

14  would need to be submitted to the Court by

15  Thursday the 14th at noon, or it would likely not

16  be considered at all.

17          MR. BRIGHTBILL:  Thank you, Your Honor.

18  We'll do that.  I appreciate the clarification.

19          THE COURT:  Mr. Card, do you have

20  anything further for the Court today?

21          MR. CARD:  I don't, Your Honor.

22          THE COURT:  Okay.  Anything further on

23  behalf of the government?

24          MS. HOLLINGSWORTH:  Your Honor, if I

25  may.  This is Mary Hollingsworth for the United

States.

Regarding the Motion for Temporary Restraining Order, all of the animals that are addressed in that order are protected under the Endangered Species Act.  They are tigers.  They listed at the species level.  You don't even have to get to the exhibitor issue because under the ESA, they are protected and we have established harm and harassment under Section 9.  And opposing counsel has not mentioned they are not under the Endangered Species Act under Section 9.  There's a provision and it is possible to get a permit to be exempted from that provision; however, the defendants do not have an exemption.  So, therefore, all these activities that we've mentioned in our Temporary Restraining Order Motion are prohibited under the Endangered Species Act.  And by the way, there is no such thing as a hybrid tiger.  They are all protected.

THE COURT:  Ms. Hollingsworth, we can't hear you right now.

MS. HOLLINGSWORTH:  I'm done.  I don't know if you heard, but I was talking about the Endangered Species Act.  I don't know if you have any questions, but I'm happy to answer them.

1            THE COURT:  I do not.

2       Are the parties submitting the exhibits to

3    the court that were listed in their various

4    exhibit list?

5            MR. BRIGHTBILL:  Your Honor, I believe

6    they have been all been submitted at this point,

7    yes.

8            THE COURT:  Okay.  So I have Plaintiff's

9    exhibits.  I will receive the exhibits listed on

10   Plaintiff's exhibits list, which are Exhibit A

11   through RR, and I will receive the Defendants'

12   Exhibits, which are 1 through 11.

13           Anything further on behalf of the

14   government?

15           MS. STRIPPOLI:  Your Honor, this is

16   Briena Strippoli.

17       This is to let you know that we have filed a

18   motion to include two additional declarations

19   right at the start of the hearing.  And the

20   stipulation on hearing that we also filed

21   permitted this, that plaintiffs reserve their

22   right to file rebuttal declarations.

23           THE COURT:  Okay.  I will receive those

24   additional affidavits.  And if you want to file

25   anything in rebuttal, then the government needs

1    to do it in its brief, which will be due January

2    14th at noon.

3            MR. BRIGHTBILL:  Let me just clarify,

4    Your Honor.  So we actually filed those at the

5    beginning of the hearing.

6        The way we agreed to handle this with

7    Mr. Card was that he would file his exhibits and

8    other documents in response to our TRO after the

9    status conference on Friday, that he would file

10   those, and then we reserved the right in the

11   stipulation to respond to those before the

12   hearing.  We expected to get those before

13   midnight, Your Honor, and so we didn't.  And so

14   we scrambled this morning to try to get our

15   rebuttal declarations together and filed, and

16   they were filed directly before the hearing.

17       So the Court, I believe, already has those is

18   what Ms. Strippoli was referring to.

19       On top of that Mr. Card, I think in the

20   stipulation, indicated that he was going to

21   further reserve the right to file yet more

22   declarations and I presume that, in that

23   instance, they would be subject to the same

24   deadline that the government is subject to.

25           THE COURT:  Yes.  So I have -- I guess I

*UNITED STATES DISTRICT COURT*

1   don't have them with me because I didn't know

2   those had been filed.  So what you're telling me

3   is that there have been two additional exhibits

4   that have been submitted, and I presume those

5   will be Exhibit SS and Exhibit TT?

6           MR. BRIGHTBILL:  I believe so, yes, Your

7   Honor.

8           THE COURT:  Okay.  So that's separate

9   and apart from the brief.  I got it.

10      Mr. Card, are you asking to submit additional

11   declarations?

12          MR. CARD:  Not at this time, Your Honor.

13          THE COURT:  Okay.  Is there anything

14   further on behalf of the government?

15          MR. BRIGHTBILL:  Not at this time, Your

16   Honor.  Thank you very much for your time this

17   morning.

18          THE COURT:  Thank you.

19      Mr. Card, anything further on behalf of the

20   defendants?

21          MR. CARD:  No, sir.  Thank you.

22          THE COURT:  Okay.  Thank you very much,

23   and I just will remind you all, I know how things

24   can be, litigation can get heated, each side

25   needs to zealously advocate for their clients,

1    the court expects and understand that.

2        Do your best as an officer of the court and

3    counsel to try to set aside personal issues,

4    because that's not going to advance the case.  It

5    seems like you have been conferring much better

6    in the last few days, and I would request that

7    you continue to do so in a very professional way

8    that's most helpful to both of your clients and

9    it's the most helpful to the court.  Thank you

10   very much.  We'll be in recess.

11              (Off the record at 11:54 a.m.)

12                  *   *   *   *

13            **C E R T I F I C A T E**

14

15       I, Shelley Ottwell, Registered Professional

16   Reporter for the Eastern District of Oklahoma, do

17   hereby certify that the foregoing is a true and

18   accurate transcription of my stenographic notes

19   and is a true record of the proceedings held in

20   the above-captioned case.

21       IN WITNESS WHEREOF, I have hereunto set my

22   hand this 4th day of January, 2022.

23

24   s/Shelley Ottwell
     SHELLEY OTTWELL, RPR, CSR
25   United States Stenographer

*UNITED STATES DISTRICT COURT*